**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**Austin Division**

| | |
|---|---|
| **CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE TEXAS LLC,** ) ) ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:16-cv-1268-LY** |
| ) | |
| **PREWITT MANAGEMENT, INC., as General Partner of WAP, Ltd., a Texas Limited Partnership,** ) ) ) | |
| **Defendant.** ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

I.     INTRODUCTION ................................................................................ 1

II.    FACTUAL AND REGULATORY BACKGROUND ...................................... 3

    A.    The City Permits and The Prewitt Agreements ................................... 3

    B.    The Federal Cable Act ................................................................. 7

    C.    The Texas Cable Act and TWC's State Franchises ............................. 8

    D.    The Prewitts' Political Lobbying and Section 66.004(f) ...................... 9

III.    ARGUMENT ................................................................................. 10

    A.    The Prewitt Agreements Are Unenforceable Because the City Permits Expired, and Extending the Payment Obligation Beyond the Life of the Expired City Permits Makes the Agreements Indefinite in Duration......................................... 11

    B.    Interpreting Section 66.004(f) to Require Plaintiffs to Make Payments to Defendant Would Violate and Be Preempted by the Federal Cable Act. ............. 14

    C.    Interpreting Interpreting Section 66.004(f) Require Plaintiffs to Make Payments to Defendant Would Violate Plaintiffs' First Amendment and Equal Protection Rights. .................................................... 15

    D.    Interpreting Section 66.004(f) to Require Plaintiffs to Make Payments to Defendant Would Violate the Federal Contracts Clause. .................................... 19

    E.    Plaintiffs Are Entitled to Recover Sums Wrongfully Collected After the City Permits Expired....................................................... 20

IV.    CONCLUSION............................................................................... 21

EXHIBIT LIST ...........................................................................................

    A.    Statement of Material Undisputed Facts.........................................Ex. A

    B.    The City Permits ................................................................. Ex. B

        1.    *City of Temple Permits*.................................................Ex. B-1
        2.    *City of Waco Permit*.....................................................Ex. B-2
        3.    *City of McGregor Permits* .............................................Ex. B-3
        4.    *City of Woodway Permit* ...............................................Ex. B-4

C.      1964 Agreement.................................................................................. Ex. C

D.      1965 Instruments of Assignment and Chattel Mortgages............................... Ex. D

E.      1971 Letter From W.A. Prewitt, Jr. to Internal Revenue Service.................... Ex. E

F.      1971 Lawsuit and Settlement Agreement .............................................. Ex. F

        1.      *State Court Petition*.................................................... Ex. F-1
        2.      *1971 Settlement Agreement*.............................................. Ex. F-2
        3.      *June 1973 Assumption Agreement* .................................... Ex. F-3

G.      June 2005 Fax From Senator Troy Fraser to Buck Prewitt ............................ Ex. G

H.      Handwritten Note On SB 5 By Prewitt Lawyer John Cunningham ............... Ex. H

I.      June 2005 Fax From Prewitt Lawyer John Cunningham To Senator
        Troy Fraser's Office......................................................................... Ex. I

J.      July 21, 2005 Texas Cable Act, As First Read and Referred to Committee.....Ex. J

K.      Declaration of Gordon Harp .......................................................... Ex. K

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.M. ex rel. McAllum v. Cash*
    585 F.3d 214 (5th Cir. 2009) ............................................................................18

*ACLU v. FCC*
    823 F.2d 1554 (D.C. Cir. 1987) ...........................................................................8

*Allied Structural Steel Co. v. Spannaus*
    438 U.S. 234 (1978)..........................................................................................20

*Ark. Writers' Project, Inc. v. Ragland*
    481 U.S. 221 (1987)...........................................................................16, 17, 18

*Cable TV Fund 14-A, Ltd. v. City of Naperville*
    No. 96 C 5962, 1997 WL 433628 (N.D. Ill. Jul. 29, 1997) .....................................7

*Carey v. Brown*
    447 U.S. 455 (1980)..........................................................................................18

*Celotex Corp. v. Catrett*
    477 U.S. 317 (1986)..........................................................................................10

*City of Rockwall v. Hughes*
    246 S.W.3d 621 (Tex. 2008)..............................................................................12

*Clear Lake City Water Auth. v. Clear Lake Util. Co.*
    549 S.W.2d 385 (Tex. 1977)..............................................................................12

*Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*
    430 S.W.3d 384 (Tex. 2014)..............................................................................15

*David J. Sacks, P.C. v. Haden*
    266 S.W.3d 447 450 (Tex. 2008)........................................................................11

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*
    459 U.S. 400 (1983)....................................................................................19, 20

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*
    380 F.3d 849 (5th Cir. 2004) ......................................................................12, 13

*Gen. Motors Corp. v. Romein*
    503 U.S. 181 (1992)..........................................................................................19

*Hodges v. Delta Airlines, Inc.*
    44 F.3d 334 (5th Cir. 1995) ...............................................................................14

*Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*
No. A-08-CA-767, 2010 WL 3522312 (W.D. Tex. Sept. 8, 2010) .........................................11

*Lindquist v. City of Pasadena Texas*
669 F.3d 225 (5th Cir. 2012) ...............................................................................................18

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*
269 F.3d 494 (5th Cir. 2001) ...............................................................................................19

*Lyng v. Nw. Indian Cemetery Protective Ass'n*
485 U.S. 439 (1988)..............................................................................................................15

*McIntyre v. Ramirez*
109 S.W.3d 741 (Tex. 2003)................................................................................................12

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*
460 U.S. 575 (1983)........................................................................................................16, 18

*NJ & Assocs., Inc. v. CNA Unisource, Inc.*
No. CIVA 300CV1420H, 2001 WL 515210 (N.D. Tex. May 15, 2001) ................................13

*Oncor Elec. Delivery Co. LLC v. Dallas Area Rapid Transit*
369 S.W.3d 845 (Tex. 2012)................................................................................................13

*Six Kingdoms Enters., LLC v. City of El Paso, Tex.*
No. EP-10-CV-485-KC, 2011 WL 65864 (W.D. Tex. Jan. 10, 2011) ..................................20

*Texas Cable & Telecomms. Ass'n v. Hudson*
265 F. App'x 210 (5th Cir. 2008) ............................................................3, 11, 15, 16, 17, 18

*Trient Partners I Ltd. v. Blockbuster Entm't Corp.*
83 F.3d 704 (5th Cir. 1996) .................................................................................................12

*Turner Broad. Sys., Inc. v. F.C.C.*
512 U.S. 622 (1994)........................................................................................................15, 17

*United Healthcare Ins. Co. v. Davis*
602 F.3d 618 (5th Cir. 2010) ...............................................................................................19

*United States v. Virginia*
518 U.S. 515 (1996)..............................................................................................................17

*Wetherbe v. Smith*
593 F. App'x 323 (5th Cir. 2014) .........................................................................................16

*Wright v. Ford Motor Co.*
508 F.3d 263 (5th Cir. 2007) ...............................................................................................12

## Statutes

42 U.S.C. § 1983 ...................................................................................................15

47 U.S.C. § 521 *et seq.* ...........................................................................................7

47 U.S.C. § 522 ...................................................................................................14

47 U.S.C. § 541(a) ..............................................................................................14

47 U.S.C. § 542 ...........................................................................................8, 14, 15

47 U.S.C. § 556 ...............................................................................................8, 14

Tex. Util. Code § 51.001(b)(2) ............................................................................14

Tex. Util. Code § 66.001 .......................................................................................8

Tex. Util. Code § 66.003(a) ...............................................................................3, 9

Tex. Util. Code § 66.004(b) ..............................................................................9, 11

Tex. Util. Code § 66.0004(f) .......................................................................... Passim

Tex. Util. Code § 66.005(a) ...........................................................................9, 14, 15

## Other Authorities

1992 Cable Consumer Protection Act. Pub. L. No. 102-385, § 7 .................................14

79th Leg., 2d Sess. (Tex. 2005) .............................................................................8

*Amendments to Parts 1, 63 & 76 of the Commission's Rules*
   Report & Order, 50 Fed. Reg. 18627 (1985) ...........................................................7

Fed. R. Civ. P. 56 ...............................................................................................10

*Implementation of Section 621(a)(1) of the Cable Commc'ns Policy Act of 1984*
   *As Amended by the Cable Television Consumer Prot. & Competition Act of*
   *1992*
   Report & Order & Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101
   (2007), *aff'd sub nom. Alliance for Cmty. Media v. FCC*, 529 F.3d 763 (6th
   Cir. 2008), *cert. den'd*, 129 S. Ct. 2821 (2009) ....................................................8

*Implementation of Section 621(a)(1) of the Cable Commc'ns Policy Act of 1984*
   *As Amended by the Cable Television Consumer Prot. & Competition Act of*
   *1992*
   Second Report & Order, 22 FCC Rcd 19633 (2007) ..................................................8

Tex. Const. Article 1, § 16...................................................................................................16

Tex. Const. Article I, § 18....................................................................................................15

U.S. Const. Amendment I.....................................................................................................15

U.S. Const. Article I, § 9, cl. 3.............................................................................................16

U.S. Const. Article I, § 10.....................................................................................................19

U.S. Const. Article VI, cl. 2..................................................................................................14

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiffs Charter Communications, Inc. ("Charter") and Time Warner Cable Texas LLC ("TWC") hereby move for summary judgment on as to all Claims stated in their First Amended Complaint (ECF 24).

## I.   **INTRODUCTION**

Over 50 years ago, a prominent and politically-connected Texan used his influence to obtain permits giving him exclusive franchise authority to construct and operate cable systems in the public rights-of-way in several Texas cities.  He then sold those exclusive franchise rights for a profitable income stream to the company that actually constructed and operated the cable systems for those cities.  Today, the successor in interest to the seller of the local permits claims entitlement to continue receiving payments, perpetually, that have grown to exceed two million dollars annually, even though the local permits have expired, the cable systems for the cities are now franchised by the state under non-exclusive "state-issued certificates of franchise authority" ("SICFAs"), and the regulatory system now is designed to encourage competition.  This demand for perpetual payments for the now-expired local permits is at the heart of this dispute. Unfortunately for the Defendant, this is not a road that "goes on forever [where] the party never ends";[1] their perpetual payment demand is controlled by two plain and unambiguous agreements, which clearly provide that the obligation to pay for the franchise rights obtained under the local permits ended when the local permits expired.  And any construction of state law that would purport to keep these payment obligations in force would violate federal and constitutional law.

W.A. Prewitt, Jr. obtained the local permits from the Texas cities of Temple, McGregor, Waco, Bellmead, Woodway, and Beverly Hills beginning in 1963.  Those local permits and their subsequent renewals (the "City Permits") granted exclusive franchises to construct and operate

---

[1] Song by Houston country singer Robert Earl Keen, *The Road Goes On Forever*, released 1989.

cable systems in the cities' rights-of-way.  In exchange for Mr. Prewitt's agreement to assign these City Permits and their exclusive franchise rights, Plaintiffs' predecessor agreed to pay Mr. Prewitt three percent of its gross revenue earned through operation of the systems operated under the City Permits.  Under the agreements, entered into in 1964 and 1971 (collectively, the "Prewitt Agreements"), the parties expressly limited the payment obligation to the life of the City Permits.  This made perfect sense.  At the time the parties entered into the Prewitt Agreements, the cities were the only permit-issuing authorities, and the exclusive franchise rights granted by the permits were quite valuable.

That changed in 2005, when the Texas Legislature enacted Senate Bill 5 ("SB 5" or the "Texas Cable Act").  The Texas Cable Act revoked local authority to issue cable franchises and vested that authority exclusively with the state.  Anxious to preserve their lucrative income stream from the expiring City Permits, Mr. Prewitt's successors in interest (the "Prewitts") successfully lobbied SB 5's author, Senator Troy Fraser, to include Section 66.004(f)—a provision the Prewitts assert allows them to continue collecting payments under the prior City Permits.  But because the City Permits have expired (either by their own terms or when Plaintiffs obtained state-issued franchises), the Prewitt Agreements and their payment obligations have expired with them.  The Prewitt Agreements are now void and unenforceable as a matter of law.

The Prewitts' theory that Section 66.004(f) conditions the issuance of a state-issued franchise on Plaintiffs' compliance with a perpetual payment obligation under the expired Prewitt Agreements is also unsustainable in view of preemptive federal law and the U.S. and Texas Constitutions.  The Prewitts' position that Section 66.004(f) requires Plaintiffs to make payments under the Prewitt Agreements, in addition to a five percent franchise fee to the cities, conflicts with, and would be preempted by, the federal Cable Act's five percent cap on franchise fees.  And

the Court should similarly decline to interpret Section 66.004(f) in a manner that would impose special burdens on Plaintiffs, simply because a predecessor in interest held a prior local franchise assigned to it by the Prewitts, but not on other holders of state-issued franchises (including new entrants), because that reading would abridge Plaintiffs' free speech and equal protection rights under the U.S. and Texas Constitutions.  The Prewitts' proffered interpretation of Section 66.004(f) similarly runs afoul of the federal Constitution's Contracts Clause.

## II.      FACTUAL AND REGULATORY BACKGROUND

There is no genuine issue as to any fact material to this motion, and Plaintiffs are entitled to judgment as a matter of law on all of their claims.

## A.      THE CITY PERMITS AND THE PREWITT AGREEMENTS

When cable operators entered the Texas market decades ago, they had to seek permission of municipalities before occupying public rights-of-way.  *Texas Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 212 (5th Cir. 2008).  This permission took the form of "franchise agreements" or permits with the municipalities.  *Id.*  In 1963 and 1964, W.A. Prewitt, Jr.—the predecessor in interest to WAP, Ltd.—obtained initial municipal permits from the Texas cities of Temple, Waco, and McGregor, giving him exclusive authority to construct, maintain, and operate community antenna systems (cable systems) in those cities.  Statement of Material Undisputed Facts ("SMF") (Ex. A) ¶¶ 9-11; Ex. B.  These permits had 20-year terms.  *See, e.g.*, Ex. B § 9.  Each permit was subsequently renewed for a specified term of years.  SMF ¶¶ 9, 26.[2]

*The 1964 Agreement.*  On March 12, 1964, Mr. Prewitt entered an agreement with Ameco, Inc., TWC's predecessor, providing for Ameco to assume the obligation to construct and

---

[2] The most recent renewal was the McGregor permit in December 2003, which provided that the local franchise was for a 10-year term and would expire "on February 12, 2014 unless renewed, revoked or terminated sooner."  Ex. B-3 at 000820.  The local franchise in McGregor could not have been renewed in 2014 because the Texas Cable Act was then in effect and prohibited new or renewed local franchises.  *See* Tex. Util. Code § 66.003(a).

operate cable systems in Waco, Temple, and McGregor.  Ex. C.  The 1964 Agreement granted Ameco an option to acquire the permits for the three cities outright in exchange for payments of three percent of the gross revenues generated annually from the operation of the cable systems. *Id.* at 4-5 § 2(b).  These payments were to continue "during the life of each [ ] assigned permit and amendments thereto," including "any holding over thereunder, renewals or extensions thereof."  *Id.*  The 1964 Agreement specifically provided: "[t]he obligations to make [the three percent] payments . . . shall run with the [city] permits."  *Id.* at 5.

The parties recognized that the three percent payment was required, in part, for the exclusivity the permits gave Ameco to operate in the cities.  The 1964 Agreement provided that if Ameco exercised its option to acquire the permits, and one of the cities issued an additional permit to a third party who started operations in the city, then the obligation to pay Mr. Prewitt would "terminate."  *Id.* at 7-8 § 2(e).

The parties also recognized that the "permits" covered by the 1964 Agreement were "city permits" granted by local franchise authorities.  The 1964 Agreement, for example, used the terms "the permits" and "the city permits" to mean the local "permits from the cities."  *Id.* at 4 § 1(d). And the parties agreed that "Ameco is familiar with the terms and status of the *city permits* now held by Prewitt," *id.* at 10 § 6 (emphasis added), including the requirement to pay sums "called for by the permits" to the "granting cities," *id.* at 3 § 1(c).  The 1964 Agreement further described Ameco's "option to purchase *such city permits*," *id.* at 4 § 2 (emphasis added), and Mr. Prewitt's obligation to "take all steps necessary to cause the *city permits* to be assigned . . ." to Ameco, *id.* at 7 § 2(d) (emphasis added).  Mr. Prewitt had no other obligations under the 1964 Agreement, and specifically disclaimed "the responsibility of causing the [Ameco entities] to carry out any of

their obligations" set forth in the permits, including requirements for building and operating the cable systems. *Id*. at 2 § 1.

The parties agreed that, once Ameco exercised the option, all "facilities (including but not limited to property and equipment) . . . shall be and remain the property of . . . Ameco and its assigns." *Id*. at 4 § 1(d). Ameco did exercise its option to purchase the city permits from Mr. Prewitt shortly after the 1964 Agreement. SMF ¶ 15; Ex. E at DEF354. In a letter sent to the Internal Revenue Service, Mr. Prewitt confirmed under oath that upon selling the permits, he "relinquished all incidents of ownership" and that "payments based on future revenues derived from the systems utilizing the permits [did] not constitute the retention of an economic interest in the property sold." *Id*. at DEF355; SMF ¶¶ 21-22.

*1965 Instruments of Assignment and Chattel Mortgages*. In March 1965, Mr. Prewitt and Ameco agreed to instruments of assignment, by which Mr. Prewitt transferred and assigned the city permits for Waco, Temple, and McGregor to Ameco. SMF ¶ 16; Ex. D at DEF29-44. As with the 1964 Agreement, the Instruments of Assignment applied only to the locally-issued city permits. *See id*. at DEF29 (referencing the "permit" granted to Mr. Prewitt by Waco); *id*. at DEF35 (same for Temple); *id*. at DEF40 (same for McGregor). The same was true in three "chattel mortgages" Ameco executed that year in favor of Mr. Prewitt, each of which applied only to the locally-issued city "permits." *Id*. at DEF45 (describing "[t]hat certain permit" issued to Mr. Prewitt by Waco); *id*. at DEF55 (same for Temple); *id*. at DEF65 (same for McGregor). Both the Instruments of Assignment and Chattel Mortgages contemplated a reversion of the city permits—and nothing more—to Mr. Prewitt in the event of a breach or default.[3]

---

[3] The Instrument of Assignment for Waco, for example, stated that "upon the breach of any such obligations by assignee, this instrument shall be of no further force or effect and *such permit* shall automatically revert to W. A. PREWITT, JR., his heirs, executors, administrators and assigns." Ex. D at DEF32 (emphasis added). Similarly, the Chattel Mortgage for the Temple permit provided that, in the event of default, the secured party will "take all steps

***1966 City Permits.***  In January and February 1966, the Texas cities of Bellmead, Beverly

Hills, and Woodway issued local permits to T.V. Cable, Inc. of Waco ("Waco TV")—an Ameco-

controlled entity—each of which had a 20-year term.  SMF ¶¶ 18-19; *see, e.g.*, Ex. B at DEF766

§ 9.  Each of these permits subsequently was renewed for a specified term of years.  SMF ¶ 18.

***The 1971 Settlement Agreement.***  In 1971, Mr. Prewitt sued the Ameco entities in the

District Court of Bell County, Texas.  *Id.* ¶ 23.  In his petition, Mr. Prewitt alleged breaches of the

1965 chattel mortgages attached to "the permits from the cities."  Ex. F-1 at DEF267.  Mr. Prewitt

sought damages for "many thousands of dollars" and a finding that the city permits "ha[d]

reverted to Plaintiff or in the alternative for reversion of same to Plaintiff."  *Id.*

On August 16, 1971, the parties to the lawsuit entered into a settlement agreement

confirming that the Ameco entities owned the city permits from Beverly Hills, Bellmead, and

Woodway.  In exchange, the Ameco entities agreed to pay Mr. Prewitt and his heirs three percent

of the gross revenues generated from the operation of the systems in those cities "during the life

of such permits and amendments thereto."  Ex. F-2 at 4-5.  The 1971 Agreement also provided

that the payment obligation "shall run with the respective permits" and shall remain in full force

and effect "as written."  *Id.* at 6, 3.  Further, any new permits "granted by either Woodway,

Bellmead or Beverly Hills . . . shall be conclusively treated and considered as a renewal of the

existing permit."  *Id.* at 5-6.  The Agreement did *not* extend or apply to new permits issued by any

franchising authority other than the cities, because the permits at issue were "the permits of the

Cities of Woodway, Bellmead and Beverly Hills [as] referred to herein."  *Id.* at 8, 6.

And similar to the 1965 Instruments of Assignment, the 1971 Agreement provided that

Mr. Prewitt's only remedy for any failure to make payment on a given permit was that the

---

necessary to cause *the permit in question* to be transferred back to the mortgagee."  *Id.* at DEF45 (emphasis added);
*see also id.* at DEF38, DEF43, DEF45, DEF55, DEF65.  This was a valuable remedy at the time in light of the
exclusive franchise rights granted by the original City Permits.

"instrument shall be of no further force or effect and *such permit* shall automatically revert" to Mr. Prewitt, his heirs, successors and assigns. *Id*. at 7 (emphasis added).[4]

Pursuant to the Prewitt Agreements, and for over five decades, Plaintiffs' and their predecessors paid tens of millions of dollars in fees to Mr. Prewitt and the Prewitts from the operation of Plaintiffs' cable systems in the six Texas cities. Just from October 2005 through July 2016, Plaintiffs and their predecessors paid nearly $17 million to the Prewitts. SMF ¶¶ 20 & 39, Ex. A-1. After Charter become the parent company of TWC in 2016, it obtained complete copies of the Prewitt Agreements and stopped making payments in October 2016. SMF ¶ 52; Declaration of Gordon Harp, Ex. K ¶ 4.

## B.     THE FEDERAL CABLE ACT

The federal Cable Communications Policy Act of 1984 ("Cable Act") establishes a national framework for regulation of cable operators. 47 U.S.C. § 521 *et seq.* Congress enacted the Cable Act to "promote competition in cable communications and minimize unnecessary regulation that would impose an undue economic burden on cable systems." *Id*. § 521.

The Cable Act authorizes a "franchising authority"—defined as "any governmental entity empowered by Federal, State, or local law to grant a franchise"—to impose on cable operators a franchise fee not to exceed five percent of the operator's gross revenues from cable service. *Id*. §§ 522(10) & 542(b).[5] A "franchise fee" is defined to "include[] any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental authority on a cable

---

[4] In a June 1973 "Assumption Agreement," the municipal permits for Waco, Temple, and McGregor, and the arising obligations to Mr. Prewitt were transferred and assigned from Daniels Properties, Inc. d/b/a/ Cable Vision to Cablevision Investors, Inc. Ex. F-3. The Assumption Agreement described the 1971 Settlement Agreement as having "amended and revised" the 1964 Agreement and the "various instruments given and executed in connection therewith." *Id.* at 1.

[5] A cable operator cannot waive the Cable Act's franchise fee cap, because its purpose is to protect consumers. *See Amendments to Parts 1, 63 & 76 of the Commission's Rules*, Report & Order, 50 Fed. Reg. 18627, 18655 (1985); *Cable TV Fund 14-A, Ltd. v. City of Naperville*, No. 96 C 5962, 1997 WL 433628, at *24-25 (N.D. Ill. Jul. 29, 1997) ("[T]he five percent cap on franchise fees . . . may not be waived.").

operator . . . solely because of their status as such." *Id.* § 542(g)(1).  The Cable Act's franchise fee cap preempts inconsistent state or local laws, establishing "a uniform federal standard for franchise fees." *ACLU v. FCC*, 823 F.2d 1554, 1574 (D.C. Cir. 1987); *see also* 47 U.S.C. § 556(c) ("[A]ny provision of law of any State, political subdivision, or agency thereof, or franchising authority, or any provision of any franchise granted by such authority, which is inconsistent with this chapter shall be deemed to be preempted and superseded.").  Thus, when a state, city, or other governmental authority (individually or collectively) charges a cable operator the maximum franchise fee, any additional compensation the government requires the operator to pay would be preempted as an excessive and unlawful franchise fee. *Id.* § 542.[6]

## C.   THE TEXAS CABLE ACT AND TWC'S STATE FRANCHISES

On July 21, 2005, then-Senator Fraser introduced SB 5, an "Act Relating to Furthering Competition in the Communications Industry."   SMF ¶ 34.   Recognizing the need to spur deployment of advanced communications services to consumers by ensuring providers could compete on a level regulatory playing field, the Texas legislature adopted, and the governor signed, the Texas Cable Act that year. *See id.* ¶ 38-39; S.B. 5, 79th Leg., 2d Sess. (Tex. 2005).

The Texas Cable Act moved the authority for the issuance of cable television franchises from municipal to state control by designating the Texas Public Utility Commission ("PUC") as the issuing authority for SICFAs.  Tex. Util. Code § 66.001.  The PUC must grant franchises for requested areas to applicants that satisfy basic requirements. *Id.* § 66.003.  Under the state-issued franchise regime, municipal franchises are permitted only "until the franchise agreement

---

[6] *See Implementation of Section 621(a)(1) of the Cable Commc'ns Policy Act of 1984 As Amended by the Cable Television Consumer Prot. & Competition Act of 1992*, Report & Order & Further Notice of Proposed Rulemaking, 22 FCC Rcd 5101, 5147-5149 ¶¶ 96, 99-108 (2007), *aff'd sub nom. Alliance for Cmty. Media v. FCC*, 529 F.3d 763 (6th Cir. 2008), *cert. den'd*, 129 S. Ct. 2821 (2009); *Implementation of Section 621(a)(1) of the Cable Commc'ns Policy Act of 1984 As Amended by the Cable Television Consumer Prot. & Competition Act of 1992*, Second Report & Order, 22 FCC Rcd 19633, 19638, ¶¶ 10-11 (2007).

is terminated under Section 66.004 or until the franchise agreement expires." *Id.* § 66.003(a).  A municipal franchise terminates "on the date the commission issues the state-issued certificate of franchise authority." *Id.* § 66.004(b).  When a cable operator obtains a SICFA, its franchise fee obligations under previous municipal agreements also end, and it is instead required to pay each city in which it provides service a franchise fee of five percent of gross revenues—the maximum allowed under federal law.  *Id.* § 66.005(a).

Between 2006 and 2011, TWC applied for and obtained SICFAs that replaced the City Permits at issue in the Prewitt Agreements.  SMF ¶¶ 40-41, 44-49.[7]  Since obtaining SICFAs, Charter or its predecessors have paid Temple, Waco, McGregor, Bellmead, Woodway, and Beverly Hills the statutory maximum five percent franchise fee.  Ex. K ¶ 6.

## D.   THE PREWITTS' POLITICAL LOBBYING AND SECTION 66.004(f)

The Prewitts sought to ensure their lucrative revenue stream was not threatened by the Texas Cable Act.  Prior to its enactment, the Prewitts retained John Cunningham, then a lawyer at Naman, Howell, Smith & Lee, LLP, to lobby Senator Fraser regarding the wording of his soon-to-be-introduced bill.  SMF ¶¶ 30-31.  On June 23, 2005, Senator Fraser's office faxed W.A. "Buck" Prewitt, III (Mr. Prewitt's son) a "first draft" of Section 66.004, which notably *did not* include the language for what would become Section 66.004(f).  *See* Ex. G.  Cunningham recognized a "*Potential risk to Prewitt Family*" because, "as local franch[ises] expire," they will "all go to state system."  Ex. H (emphasis added).  So on June 24, 2005, Cunningham faxed Buck and Janice Steffes (Senator Fraser's Chief of Staff) a memorandum and "proposed addition" to Section 66.004, intended to protect the Prewitts' purported "contractual rights with respect to local franchises" and their "private property rights."  SMF ¶¶ 32-33; Ex. I.  Senator

---

[7] The SICFAs were issued on the following dates covering the following service areas: Temple (02/16/2006); Bellmead (03/31/2006); Beverly Hills (05/15/2006); Waco (08/21/2006); McGregor (12/20/2011); and Woodway (12/20/2011). SMF ¶ 40.

Fraser adopted nearly verbatim the language proposed by Cunningham when he introduced Section 66.004(f) a month later in SB 5. *See* Ex. J at 25-26.

As codified, Section 66.004(f) provides that the Texas Cable Act is not intended to "adversely affect in any way the contractual rights, duties, and obligations incurred by a [cable operator] . . . before the date a franchise expires," including "those obligations measured by and related to the gross revenue hereafter received by the holder of a [SICFA]." Tex. Util. Code § 66.0004(f). This would include the right of a cable operator to stop making payments after the date a local permit expired. But also under subsection (f), any contractual rights or obligations in effect on September 1, 2005, "shall continue in full force and effect, without the necessity for renewal, extension, or continuance . . . as though the revenue generated by the holder of a [SICFA] continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority." Section 66.004(f) also purports to make it a precondition to the issuance or renewal of a SICFA "that the private contractual rights and obligations herein described continue to be honored . . . to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such [SICFA] and any renewals or extensions thereof." *Id.*

Plaintiffs are currently unaware of any other holder of a SICFA making regular monetary payments to private entities in Texas pursuant to Section 66.004(f). Ex. K ¶ 5.

## III.   **ARGUMENT**

Plaintiffs are entitled to judgment as a matter of law on all of their claims because there are no genuine disputes over any facts material to this motion. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).[8]

---

[8] Should the Court deem WAP, Ltd. the proper defendant, WAP still should be bound with equal force to the outcome of this Motion because it has at all times had notice of the claims against it, and its exclusive and

**A.**   **THE PREWITT AGREEMENTS ARE UNENFORCEABLE BECAUSE THE CITY PERMITS EXPIRED, AND EXTENDING THE PAYMENT OBLIGATION BEYOND THE LIFE OF THE EXPIRED CITY PERMITS MAKES THE AGREEMENTS INDEFINITE IN DURATION.**

As an initial matter, the terms of the Prewitt Agreements are plain and unambiguous and thus should be interpreted only on their face. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports.").

By their terms, the Prewitt Agreements transferred the City Permits to Plaintiffs' predecessors in exchange for three percent royalty payments to be made only "during the life of the permits." Ex. C at 5 § 2(b); Ex. F-2 at 5. Because the payment obligation arises solely from the assignment of "city permits," it extends only so far as those permits continue to exist, based on the cities' authority to issue new, renewed, or extended permits. Ex. C at 4 § 1(d), 7 § 2, & 10 § 6; Ex. F-2 at 6, 8. To be sure, the obligation to pay the Prewitts was to "run with the permits," and only the permits. Ex. C at 5 § 2(b); *see also* Ex. F-2 at 6.

The City Permits no longer exist. They expired either by their own terms or when TWC obtained SICFAs between 2006 and 2011 covering Temple, Waco, McGregor, Woodway, Bellmead, and Beverly Hills (*supra* note 7). *See* SMF ¶ 41; Tex. Util. Code § 66.004(b); *Hudson*, 667 F.3d at 642 ("[T]he text of S.B. 5 casts to the wayside the agreements of most municipalities in Texas."). Because the payment obligation under the Prewitt Agreements was expressly tied to the "life of the permits," that obligation expired with the expiration of the City Permits. *See Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*, No. A-08-

authorized agent, Prewitt Management, Inc., has appeared on its behalf and affirmatively invoked the Court's jurisdiction seeking relief on counterclaims belonging to WAP. *See* Def's. Second Am. Countercls., ECF 33.

CA-767, 2010 WL 3522312, at *13 (W.D. Tex. Sept. 8, 2010) ("[W]hen a contract is limited by a recognized contingency or an event of limited duration, then it is reasonable for a court to look to that contingency or event to imply a term for the contract.").[9]

The Court should consider "the consequences of a particular construction" when interpreting the effect of the Texas Cable Act.  *See McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003) (citing Tex. Gov't Code § 311.023(5)); *cf. Wright v. Ford Motor Co.*, 508 F.3d 263, 269 (5th Cir. 2007) ("When we interpret a Texas statute, we follow the same rules of construction that a Texas court would apply.").  That private obligations tied to city permits end when those city permits expire is a logical and commonsense consequence.  But reading the Texas Cable Act in any way that would extend the Prewitt Agreements beyond the expiration of the City Permits is unnecessary, avoidable, and "would lead to absurd results" for multiple reasons.  *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008).

***First***, "[u]nder Texas law, when a contract contemplate[s] continuing performance (or successive performances) and . . . [is] indefinite in duration, it may be terminated at the will of either party."  *Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 856 (5th Cir. 2004) (quotations & citations omitted); *Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 391 (Tex. 1977).  The Fifth Circuit "does not favor perpetual contracts and presumes that [any such] contract is terminable at will."  *Trient Partners I Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704, 708 (5th Cir. 1996) (citations omitted).

Thus, if the Prewitt Agreements could be interpreted as continuing beyond the expiration of the City Permits, then the Agreements must be interpreted as being indefinite in duration and,

---

[9] The SICFAs cannot be interpreted as renewed, amended, or extended "permits" referred to or defined in the Prewitt Agreements because they are issued by the state—an entirely different franchising authority, rather than cities, and the agreements themselves referred only to the cities as granting authorities.  Nor, for that reason, can the SICFAs be regarded under the plain language of the Prewitt Agreements as "new permit[s] that would be treated as "renewal[s] of the existing permits."  *See* Ex. C at 5 § 2(b); Ex. F-2 at 5-6.

as such, terminable at will by either party.  *See, e.g.*, *Flourine*, 380 F.3d at 857 (agreement granting plaintiff an exclusive license in return for royalty payments held indefinite and terminable); *NJ & Assocs., Inc. v. CNA Unisource, Inc.*, No. CIVA 300CV1420H, 2001 WL 515210, at *2-7 (N.D. Tex. May 15, 2001) (holding contract, which was "continuous from its effective date until terminated as set forth hereinafter," was terminable at will and no longer in force).  This interpretation is necessary to avoid a construction of Section 66.004(f) that yields an inherently contradictory and absurd result.  The Texas Cable Act expressly states that it was not intended to "adversely affect" cable operators' contractual rights and obligations incurred "before the date a franchise expired."  Tex. Util. Code § 66.004(f).  That includes Plaintiffs' right to stop paying the Prewitts when the City Permits expired, with the only consequence being a reversion of the expired and now-worthless local permits.  But Plaintiffs' contractual rights to cancel the Prewitt Agreements by choosing not to renew or extend the expired City Permits plainly would be adversely affected (in fact, entirely denied) if subsection (f) truly meant that the Prewitt Agreements "shall continue in full force and effect, without the necessity for renewal, extension, or continuance."  *Id.*  The effect would be to extend Plaintiffs' payment obligation beyond the life of the only thing the Plaintiffs contracted to pay for—the City Permits.  *See, e.g.*, *Oncor Elec. Delivery Co. LLC v. Dallas Area Rapid Transit*, 369 S.W.3d 845, 851 (Tex. 2012) (declining to interpret one part of a Texas Utilities Code provision that "would swallow the rest of the provision, denying it effect").

**Second**, the expressed predicate of the Prewitt Agreements and the underlying City Permits was granting an exclusive franchise to Plaintiffs' predecessors for a set time.  *See* Ex. B at 7-8 § 2(e).  The Prewitts admit the City Permits were "exclusive permits" and "the parties to the agreements clearly contemplated that the purchase price being paid [was] for the assignment

of the exclusive permits."  Def's. Second Am. Countercls., ECF 33 ¶ 73; *see also* SMF ¶¶ 10-11.[10]  Yet the purpose of the Texas Cable Act, as gleaned from its title, was entirely opposite: "Furthering Competition in the Communications Industry."  And "[i]t is the policy of [Texas] to . . . encourage a fully competitive telecommunications marketplace . . . ."  *See* Tex. Util. Code § 51.001(b)(2).  When Texas moved to a state-issued franchising system, any consideration Mr. Prewitt had provided under the Prewitt Agreements disappeared.

Plaintiffs therefore are entitled to a judgment declaring that the City Permits have expired and that the Prewitt Agreements and any underlying payment obligations expired with them or were terminable at will and have been terminated (Plaintiffs' First and Third Claims for Relief).

## B. INTERPRETING SECTION 66.004(f) TO REQUIRE PLAINTIFFS TO MAKE PAYMENTS TO DEFENDANT WOULD VIOLATE AND BE PREEMPTED BY THE FEDERAL CABLE ACT.

The Supremacy Clause mandates that federal law preempts state and local laws that "interfere with, or are contrary to," federal law.  U.S. Const. art. VI, cl. 2.  Federal statutes preempt state law where, among other things, "Congress expressly preempts state law."  *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 n.1 (5th Cir. 1995); *see also* 47 U.S.C. § 556(c).

The federal Cable Act caps franchise fees imposed on cable operators at five percent of gross revenues from cable service.  47 U.S.C. §§ 542(b) & 522(10).  Under its SICFAs, and pursuant to the Texas Cable Act, TWC already pays the statutory maximum franchise fee of five percent to each of the cities in which it operates.  Tex. Util. Code § 66.005(a); Ex. K ¶ 6.

If, however, as a state-imposed "condition to the issuance and continuance of a [SICFA]," Tex. Util. Code § 66.004(f), Plaintiffs were obligated to continue paying the Prewitts

---

[10] Such "exclusive franchise[s]" were later prohibited by federal law under the 1992 Cable Consumer Protection Act.  Pub. L. No. 102-385, § 7, 106 Stat. 1460 (1992) (codified at 47 U.S.C. § 541(a)(1)).

an additional three percent fee, in perpetuity, in order to provide cable service in the cities (beyond the expiration of the City Permits), such a statutory mandate necessarily would be preempted as an excessive and unlawful franchise fee under federal law.  *See* 47 U.S.C. §§ 542(g)(1) ("franchise fee" includes a "fee" or "assessment of any kind imposed by a franchising authority or . . . governmental entity on a cable operator") & 556(c).  The Court should avoid an interpretation of the Texas Cable Act—incorrect and nonsensical in its own right—that puts the statute in the preemption crosshairs of the federal Cable Act.[11]  Plaintiffs thus are entitled to summary judgment on their Third Claim for Relief.

**C.   INTERPRETING SECTION 66.004(f) TO REQUIRE PLAINTIFFS TO MAKE PAYMENTS TO DEFENDANT WOULD VIOLATE PLAINTIFFS' FIRST AMENDMENT AND EQUAL PROTECTION RIGHTS.**

Applying Section 66.004(f) to perpetuate the Prewitt Agreements' payment obligations as a condition to the issuance of SICFAs also would abridge Plaintiffs' rights under the free speech and equal protection clauses of the U.S. and Texas Constitution.  *See* U.S. Const. amend. I; Tex. Const. art. I, § 18; 42 U.S.C. § 1983.[12]

*Free Speech.*  "There can be no disagreement on an initial premise: Cable programmers and cable operators [such as Charter] engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment."  *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994); *see also Hudson*, 667 F.3d at 634.  Laws that "single out the press, or certain elements thereof for special treatment . . . are always subject to at least some degree of heightened First Amendment scrutiny."  *Turner*, 512 U.S. at 640-41 (internal

---

[11] This interpretation would also put Section 66.004(f) at odds with the Texas Cable Act's own five percent cap.  *See* Tex. Util. Code § 66.005(a); *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) (stating courts "must not interpret [a] statute in a manner that renders any part of the statute meaningless or superfluous").

[12] Of course, courts typically "avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988).

quotations omitted); *see also Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228-29 (1987) (applying strict scrutiny to state sales tax even "where . . . there [was] no evidence of an improper censorial motive"); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 591-92 (1983) (applying strict scrutiny to state tax targeting a small number of publishers because the tax "resemble[d] more a penalty for a few of the largest newspapers"). "[A] law may target a small number of speakers without expressly identifying those singled out. Rather, legislation 'targets a small group' by structuring its burdens in a way that apply to the few." *Hudson*, 667 F.3d at 640 n.13 (quoting *Minneapolis Star*, 460 U.S. at 591).[13]

Here, Section 66.004(f) is not a law of general applicability and would be subject to strict scrutiny if it were interpreted to operate as the Prewitts suggest. Under their construction, the provision would mandate disparate treatment of, on the one hand, incumbent cable operators (such as Plaintiffs) burdened by "contractual rights, duties, and obligations" stemming from prior municipal franchises, and on the other hand, new-entrant cable operators that never held municipal franchises before Texas moved to the state-issued franchising system. *See* Tex. Util. Code § 66.004(f); *Hudson*, 667 F.3d at 638-41 (applying strict scrutiny to other provisions of the Texas Cable Act that limited the ability of only certain incumbent cable operators to obtain SICFAs). The communications between the Prewitts' attorney and Senator Fraser (the authors of Section 66.004(f)), would further suggest the section was laser-focused to burden the Plaintiffs for the benefit of the Prewitts. *See* Exhs. G & I.[14]

---

[13] The Texas Constitution's free-speech protections "can be more extensive than the First Amendment's protections," *Wetherbe v. Smith*, 593 F. App'x 323, 329 (5th Cir. 2014), but Plaintiffs do not contend they are different for the purposes of this case.

[14] This evidence also raises the specter of Section 66.004(f) being, in essence, an unconstitutional bill of attainder. *See* U.S. Const. art. I, § 9, cl. 3; Tex. Const. art. 1, § 16.

Applying strict scrutiny, Section 66.004(f) would violate the First Amendment if the Prewitts' interpretation were adopted, because the state has not shown that the section's discrimination against a small and identifiable number of cable operators "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project*, 481 U.S. at 231.  To be sure, when the Texas PUC was a defendant, it in effect argued it had no interest whatsoever in enforcing Section 66.004(f) because the provision was directed to the relationships between private parties.  *See* ECF 12 at 10-13, 15.

Even applying intermediate scrutiny, a broad reading of Section 66.004(f) to protect the Prewitt revenue stream would not survive.  A statutory provision can only withstand intermediate scrutiny if "it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  *Turner*, 512 U.S. at 662 (quotation omitted); *see also United States v. Virginia*, 518 U.S. 515, 533 (1996) (holding purported justification "must be genuine, not hypothesized or invented *post hac* in response to litigation").

Again, the state here has not put forth any substantial governmental interest for an interpretation of Section 66.004(f) that would burden the speech of only a handful of communications providers, let alone one that is no greater than necessary.  To the contrary, the stated purpose of the Texas Cable Act was to promote competition in the communications industry, and a reading of Section 66.004(f) that would shackle Plaintiffs with perpetual payments based on expired City Permits would contravene that purpose.  In *Hudson*, the Fifth Circuit recognized that "[t]he advantages of a statewide franchise explain why the state created this pro-competition benefit, but they do not justify the exclusion of other speakers from that

same benefit."  667 F.3d at 641.  Similarly, there is no justification for placing special burdens on only a subset of speakers (if not only Plaintiffs) who have obtained the advantages of a state-issued franchise by forcing them to make ongoing payments to third-parties under expired obligations.  *See* Ex. K  ¶¶ 7-8.  Thus, even under intermediate scrutiny, the Prewitt's interpretation of Section 66.004(f) would not pass constitutional muster.

Accordingly, the Court should decline the Prewitts' invitation to interpret Section 66.004(f) in a manner that would make it unconstitutional.  *See Ark Writers' Project*, 481 U.S. at 228-229; *Minneapolis Star*, 460 U.S. at 591-92; *Hudson*, 667 F.3d at 641.

**Equal Protection.** For the same reasons that Section 66.004(f) would violate Charter's free speech rights under the Prewitts' construction, it also would violate Charter's equal protection rights under the U.S. and Texas Constitutions.  "Under the equal protection clause, strict scrutiny applies to classifications that infringe on a fundamental right . . . such as the right to free speech."  *A.M. ex rel. McAllum v. Cash*, 585 F.3d 214, 226 (5th Cir. 2009).  "When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."  *Carey v. Brown*, 447 U.S. 455, 461-62 (1980).[15]  Because the Prewitts' interpretation of Section 66.004(f) would distinguish among cable operators without a substantial state interest, and would not be finely tailored in any event, it would render the provision unconstitutional.  Accordingly, Plaintiffs are entitled to summary judgment on their Fourth Claim for Relief.

---

[15] The same "federal analytical approach applies to equal protection challenges under the Texas Constitution." *Lindquist v. City of Pasadena Texas*, 669 F.3d 225, 233 (5th Cir. 2012) (quoting *Bell v. Low Income Women of Tex.*, 95 S.W.3d 253, 266 (Tex. 2002)).

**D.   INTERPRETING SECTION 66.004(f) TO REQUIRE PLAINTIFFS TO MAKE PAYMENTS TO DEFENDANT WOULD VIOLATE THE FEDERAL CONTRACTS CLAUSE.**

The Federal Contracts clause prohibits states from passing any law that "impair[s] the Obligation of Contracts."  U.S. Const. art. I, § 10.  To succeed under the Contracts Clause, a plaintiff need only show that a "change in state law has operated as a substantial impairment of a contractual relationship."  *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quotations omitted).  This means showing "a contract relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial."  *Id.*  "[T]he court should consider the expectations of the parties with respect to changes in the law,"  including "whether the subject matter of the contracts had been subject to regulation at the time the contracts were made" and "what terms of the contract are affected and the duration of the effects."  *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504 (5th Cir. 2001).

From there, the burden shifts to the state to proffer a "significant and legitimate public purpose behind the regulation" such as the "remedying of a broad and general social or economic problem."  *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983).  "The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests."  *Id.* at 12; *see, e.g., United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 631 (5th Cir. 2010) (Contracts Clause violated where state law was "narrowly focused on benefitting in-state HMOs (indeed, a specific one)").

Here, there is no dispute that Plaintiffs' predecessors were parties to the Prewitt Agreements.  SMF ¶ 3.  And, as discussed earlier, the payment obligations under those Agreements terminated with the expiration of the City Permits.  But if Section 66.004(f) were read to impose on Plaintiffs an indefinite obligation to continue making payments to the Prewitts despite the expiration of the City Permits, the state would in effect be substantially reforming and

impairing the contractual relationship between the Prewitts and Plaintiffs by, among other things, denying the Plaintiffs the ability to terminate it. The resulting impairments would be "substantial" because they would impose unnecessary and unreasonable costs on Plaintiffs and harm their competitive position in the market. Ex. K ¶¶ 7-8.

While the Texas Cable Act as a whole may serve some "significant and legitimate public purpose," *Energy Reserves*, 459 U.S. at 411, the legislative history provides no such purpose that would justify the Prewitts' interpretation of Section 66.004(f). The only evidence of the section's purpose was that it was drafted by the Prewitts' attorney "to protect existing parties [the Prewitts] who have contractual rights with respect to local franchises," then sent to Senator Fraser, who added it to SB 5 with minor revision. *See* Ex. I; Ex. J at 25-26. This, however, is "uncomfortably close to the exact issue the Supreme Court has cautioned courts to investigate, that is, a legislative body acting to benefit one group of special interests at the expense of another." *Six Kingdoms Enters., LLC v. City of El Paso, Tex.*, No. EP-10-CV-485-KC, 2011 WL 65864, at *6 (W.D. Tex. Jan. 10, 2011) (holding ordinance likely violated Contracts Clause) (citing *Energy Reserves*, 459 U.S. at 412); *see Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248-49 (1978) (striking statute with "an extremely narrow focus," possibly limited to one entity). Accordingly, Plaintiffs are entitled to summary judgment on their Fifth Claim for Relief.

**E. PLAINTIFFS ARE ENTITLED TO RECOVER SUMS WRONGFULLY COLLECTED AFTER THE CITY PERMITS EXPIRED.**

Because the City Permits expired by their own terms or by TWC obtaining SICFAs covering each of the six cities between 2006 and 2011, Plaintiffs should be awarded judgment in the sum of all amounts collected by the Prewitts from Plaintiffs for each of those cities (totaling over $12 million) from the date each City Permit expired or was replaced. Accordingly, Plaintiffs are entitled to summary judgment on their Sixth Claim for Relief.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment should be granted.


Dated:  March 16, 2017                Respectfully submitted,

                                      By   /s/ Steven P. Hollman
                                      _____

                                            R. James George, Jr.
                                            GEORGE BROTHERS KINCAID & HORTON LLP
                                            1100 Norwood Tower
                                            114 W 7th Street, Suite 1100
                                            Austin, Texas 78701
                                            512.495.1410 Telephone
                                            E-mail:  rjgeorge@gbkh.com

                                            Gardner F. Gillespie (admitted *pro hac vice*)
                                            Steven P. Hollman (admitted *pro hac vice*)
                                            Abraham J. Shanedling (admitted *pro hac vice*)
                                            James N. Bierman, Jr. (admitted *pro hac vice*)
                                            SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
                                            2099 Pennsylvania Avenue, N.W., Suite 100
                                            Washington, D.C.  20006-6801
                                            202.747.1941 Telephone
                                            Email: ggillespie@sheppardmullin.com
                                                     shollman@sheppardmullin.com
                                                     ashanedling@sheppardmullin.com
                                                     jbierman@sheppardmullin.com

                                            *Counsel for Plaintiffs*
                                            *Charter Communications, Inc. and*
                                            *Time Warner Cable Texas LLC*

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that a true and correct copy of the foregoing PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT was delivered via electronic filing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record on this 16th day of March, 2018.


/s/ *Steven P. Hollman*
Steven P. Hollman