UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Austin Division

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE TEXAS LLC,  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>PREWITT MANAGEMENT, INC., as General Partner of WAP, Ltd., a Texas Limited Partnership,  )<br><br>and  )<br><br>WAP, LTD., a Texas Limited Partnership,  )<br><br>Defendants.  ) | Case No. 1:16-cv-1268-LY |

## SECOND AMENDED COMPLAINT

For their Second Amended Complaint against Defendants Prewitt Management, Inc., and WAP, Ltd., Plaintiffs Charter Communications, Inc. and Time Warner Cable Texas LLC (collectively "Charter") state and allege the following:

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Charter's claims arise under the laws of the United States, including 47 U.S.C. § 542, 28 U.S.C. § 1343(a)(3) and (4), 42 U.S.C. § 1983, the First Amendment to the U.S. Constitution, and the Equal Protection and Contract Clauses of the U.S. Constitution. This Court has equitable jurisdiction to enjoin unconstitutional action. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015). The declaratory and injunctive relief sought herein are

authorized by 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction over claims arising under state law, which are part of the same case or controversy as the federal claims.

2.      This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.  Plaintiff Charter Communications, Inc. is a Missouri corporation with its principal offices in Stamford, Connecticut; Plaintiff Time Warner Cable Texas LLC is a Delaware limited liability company with its principal offices in Connecticut.  Defendants are citizens of Texas.  The amount in controversy in the direct claims of Charter Communications, Inc. and Time Warner Cable Texas LLC exceeds $75,000.

3.      Venue lies in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this controversy occurred in this district.

## NATURE OF THE CASE

4.      More than 50 years ago, a powerful and politically influential individual, Mr. W.A. Prewitt, Jr., obtained local city franchise permits to operate cable television systems in Central Texas and sold those naked permits to a cable operator.  Without undertaking any action other than obtaining and transferring these public grants, Mr. Prewitt established a private income stream that now exceeds two million dollars annually and has run for more than a half century.  In the first decade of the new millennium, the city franchise permits, as renewed and extended, expired and the Texas Legislature removed any authority for the cities to issue or control franchise permits.  At that time, Mr. Prewitt's heirs sought and obtained an unusual and unique series of legislative provisions which became part of the Texas Utility Code.  The sole purpose of these provisions was to maintain the income stream for the expired permits by forcing Charter, and any successors, to continue to pay Mr. Prewitt's heirs for so long as Charter and its successors continue to operate in the cities under state franchise authorization.  Charter, which now operates

the cable systems in question through its subsidiary, asks this Court to put an end to this unfair, unjustified, and unlawful gravy train.

5.     The city permits at issue authorized the construction and operation of cable systems in the cities of Waco, Temple, McGregor, Bellmead, Beverly Hills and Woodway, Texas. In exchange for Mr. Prewitt's agreement to assign the cable permits issued by these cities (collectively, the "City Permits"), Charter's predecessor agreed to pay Mr. Prewitt three percent of its gross receipts earned through the operation of the systems under the City Permits (the agreements, entered into in 1964 and 1971, are collectively referred to here as the "Prewitt Agreements"). The City Permits, and thus any obligation to make payments under the Prewitt Agreements, terminated when a change in state law designated the state rather than individual municipalities as the franchise permit granting authority. Charter seeks a declaration from this Court that the Prewitt Agreements, and its payment obligations thereunder, are terminated and a permanent injunction to enjoin Mr. Prewitt's successors in interest from seeking to collect monies from Charter under the expired Prewitt Agreements.

6.     The Texas Cable Act, enacted by the Texas legislature in 2005, moved the authority for issuance of cable television franchises from municipal to state control. Anxious to preserve their income stream for the City Permits, Mr. Prewitt's heirs used their connections with the author of the Texas Cable Act, Senator Troy Fraser, to include in Section 66.004(f) of the Texas Cable Act a provision purporting to allow the heirs to continue to collect their percentage of gross revenues from the systems that previously had operated under the City Permits. But because the City Permits have expired, the Prewitt Agreements terminated with them and are void and unenforceable by their own terms and as a matter of state law. Further, the state statute purporting to condition the issuance of state permits on continuing payments under the terminated Prewitt Agreements runs afoul of the federal Cable Act's five percent cap on franchise fees. Also,

because the statute imposes discriminatory and unfair financial obligations on Charter that are not imposed on other state permit holders, it violates Charter's rights under the First Amendment and the Equal Protection Clause of the U.S. and Texas Constitutions, as well as under the federal Constitution's Contracts Clause.[1]  Charter therefore additionally seeks a declaration that its rights under these provisions preclude the Prewitt interests from continuing to collect payments under the terminated Prewitt Agreements or section 66.004(f) of the Texas Cable Act.  Charter also seeks damages from the Prewitt interests equal to payments it has made since the City Permits expired.

## PARTIES

7.     Plaintiff Charter Communications, Inc. is a Missouri corporation founded in 1993 with its principal headquarters located in Stamford, Connecticut.  It is a cable and telecommunications provider and has significant coverage in Texas, where it competes with other national and local video service providers such as AT&T and Grande Communications.  In 2016, through a merger, Charter Communications, Inc. completed the acquisition of Time Warner Cable Inc., which directly or through subsidiaries owns cable systems providing cable services in various service areas within Texas.  Charter Communications, Inc. is the manager of Time Warner Cable Texas LLC.

8.     Plaintiff Time Warner Cable Texas LLC ("TWC") is a Delaware limited liability company with its principal headquarters located in Stamford, Connecticut.  It holds a state permit (in the form of a state issued certificate of franchise authority) to provide cable services in various service areas within Texas, including Waco, Temple, McGregor, Bellmead, Beverly Hills and

---

[1] Charter's initial Complaint in this matter named as defendants the Chairman and Commissioners of the Public Utility Commission of Texas ("PUC"), in their official capacities, in order to allow them notice and the opportunity to defend the constitutionality of section 66.004(f).  The PUC and the Texas Attorney General subsequently disclaimed any authority to enforce section 66.004(f), and any interest in defending its constitutionality and, thus, are not named as defendants to Charter's Second Amended Complaint.

Woodway.  TWC is the successor in interest to the parties which contracted with Mr. Prewitt under the Prewitt Agreements.

9.      Defendant Prewitt Management, Inc. ("PMI") is a Texas corporation that serves as a holding company for some of the business interests of the family of W.A. Prewitt, Jr.  Prewitt Management, Inc. is the General Partner of Defendant WAP, Ltd., ("WAP") a successor to the interests of W.A. Prewitt, Jr. and his heirs under the Prewitt Agreements.  The company is run by W.A. "Buck" Prewitt, III, son of W.A. Prewitt, Jr.  According to WAP's partnership agreement (ECF 46-3), PMI has exclusive authority to act for WAP, no other entity (including WAP itself) can make decisions regarding the business of WAP, and third parties such as Plaintiffs can rely conclusively on the authority of PMI to act on behalf of WAP.  Consistent with the scope of that authority, at all times relevant to this proceeding, PMI has acted within the scope of its authority as WAP's exclusive, authorized agent, fully asserting counterclaims and defenses on behalf of WAP such that the litigation positions taken by PMI, and any outcome in this case, should bind WAP with equal force.

10.     Defendant WAP is the successor to the interests of W.A. Prewitt, Jr. and his heirs under the Prewitt Agreements.

## FACTS COMMON TO ALL COUNTS

### A.      The Prewitt Family

11.     The Prewitts are a well-established, old-guard Central Texas family with deep pockets and equally deep political connections.  Over a  fifty year period, W.A. Prewitt, Jr. and his successors in interest (the "Prewitt interests") have secured valuable local government-issued permits and have monetized these raw governmental grants by assigning them in exchange for an income stream.  The City Permits—municipal cable franchises—at issue in this matter are an example.  They permitted the Prewitt interests to collect royalties each year since the 1960s—

royalties that now exceed $2 million a year—without lifting a finger in the construction or operation of the cable systems.

**B.**     **The City Permits and The Prewitt Agreements**

       **(1)     The 1964 Agreement**

12.     In 1963 and 1964, W.A. Prewitt, Jr. used his influence to obtain municipal permits from the Texas cities of Waco, Temple, and McGregor authorizing Mr. Prewitt to construct, maintain and operate community antenna systems (cable systems) in those cities.  Mr. Prewitt was not a cable operator, but he quickly arranged to monetize his influence in obtaining the City Permits by identifying an assignee willing to pay dearly for the bare permit rights he held.

13.     On March 12, 1964, Mr. Prewitt entered an agreement (the "1964 Agreement") with Ameco, Inc. ("Ameco"), TWC's predecessor, providing for Ameco to assume the obligation for the construction and operation of the cable systems in Waco, Temple, and McGregor.  A true and correct copy of the 1964 Agreement is attached hereto as Exhibit A and incorporated herein by reference.  Under the 1964 Agreement, Mr. Prewitt granted Ameco an option to acquire the municipal permits for those three cities in exchange for future payments of three percent of the gross revenues generated from the operation of the cable systems.   These payments were to continue "during the life of each [ ] assigned permit and amendments thereto," including "any holding over thereunder, renewals or extensions thereof."  Ex. A at 5.  The 1964 Agreement also stated that "[t]he obligations to make [the three percent] payments … shall run with the permits." *Id*.  The parties also recognized that the three percent payment was required, in part, for the exclusivity the permits gave Ameco to operate in the cities.  The 1964 Agreement provided that if Ameco exercised its option to acquire the permits, and one of the cities issued an additional permit to a third party who started operations in the city, then the obligation to pay Mr. Prewitt would "terminate."  *Id.* at 7-8.

14.     The "permits" at issue in the 1964 Agreement are referenced throughout as "city permits."  *See* Ex. A at 4 (describing "an option to purchase such city permits"); *id.* at 7 ("In the event of exercise of such options, Prewitt will take all steps necessary to cause the city permits to be assigned . . ."); *id.* at 10 ("Ameco is familiar with the terms and status of the city permits now held by Prewitt").  In addition, the "permits from the cities" explicitly are referred to and defined in the Agreement both as "the permits" and "the city permits."  *Id.* at 4.

15.     The 1964 Agreement also acknowledged the cities as the granting authorities of the permits.  *See id.* at 3 (requiring payment of sums "called for by the permits to be paid to such granting cities"); *see also id.* at 6 ("To the extent which may be permitted by law of said cities, the obligation of the permit holder to make such payments to Prewitt . . . shall be written into, or reflected on the face of, such permit.").  And, the parties agreed that, once Ameco exercised the option, all "facilities (including but not limited to property and equipment) . . . shall be and remain the property of . . . Ameco and its assigns."  *Id.* at 4.

16.     Ameco did exercise its option to purchase the city permits from Mr. Prewitt shortly after the 1964 Agreement.  Indeed, in a letter sent to the Internal Revenue Service, Mr. Prewitt later confirmed under oath that upon selling the city permits, he "relinquished all incidents of ownership" and that "payments based on future revenues derived from the systems utilizing the permits [did] not constitute the retention of an economic interest in the property sold."

17.     Mr. Prewitt's only obligation under the 1964 Agreement was to "take all steps necessary to cause the city permits to be assigned" to Ameco or its successors.  *Id.* at 7.  Mr. Prewitt had no involvement in the construction or operation of the systems and no continuing obligation after transferring the City Permits to Ameco.  The transfer of the subject permits was the sum total of Mr. Prewitt's contribution to the contractual relationship.  And, for the raw

transfer of bare governmental permits, the Prewitt interests were richly rewarded with royalty payments totaling many millions of dollars over the ensuing five decades.

### (2)    The 1971 Agreement

18.     In 1966, T.V. Cable, Inc. of Waco ("Waco TV") obtained cable permits to construct and operate cable systems from the cities of Bellmead, Beverly Hills, and Woodway.

19.     On August 16, 1971, Mr. Prewitt and Charter's predecessors entered into a settlement agreement (the "1971 Agreement") confirming that all rights, titles, and interests in and to the city-issued permits "to construct, maintain and operate . . . a CATV System in [Beverly Hills, Bellmead, and Woodway], cities of McLennan County, Texas, by ordinance finally passed by each City" would be held by Waco TV.  A true and correct copy of the 1971 Agreement is attached hereto as Exhibit B and incorporated herein by reference.  In exchange, TWC's predecessors again agreed to pay Prewitt and his heirs three percent of the gross revenues generated from the operation of the systems in those cities "during the life of such permits and amendments thereto."  Ex. B at 5.

20.     The 1971 Agreement also provided that the payment obligation "shall run with the respective permits" and shall remain in full force and effect "as written."  Ex. B at 6, 3.  Further, any new permits granted by the cities "shall be conclusively treated and considered as a renewal of the existing permit."  *Id*. at 5-6.  The Agreement did *not* include language regarding new permits issued by any granting authority other than the cities.

21.     The 1971 Agreement explicitly provided that the permits at issue were "the permits of the Cities of Woodway, Bellmead and Beverly Hills [as] referred to herein."  *Id*. at 8.

22.     As with the 1964 Agreement, Mr. Prewitt's obligation under the 1971 Agreement extended only to the assignment to Charter's predecessors of the city permits.  Beyond the assignment of the permits, Mr. Prewitt had no ongoing obligation.

23.     The 1971 Agreement explicitly provided that Mr. Prewitt's remedy for any failure to make payment on a given permit was that "upon the breach of any such obligations by [Ameco], its successors or assigns, this instrument shall be of no further force or effect and *such permit* shall automatically revert" to Mr. Prewitt, his heirs, successors and assigns.  *Id*. at 7 (emphasis added).

24.     The rights and obligations under the Prewitt Agreements, including permits for cable systems in Waco, Temple, McGregor, Beverly Hills, Bellmead, and Woodway (the "Cities") and the obligation to pay a three percent royalty for the transfer of the City Permits passed over to various predecessors of Charter.  Pursuant to the Prewitt Agreements, Charter and its predecessors paid millions of dollars in royalty fees for five decades.  On information and belief, as of the turn of the century, Charter's predecessors did not have a complete copy of the Prewitt Agreements.  Charter Communications, Inc. first obtained a complete copy the Prewitt Agreements from counsel for the Prewitt interests in October 2016.  Beginning in October 2016, Charter advised the Prewitt interests that it was paying under protest.

## C.     The Federal Cable Act

25.     In 1984, the United States Congress enacted the federal Cable Act to establish a national framework for regulating cable television.  With the federal Cable Act, Congress sought to "promote competition in cable communications and minimize unnecessary regulations that would impose an undue economic burden on cable systems."  47 U.S.C. § 521.

26.     The federal Cable Act authorizes a "franchising authority"—defined as "any governmental entity empowered by Federal, State, or local law to grant a franchise"—to impose on cable operators a franchise fee not to exceed five percent of the operator's gross revenues.  47 U.S.C. §§ 522(10); 542(b).  A "franchise fee" is defined to "include[] any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or

cable subscriber, or both, solely because of their status as such." 47 U.S.C. § 542(g). The federal Cable Act preempts contrary state legislation. *Id.* § 556(c).

### D.  **The Texas Cable Act**

27.     Starting in the 1980s, a number of states passed legislation removing cable franchising authority from municipalities and replacing it with state-issued franchises. Consistent with this trend, the Texas legislature in 2005 moved the authority for the issuance of cable television franchises from municipal to state control. Specifically, then Senator Fraser introduced, and the legislature adopted, Senate Bill 5, an "Act Relating to Furthering Competition in the Communications Industry," codified at Section 66 of the Public Utilities Code (the "Texas Cable Act"), which designated the Public Utility Commission of Texas ("PUC") as the franchising authority for state-issued franchises. Tex. Util. Code. § 66.001. The PUC must grant "state-issued certificates of franchise authority" ("SICFAs") for requested areas to applicants that satisfy basic requirements. Tex. Util. Code § 66.003. Under the state licensing regime, cable agreements with municipalities are valid "until the franchise agreement is terminated . . . or until the franchise agreement expires." *Id*. § 66.003(a). A municipal franchise terminates "on the date the commission issues the state-issued certificate of franchise authority." *Id.* § 66.004(b). There is no requirement to obtain a local permit as a condition to receiving a state franchise permit.

28.     Under the Texas Cable Act, Texas cable operators' franchise fee obligations under previous municipal agreements ended, and each holder of a state-issued certificate of franchise authority was required pursuant to state law to pay each municipality in which it provides service a franchise fee of five percent of gross revenues—the maximum allowed under federal law. Tex. Util. Code § 66.005(a). The City Permits, transferred by Mr. Prewitt to Ameco and thereafter renewed and extended, expired either by their own terms or by operation of the Texas Cable Act,

Tex. Util. Code § 66.004, and the obligation to pay royalty fees for the assignment of the City Permits ended.

### TWC's State Franchises

29.     Between 2006 and 2011,[2] pursuant to the Texas Cable Act, TWC received "state-issued certificates of franchise authority" that replaced the City Permits at issue in the Prewitt Agreements (the "State Franchises").

30.     TWC is not the only cable provider with state franchises to serve Waco and the surrounding cities.  For example, Grande Communications Networks LLC has state franchises to serve Waco, Temple, Beverly Hills, and Woodway.

### The Prewitt's Political Activity and Section 66.004(f)

31.     Faced with the potential loss of its lucrative revenue stream, the Prewitt interests resolved to act and to intervene in the state's new cable licensing system.  Upon information and belief, one of W.A. Prewitt, Jr.'s sons, W.A. "Buck" Prewitt, III, has stated that the family was able to ensure that the Texas Cable Act included language specifically intended to extend the Prewitt Agreements' royalties to the new State Franchises, in perpetuity.  Indeed, prior to the Texas Cable Act's enactment, the Prewitts retained John Cunningham, then a lawyer at Naman, Howell, Smith & Lee, LLP, to lobby Senator Fraser regarding the wording of his soon-to-be-introduced bill.  Less than a month before Senator Fraser introduced the bill, Cunningham faxed Buck and Janice Steffes (Senator Fraser's Chief of Staff) a memorandum and "proposed addition" to Section 66.004, intended to protect the Prewitts' purported "contractual rights with respect to local franchises" and their "private property rights."  Senator Fraser adopted nearly verbatim the language proposed by Cunningham when he introduced Section 66.004(f).

---

[2] The State Franchises were issued on the following dates: Temple (02/16/2006); Bellmead (03/31/2006); Beverly Hills (05/15/2006); Waco (08/21/2006); McGregor (12/20/2011); Woodway (12/20/2011).

32.    As codified, Section 66.004(f) provides that the Texas Cable Act is not intended to "adversely affect in any way the contractual rights, duties, and obligations incurred by a [cable operator] . . . before the date a franchise expires," including "those obligations measured by and related to the gross revenue hereafter received by the holder of a state-issued certificate of franchise authority."   Under subsection (f), any contractual rights or obligations in effect on September 1, 2005, "shall continue in full force and effect, without the necessity for renewal, extension, or continuance . . . as though the revenue generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority."   Thus, the statutory language purports to extend the payment obligation beyond the life of the City Permits.

33.    With respect to the franchising authority's obligations, Section 66.004(f) makes it a precondition to the issuance or renewal of a SICFA "that the private contractual rights and obligations herein described continue to be honored . .  to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such state-issued certificate of franchise authority and any renewals or extensions thereof."

34.    None of Charter's direct competitors in the Cities make regular payments to private entities in Texas, pursuant to Section 66.004(f), based on contractual agreements related to municipal permits or franchises issued prior to the enactment of the Texas Cable Act.  And upon information and belief, no cable operator at all, besides Charter, currently makes regular payments to private entities in Texas pursuant to Section 66.004(f).

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Declaratory Judgment)
### The Prewitt Agreements Are Unenforceable Because The City Permits Expired

35.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 34 inclusive, as though fully set forth herein.

36.     The Prewitt Agreements transferred the City Permits to Charter's predecessors in exchange for three percent royalty payments "during the life of the permits."  Ex. A at 5; Ex. B at 5.  The obligation to pay the royalty specifically was to "run with the permits."  Ex. B at 6.  The "permits" at issue were limited to the city authorizations to construct, operate, and maintain cable systems.  *See* Ex. A at 4; Ex. B at 8.  The royalty payments were made in exchange for the assignment of such permits, with "permit" as used throughout referring to the "city permits" issued by the municipalities.  *Id*.

37.     These City Permits no longer exist.  Even if the City Permits had not otherwise expired, they ceased to exist when Charter's predecessor obtained the State Franchises between 2006 and 2011.

38.     Any payment obligations under the Prewitt Agreements ended with the expiration of the City Permits and the issuance to Charter's predecessor of the State Franchises.  The State Franchises are not "permits" as referred to or defined in the Prewitt Agreements because they are issued by the state, a separate issuing authority, rather than by the city, and the State Franchises therefore cannot be regarded as "new permit[s]" that would be treated as "renewal[s] of the existing permits."  *See* Ex. A at 5; Ex. B at 6.

39.     By the terms of the Prewitt Agreements and according to municipal and State law, TWC's obligation to pay Prewitt the three percent royalty fees expired with the City Permits.

40.     There is an actual controversy of a justiciable nature concerning the rights and obligations of Charter and Defendants under the Prewitt Agreements and federal and state law, and Charter is entitled to a judgment declaring the City Permits have expired and the Prewitt Agreements and any payment obligations thereunder are null and void and without further force or effect.

**Second Claim for Relief**
**(Declaratory Judgment)**
**The Agreements Are Unenforceable Because They Are Indefinite In Duration**

41.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

42.     As a matter of Texas law, when a contract is indefinite in duration, it may be terminated at the will of either party.  Moreover, the Fifth Circuit Court of Appeals does not favor perpetual contracts and presumes that any such contract is terminable at will.  *See Fluorine On Call Ltd v. Fluorogas Limited, et al.*, 380 F.3d 849, 855 (5th Cir. 2004) (collecting cases).

43.     If the Prewitt Agreements could be interpreted as continuing beyond the expiration of the City Permits, then the Agreements reasonably must be interpreted as being indefinite in duration.  If, in other words, Charter's obligation to pay the three percent royalty fees did not "run with the permits" themselves, but rather properly could be interpreted to continue interminably, then the Prewitt Agreements are unlawful perpetual contracts.

44.     Charter is entitled to a judgment declaring that the Prewitt Agreements were terminable at will and have been terminated.  Even if the Prewitt Agreements were not terminable at will, they would be terminable at a reasonable time, which would be no later than the replacement of the City Permits with the State Franchises.

**Third Claim for Relief**
**(Declaratory Judgment)**
**Section 66.004(f) Violates The Federal Cable Act And Is Preempted**

45.      Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 44 inclusive, as though fully set forth herein.

46.      The federal Cable Act caps at five percent any franchise fees imposed on cable operators.  47 U.S.C. §§ 542(b) & 522(10).  Specifically, no "governmental entity empowered by Federal, State, or local law to grant a franchise" can impose on a cable operator "any tax, fee, or assessment of any kind" in excess of five percent of gross revenues.  *Id.* §§ 542(b), (g)(1).  Any contrary state legislation is preempted and superseded by the Cable Act, *id.* § 556(c), and the Supremacy Clause, U.S. Const. art. VI, cl. 2.

47.      Pursuant to the Texas Cable Act, Charter pays a five percent franchise fee to each of the cities in which it operates.  Tex. Util. Code § 66.005(a).  Under federal law, these fees are the maximum fees that legally can be imposed on Charter as a cable operator.

48.      The Prewitt interests acted to ensure that as "a condition to the issuance and continuance of a state-issued certificate of franchise authority" Charter would have to continue beyond the expiration of the City Permits to pay the Prewitt interests an additional three percent fee in perpetuity in order to provide cable service in the Cities.  Tex. Util. Code § 66.004(f). These statutorily mandated payments are an "assessment" "impose[d] by . . . a governmental entity on a cable operator . . . solely because of [its] status as such," 47 U.S.C. § 542(g)(1), and thus constitute a franchise fee that is subject to the federal franchise fee cap.

49.      Because section 66.004(f) requires payment of a fee above and beyond the five percent franchise fee that is paid to the local governments under the Texas Cable Act, the section violates the federal franchise fee cap and is preempted and superseded by 47 U.S.C. § 556(c) and the Supremacy Clause.

50.     Charter therefore is entitled to a judgment declaring section 66.004(f) unlawful and preempted by federal law.

**Fourth Claim for Relief**
**(Declaratory Judgment)**
**Section 66.004(f) Violates The First Amendment And The Equal Protection Clause**

51.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 50 inclusive, as though fully set forth herein.

52.     On information and belief, Charter is the only cable provider with obligations imposed by Section 66.004(f), but it is not the only cable provider with state franchises to serve the Cities.  Applying Section 66.004(f) to require Charter to continue to pay a three percent fee for the expired City Permits as a condition to the issuance of its State Franchises in the Cities therefore would violate the free speech and equal protection clauses of the Constitutions of the United States and Texas and 42 U.S.C. § 1983.

53.     As a cable operator, Charter is entitled to the protection of the First Amendment. Because Section 66.004(f) draws distinctions between cable operators, it is not a law of general applicability and is subject to strict scrutiny.  In fact, the apparent purpose of Section 66.004(f) was to require Charter to continue to pay the Prewitt interests a royalty fee above and beyond the franchise fees imposed on Charter and other cable operators.

54.     Section 66.004(f) therefore discriminates against a small and identifiable number of cable providers—in fact, apparently only a single operator—without being narrowly tailored to serve a compelling state interest.  Even under intermediate scrutiny, section 66.004(f) does not further an important or substantial governmental interest, nor is the incidental restriction on Charter's First Amendment freedoms less than what is necessary to the furtherance of any legitimate state interest.

55.     Under the Equal Protection Clauses of the U.S. and Texas Constitutions, targeting one speaker for restrictive burdens without applying the same burdens on others is unlawful. Section 66.004(f) draws distinctions between cable operators with the apparent purpose of allowing the Prewitt interests to continue to collect a substantial fee from Charter.  Applying strict scrutiny, Section 66.004(f) is neither finely tailored nor does it serve a substantial state interest.   Indeed, it serves no public interest at all but rather purports to mandate a private inurement.  The statute therefore is unconstitutional under Equal Protection analysis.

56.     Charter therefore is entitled to a judgment declaring section 66.004(f) unconstitutional and unlawful.

### Fifth Claim for Relief
**(Declaratory Judgment)**
**Section 66.004(f) Violates The Federal Contracts Clause**

57.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 56 inclusive, as though fully set forth herein.

58.     The Prewitt Agreements governed Charter's rights and obligations during the life of the City Permits.  Those Agreements were protected against impairment by the government through the Contracts Clause of the U.S. Constitution.

59.     By enacting the requirements of Section 66.004(f) despite the expiration of the City Permits, the legislature substantially impaired the contractual relationship between Prewitt and Charter.   The payment obligations under the Prewitt Agreements terminated with the expiration of the City Permits, and any purported ongoing obligation for Charter to continue making payments to the Prewitt interests is the result of an unlawful contractual revision adopted by the State.

60.     Because any action to enforce Section 66.004(f) would substantially impair the Parties' contractual relationship, the regulation can only survive if it serves a significant and legitimate public purpose, such as remedying a broad and general problem.  While the Texas Cable Act as a whole may serve such a purpose, there is no justification offered in the legislative history for the carve-out in Section 66.004(f), and, on information and belief, the section was added solely at the behest of the Prewitt interests for their own benefit.  Indeed, the challenged provision seems to serve no public interest at all but rather appears to mandate a private inurement.

61.     Charter therefore is entitled to a judgment declaring Section 66.004(f) unconstitutional and unlawful.

## Sixth Claim for Relief
**(Money Damages)**
**Charter Is Entitled to Recover Sums Improperly Collected by the Prewitt Interests After the Prewitt Agreements Terminated**

62.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 61 inclusive, as though fully set forth herein.

63.     By virtue of the facts set forth above, Charter has been forced to pay the Prewitt interests a sum exceeding $12 million since the City Permits expired, all moneys that the Prewitt interests were not entitled to receive.  Therefore, Charter is entitled to judgment in the sum of the amounts wrongfully collected by the Prewitt interests.

## Prayer for Relief

WHEREFORE, Plaintiffs Charter Communications, Inc. and Time Warner Cable Texas LLC request the following relief:

(1) a declaration that:

    a.  the City Permits expired by their own terms and were terminated and replaced by State Franchises in the period 2006-2011; and

    b.  the Prewitt Agreements terminated as of the dates the City Permits expired and were terminated and are null and void and have no further force or effect; and

    c.  to the extent the Prewitt Agreements properly could be interpreted to impose upon Charter payment obligations continuing after the expiration and termination of the City Permits, they are indefinite in duration and therefore are terminable at will and have been terminated; and

    d.  Section 66.004(f) of the Texas Cable Act is unlawful and inconsistent with state and federal law insofar as:

        i.  it violates the federal Cable Act's five percent cap on franchise fees;

        ii.  it violates the free speech and equal protection clauses of the U.S. and Texas Constitutions; and

        iii.  it conflicts with the Contracts Clause of the U.S. Constitution; and

(2)  to the extent the Prewitt Agreements properly could be interpreted to impose upon Charter payment obligations continuing after the expiration and termination of the City Permits, and are not terminable at will, a declaration that they are indefinite in duration and are terminable by the Court on a reasonable date, such as the date when the State Franchises replaced the City Permits; and

(3)  a judgment for all sums improperly paid to the Prewitt interests on a quarterly basis from the date on which the Prewitt Agreements terminated by virtue of the

expiration of the City Permits and their replacement with State Franchises under

the Texas Cable Act; and

(4) an award of costs and reasonable attorney's fees  and such other and further relief

as this Court may deem just and proper.

Dated:  March 29, 2018                    Respectfully submitted,

By    /s/ Steven P. Hollman

R. James George, Jr.
GEORGE BROTHERS KINCAID & HORTON LLP
1100 Norwood Tower
114 W 7th Street, Suite 1100
Austin, Texas 78701
512.495.1410 Telephone
E-mail:  rjgeorge@gbkh.com

Gardner F. Gillespie (admitted *pro hac vice*)
Steven P. Hollman (admitted *pro hac vice*)
J. Aaron George (admitted *pro hac vice*)
Abraham J. Shanedling (admitted *pro hac vice*)
James N. Bierman, Jr. (admitted *pro hac vice*)
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C.  20006-6801
202.747.1941 Telephone
Email: ggillespie@sheppardmullin.com
        shollman@sheppardmullin.com
        ageorge@sheppardmullin.com
        ashanedling@sheppardmullin.com
        jbierman@sheppardmullin.com

*Counsel for Plaintiffs*
*Charter Communications, Inc. and*
*Time Warner Cable Texas LLC*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing PLAINTIFFS' SECOND AMENDED COMPLAINT was delivered via electronic filing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record on this 29th day of March, 2018.


/s/ *Steven P. Hollman*
Steven P. Hollman