UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Austin Division

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE TEXAS LLC,<br><br>Plaintiffs,<br><br>v.<br><br>PREWITT MANAGEMENT, INC., as General Partner of WAP, Ltd., a Texas Limited Partnership, and<br>WAP, LTD., a Texas Limited Partnership,<br><br>Defendant. | Case No. 1:16-cv-1268-LY |

**DEFENDANT WAP, LTD.'S REPLY TO PLAINTIFFS' RESPONSE TO WAP, LTD.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND SUR REPLY TO PLAINTIFFS' REPLY IN SUPPORT OF RENEWED MOTION FOR SUMMARY JUDGMENT/TRIAL BRIEF**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW WAP, Ltd. and files this reply to Plaintiffs' response to WAP, Ltd.'s cross-motion for summary judgment, and COME NOW WAP, Ltd. and Prewitt Management, Inc., Defendants herein, and file this sur reply to Plaintiffs' reply in support of Plaintiffs' renewed motion for summary judgment/trial brief.

**I.**
**ARGUMENT & AUTHORITIES**

There has been an extensive amount of briefing in this case already, and Defendants understand there will be presentation of arguments and evidence at trial. Thus, this brief is not meant to respond on every legal or factual issue raised by Plaintiffs' response to WAP's cross-motion for summary judgment or by Plaintiffs' reply in support of Plaintiffs' renewed motion for

summary judgment. Instead, this brief is meant to address a select number of the assertions contained within Plaintiffs' response and reply brief. Each of Plaintiffs' assertions is listed below in quotation marks and next to bullet points, and is followed by an explanation as to why such assertion is false, misleading, contrary to controlling legal principles, and/or unsupported by the facts.

- **"Nor do the Prewitts cite to or submit any evidence or affidavits of their own to refute the facts contained in the declarations of Gordon Harp, Jeff Burdett, and Dale Schneberger."**

As an initial matter, the declarations of Gordon Harp, Jeff Burdett, and Dale Schneberger are replete with hearsay, conclusory opinions with no support, and speculation. Defendants have objected to each of these declarations on those grounds, amongst others.

Additionally, these declarations prove nothing relevant to the case. The Declaration of Gordon Harp states that, "Charter currently is unaware of any other cable operator in Texas actually making regular payments to private entities in Texas pursuant to Section 66.004(f) of the Texas Cable Act." At best, this statement is evidence of Mr. Harp's subjective lack of awareness of any cable provider with a contract similar to the one at issue in the present case. The Declaration of Jeff Burdett states that he called representatives from Grande Communications, Comcast, ConNEXTions Telcom, NTS Communications, and One Source Communications, all of whom stated that they do not make payments to private entities pursuant to Section 66.004(f). Again, at best, these statements show that these, mostly anonymous, representatives of these companies have no subjective awareness of these various cable providers having a contract similar to the one at issue in the present case. Finally, the Declaration of Dale Schneberger states that, "[n]either Grande nor any of its corporate affiliates in Texas currently makes regular monetary payments to a private entity pursuant to Section 66.004(f), based on a contractual

agreement(s) with that entity." But again, at best, proves Mr. Schneberger's lack of subjective awareness of any such contract.

Even taken as true, and given their full weight, despite being rank hearsay, none of these declarations proves, or comes close to proving, that: (1) these companies do not have any contracts that were saved by Section 66.004(f) at the time of the passage of the *Texas Cable Act*; (2) that these companies do not currently have any contracts that were saved by Section 66.004(f) of the *Texas Cable Act*; or (3) that Section 66.004(f) only applies to a small subset of cable providers in Texas.

Thus, the Court should not even consider these declarations as part of the summary judgment record, and if the Court does consider these affidavits as part of the summary judgment record then it should assign no significance to them.

Moreover, these hearsay declarations do not conclusively prove any facts relied upon by Plaintiffs on which they have the burden of proof, and Defendants are not required to controvert what Plaintiffs have failed to establish.

- **"In particular the Prewitts provide no evidence to rebut the fact that although certain cable operators, including Comcast and Grande Communications, stated on SICFA applications that they agreed to comply with Section 66.004(f), those cable operators have confirmed that they either do not in fact make regular monetary payments to private Texas entities pursuant to that provision, or that they did not know why they acknowledged those obligations."**

First, this is shifting the burden. Defendants have no burden to disprove Plaintiffs unsupported assertion that Section 66.004(f) applies to a small subset of cable providers. Plaintiffs have the burden to prove their case and the facts supporting that case.

Second, none of the declarations attached to Plaintiffs' renewed motion for summary judgment states that these various cable providers "did not know why they acknowledged" obligations under Section 66.004(f). It may be true that some anonymous representative from

Comcast allegedly told Jeff Burdett that, "Comcast only affirmed its compliance with Section 66.004(f) in SICFA applications as a general agreement to comply with *all* sections of the Texas Utilities Code." But, given that we have no idea who from Comcast made this assertion, whether they were involved in filling out the SICFA applications in question, or whether they even worked for Comcast at the time that those SICFA applications were completed, this evidence amounts to nothing more than speculation, conjecture, and hearsay from an unidentified source.

The reality is that Plaintiffs have claimed that they are the only cable provider, or part of a limited and small subset of cable providers, that have a contract or contracts to which Section 66.004(f) applies, but the SICFA applications attached to Defendants' response and cross-motion show this is untrue. Plaintiffs have the burden to prove their claim and have offered no admissible evidence to do so, much less established these facts conclusively.

- **"The Prewitts also falsely assert, without citation, that TWC 'stated under oath that the [Prewitt] Agreements were not subject to or continued by Section 66.004(f)' on its SICFA applications."**

This is not accurate. Defendants cited the Court to SICFA applications filed by TWC in 2005 and 2006, in which TWC affirmatively represented, under oath, that it had no private contractual rights or obligations that were subject to Section 66.004(f).[1] The Prewitt Agreements were a private contract, which was in existence at the time TWC filled out these applications, yet TWC stated that it had no private contractual obligations that were subject to Section 66.004(f), which would include the Prewitt Agreements.

- **"Similarly, the Prewitts proclaim, as if in open court, that 'extrinsic evidence will show' that the parties to the 1964 Agreement 'intended that Plaintiffs' obligation to pay . . . was to continue for so long as Plaintiffs, their predecessors, or their successors operate cable systems in the six cities,' Resp. ¶ 31, and that the 'evidence shows that Plaintiffs understood that the obligation to make the 3% royalty payments was still in effect even**

---

[1] See Appendix "D" to Defendants' Response to Plaintiffs' Renewed Motion for Summary Judgment and WAP, Ltd.'s Cross-Motion for Summary Judgment

> though the city permits had been replaced by SICFAs,' id. ¶ 71. But what 'evidence' the Prewitts are referring to is unknown because they do not cite any."

Again, this is not accurate and is disingenuous. In the exact paragraph cited by Plaintiffs, Paragraph 71, Defendants point out that since the passage of the *Texas Cable Act* in 2005 and the replacement of the city permits with SICFAs, Plaintiffs continued to pay WAP 3% of their gross revenues derived from operating cable systems in the six cities, without protest, for over a decade. This is proven by Plaintiffs' responses to requests for admission, which were attached to Defendants' response as Appendix "E." In addition, TWC's SICFA applications, which were attached to Defendants' response as Appendix "D," show that Plaintiffs were not making these payments because of Section 66.004(f). This evidence was attached to, cited within, and referenced throughout Defendants' response and cross-motion.

- **"Defendants do not dispute that the Prewitt Agreements plainly state that the three percent royalty payments made by Charter's predecessors to the Prewitts was to be made only 'during the life of the permits.'"**

Again, this is not accurate. Defendants do not dispute that the Prewitt Agreements say that the 3% royalty payments will be made "during the life of the permits," but the Prewitt Agreements do not say that those royalty payments will be made "***only***" during the life of the permits. In fact, the Prewitt Agreements are very clear that the 3% royalty payments will be made, "during the life of each such assigned permit and amendments thereto, and any holding over thereunder, renewals or extensions thereof," and also, "in the event any new permit is granted," even if such new permit has new and different terms and without any reference to the new permit being issued by a city.[2]

- **"The Agreements could not be more clear, reiterating that '[t]he obligations to make such payments . . . shall run with the permits.'"**

---

[2] The 1964 Agreement is attached to Plaintiffs' Motion for Summary Judgment as Exhibit "C"

Plaintiffs accuse Defendants of having a response, "replete with mischaracterizations of documents." However, here is just one example of Plaintiffs willingness to take language out of context and to mischaracterize the documents in question. The paragraph Plaintiffs took this language from actually reads:

> The obligations to make such payments, and the other obligations of Ameco and such corporations hereunder, shall run with the permits and shall be and constitute a charge and lien against the same at all times, and no assignment, transfer or encumbrance of such permits shall ever be made or be valid without the express assumption by the assignee or transferee of the provisions of this contract, and any such assignment, transfer or encumbrance shall be subject to the terms of this contract.[3]

When read in context, this language is clearly referring to the fact that these permits can not be transferred or assigned without the obligation to make the 3% royalty payments "running with" those permits as a charge or a lien against those permits. Plaintiffs attempt to take this language out of context to make it appear that the contract says that the obligation to make the payments terminates when the city permits terminate, but that is not what this language says or what it means, which is clear from the language of the full paragraph.

- **"They instead ignore it by arguing that a stray reference to a "new permit" must mean a permit issued by some entity other than one of the cities. See Resp. ¶ 54 (quoting without citing Ex. C at 5 § 2(b)). But their argument ignores the 1964 Agreement's express clarification that reference to 'permits' means '[t]he permits from the cities.'"**
- **"The Prewitts' position also ignores the express language of the Prewitt Agreements, which, as described above, defined "new permits" to mean only a new permit issued by the cities."**

Again, here is another example of Plaintiffs willingness to take language out of context and to mischaracterize the documents in question. The 1964 Agreement states, "[t]he permits from the cities (sometimes referred to herein as 'the permits' or 'the city permits')." Thus, both phrases, "the permits" and "the city permits," are defined as "the permits from the cities." However, nowhere in the 1964 Agreement do the parties define the term "permit," by itself, to

---

[3] Id.

mean a permit issued by the cities. It is interesting how Plaintiffs want to stick to a strict reading of the language of the Prewitt Agreements when it benefits them, but how they seem to mischaracterize and decontextualize the language form those agreements when they need to in order to avoid the effect of a strict reading of those agreements.

- **"Defendants also argue that if the city permits had expired but Charter continued operating cable systems in the six cities, "then Plaintiffs' obligations to pay under the [Prewitt] Agreements would have continued as well even though a permit no longer existed, making it clear that [t]he existence of a city-issued permits is not required for the continuation of the obligation to pay." Resp. ¶ 52. This makes no sense. If Charter did not have a permit to operate in a city (prior to the Texas Cable Act), then it would not have had the legal right to operate in those cities' rights-of-way. In other words, Defendants have it backwards: the existence of a city-issued permit was required for the payment obligations to continue."**

As part of their reply, Plaintiffs point out that, "when interpreting contracts, courts strive to 'give effect to all the provisions of the contract so that none will be rendered meaningless.'" *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). However, here, in footnote number 7, Plaintiffs ask the Court to ignore the "holding over" language in the Prewitt Agreements and render it completely meaningless. By its very nature, a holding over means operating outside of the term of a lease, or in this case a permit. Thus, the 1964 Agreement envisioned that Plaintiffs might, at some point, operate cable systems without a city permit authorizing them to do so, and made it clear that Plaintiffs would still have to make the 3% royalty payment for so long as it was operating in that city, even if it did not have a city permit authorizing it to do so.

Also, Plaintiffs say that a cable provider operating without a permit "makes no sense," but in their Proposed Findings of Fact and Conclusions of Law, Plaintiffs point out the following:

- o The city permit for Temple expired on June 2, 2004, but TWC did not obtain a SICFA until February 16, 2006; and

- o   The city permit for Waco expired on June 5, 2006, but TWC did not obtain a SICFA until August 21, 2006; and

So, we are either to believe that TWC operated without permits during these periods, and continued to make the 3% royalty payments without protest, or that TWC ceased operating during those time periods in Waco and Temple. The reality is that a city can allow a cable provider to continue operating without a permit if it so chooses, and history shows us that cities have allowed that in the past.

- **"Nor for that matter would it have made any sense for the 1964 Agreement to provide that the payment obligation would 'terminate' if Ameco exercised its option to acquire the permits and one of the cities issued an additional permit to a third party who started operations in the city."**

Again, here is another example of Plaintiffs willingness to take language out of context and to mischaracterize the documents in question. The 1964 Agreement did not provide that Plaintiffs' payment obligation would terminate if any of the cities *ever* issued an additional permit to a third-party. Section 2(e) of the 1964 Agreement provided:

> In the event of the exercise of this option, and in the event an additional permit is issued by either Waco, Temple or McGregor, to a third party or parties not directly or indirectly connected with Ameco or any of such corporations, ***prior to January 31, 1969***, and in the further event that thereafter such additional permit holder commences actual, bona fide operation and Cable TV service to customers in such city, the Texas corporation's obligation to pay Prewitt a sum equal to three per cent (3%) of its gross revenues from such city's operations shall also terminate as to that city only…[4]

So, the 1964 Agreement does not state that Plaintiffs', or their predecessors', obligation to make the 3% royalty payments would terminate if the cities ever issued a permit to a third-party, making the permits non-exclusive. Rather, the 1964 Agreement states that the obligation to make those payments would terminate if one of the cities issued a permit to a third-party prior to January 31, 1969, ***and*** if that third-party actually started operating a cable television system in

---

[4] The 1964 Agreement is attached to Plaintiffs' Motion for Summary Judgment as Exhibit "C" (emphasis added)

the city.  However, there is no evidence that another permit was issued to a third-party cable provider prior to January 31, 1969, or that a third-party cable provider actually started operating a cable television system in one of the cities, which meant that Plaintiffs' obligation to make the royalty payments was never affected by this contingency in the 1964 Agreement.

- **"The SICFA applications merely stated that Section 66.004(f) was 'Not Applicable' to TWC, see SMF ¶¶ 42-47, which the Prewitts already have acknowledged means little, if anything. See JSUF ¶ 64."**

Again, this is just not true.  In stipulation number 64 as part of the Joint Stipulation of Undisputed Facts, the parties agreed that:

> The fact that on certain applications for SICFAs, some cable operators acknowledged their agreement to continue to honor obligations pursuant to Section 66.004(f)...does not conclusively establish that such cable operators do or did in fact make regular monetary payments to a private entity based on a contractual agreement with that entity that was entered into prior to the enactment of the Texas Cable Act.

This stipulation has ***nothing*** to do with TWC admission, under oath, that Section 66.004(f) did not apply to any of its contractual obligations or rights.  Further, Defendants have ***never*** agreed or acknowledged that TWC's admission, under oath, that Section 66.004(f) did not apply to any of TWC's contractual obligations or rights, "means little, if anything."  In fact, Defendants maintain that TWC's admission, under oath, combined with Plaintiffs' decision to continue making the 3% royalty payments for the next decade, without protest, shows that the Plaintiffs knew their obligation to make those payments was not terminated or impacted by the *Texas Cable Act*, or by the termination of those city permits, in any way.

- **"Defendants suggest that Charter 'conceded' that Section 66.004(f), 'if valid and effective, would operate to cause [the payment] obligation to continue.' Resp. at 13. That is not so."**
- **"That is because Section 66.004(f) expressly states that it does not 'abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations existing and incurred by a cable service provider or a video service provider before the date a**

**franchise expires or the date a provider terminates a franchise,' including Charter's contract right to terminate the payment obligation by terminating the city permits."**

This is a novel argument that the Plaintiffs are making for the very first time in their reply brief. This is particularly interesting because Plaintiffs new claim that Section 66.004(f), by its terms and plain and unambiguous language, does not save and continue Plaintiffs' obligation to make the 3% royalty payments under the WAP Agreements is contradicted by the language of Section 66.004(f) and Plaintiffs' own judicial admissions in this case.

First, Plaintiffs cite the language of Section 66.004(f) that states that the *Texas Cable Act* does not "abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations existing and incurred by a cable service provider or a video service provider before the date a franchise expires or the date a provider terminates a franchise," but leaves out the remainder of the statute. Section 66.004(f) goes on to provide that:

> All liens, security interests, royalties, and other contracts, rights, and interests in effect on September 1, 2005, or the date a franchise is terminated under Subsection (b-1) or (b-2) shall continue in full force and effect, without the necessity for renewal, extension, or continuance, and shall be paid and performed by the holder of a state-issued certificate of franchise authority, and shall apply as though the revenue generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority or municipality within the geographic area to which the prior permit or franchise applies.

This language, which Plaintiffs conveniently left out of their reply, makes it clear that all contract rights in effect on September 1, 2005, or the date the franchise is terminated, shall continue in full force and effect as if the revenue generated by the holder of a SICFA continued to be generated pursuant to a city permit. Thus, it is clear that Section 66.004(f) saves and continues Plaintiffs' obligation to make the 3% royalty payments despite the expiration of the relevant city permits.

Also, this argument is particularly confusing given that in Plaintiffs' Second Amended Complaint, and throughout the course of this litigation, Plaintiffs have consistently argued that

Section 66.004(f), if valid, saves and continues Plaintiffs' obligation to make the 3% royalty payments:

- Plaintiffs' Second Amended Complaint, Paragraph 32 – "Thus, the statutory language purports to extend the payment obligation beyond the life of the City Permits."

- Plaintiffs' Second Amended Complaint, Paragraph 49 – "Because section 66.004(f) requires payment of a fee above and beyond the five percent franchise fee that is paid to the local governments under the Texas Cable Act…"

- Plaintiffs' Second Amended Complaint, Paragraph 52 – "Charter is the only cable provider with obligations imposed by Section 66.004(f)…"

- Plaintiffs' Second Amended Complaint, Paragraph 53 – "In fact, the apparent purpose of Section 66.004(f) was to require Charter to continue to pay the Prewitt interests a royalty fee…"

- Plaintiffs' Second Amended Complaint, Paragraph 59 – "By enacting the requirements of Section 66.004(f) despite the expiration of the City Permits, the legislature substantially impaired the contractual relationship between Prewitt and Charter."

These pleadings were not made in the alternative and were not prefaced with, "if the Court agrees with Defendants' interpretation of Section 66.004(f)." Instead, Plaintiffs pleadings were based on the idea that Section 66.004(f), if valid, saved and continued Plaintiffs' obligation to make the 3% royalty payments, but, now that we are on the eve of trial, Plaintiffs have shifted their argument.

    Finally, if Section 66.004(f) was read to give Plaintiffs the right to terminate their obligation to make the 3% royalty payments once Plaintiffs' city permits expired and they obtained SICFAs it would not be preserving their rights under the Prewitt Agreements, it would be giving them new rights they never had before. Prior to the passage of the *Texas Cable Act*, the only way that Plaintiffs could terminate their obligation to make the 3% royalty payments would be to give up their city permits and cease operating cable television systems in one or more of the relevant central Texas cities. Under a plain reading of the *Texas Cable Act* and Section 66.004(f), the only way that Plaintiffs can terminate their obligation to make the 3%

royalty payments after the passage of the *Texas Cable Act* would be to give up their SICFAs and cease operating cable television systems in one or more of the relevant central Texas cities.

But Plaintiffs are asking the Court to read Section 66.004(f) as giving them a completely new right: the right to terminate their obligation to make the 3% royalty payments while continuing to operate cable television systems in all of the relevant central Texas cities. Plaintiffs' interpretation is not consistent with the language, the intent, the purpose, or the spirit of Section 66.004(f), and should not be embraced by the Court.

- **"The Fifth Circuit has made clear that S.B. 5—the Texas Cable Act—'is not a law of general applicability as it excludes statewide franchises from certain incumbents and singles out elements of the press for special treatment.' *Hudson*, 667 F.3d at 638."**

This argument is, at best, disingenuous. In *Hudson*, the Fifth Circuit was dealing only with the old Sections 66.004(a) and 66.004(b) of the *Texas Cable Act*: (1) not with Section 66.004(f); (2) not with the entirety of Section 66.004; and (3) not with the entire *Texas Cable Act*. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 634 (5th Cir. 2012). Plaintiffs know this because later on in their reply, while talking about Defendants' affirmative defense of res judicata related to the *Hudson* case, Plaintiffs make the following argument:

> Similarly fatal to Defendants' invocation of the *Hudson* litigation is their admission that "the Fifth Circuit was analyzing a different provision within Section 66.004," and their subsequent attempt to distinguish "the provision at issue in Hudson" from Charter's current constitutional claims regarding Section 66.004(f).

So, Plaintiffs know that the *Hudson* decision did not address Section 66.004(f), the entirety of Section 66.004, or the entirety of the *Texas Cable Act*. This knowledge does not stop them from making this argument, which makes it seem as though the Fifth Circuit declared the entirety of the *Texas Cable Act* to be a law that "singles out elements of the press for special treatment," when that is not the case.

- "Nor for that matter would it have made any sense for the 1964 Agreement to provide that the payment obligation would "terminate" if Ameco exercised its option to acquire the permits and one of the cities issued an additional permit to a third party who started operations in the city. Mot., Ex. C at 7-8 § 2(e)."
- "Indeed, this proviso confirms that the parties understood at the time that the city permits were valuable because they were *exclusive*."
- "The Act created an entirely different franchising approach by installing a new franchising authority, *non-exclusive* franchise rights, and different obligations compared to the prior, locality-based system, including uniform requirements for franchise fees, "in-kind" contributions of free services to cities, customer service requirements, and public, educational, and governmental access channels, as well as relaxed build-out requirements, and more."
- "The city permits purchased by Ameco were quite valuable at the time because cities were the only franchising authorities and they issued *exclusive permits* to cable operators."
- "Except, according to the Prewitts, Section 66.004(f) would operate to preserve and perpetuate only their own contractual right to payments under the Prewitt Agreements—but not Charter's contractual right to discontinue the payments once the consideration they received in exchange—*the exclusive city permits*—expired or were terminated."

This is a concept that Plaintiffs repeat throughout their renewed motion for summary judgment and their response to Defendant WAP's cross-motion for summary judgment: that the consideration for Plaintiffs' promise to continue making the 3% royalty payments was the existence of exclusive permits covering the relevant central Texas cities. But the reality is: (1) that the 1964 Agreement did not require exclusive permits for the lifetime of the contract; and (2) these permits became non-exclusive long before the passage of the *Texas Cable Act*.

Plaintiffs mistate that Section 2(e) of the 1964 Agreement provides that if ones of the cities in the 1964 Agreement issued a permit to a third-party then Plaintiffs' obligation to make the 3% royalty payment would terminate, which, according to Plaintiffs, "confirms that the parties understood at the time that the city permits were valuable *because they were exclusive*." But that is not what the 1964 Agreement says. The 1964 Agreement says that in the event any one of those cities issued a permit to a third-party "prior to January 31, 1969," and if that third-party actually operates a cable television system in one of the cities, then Plaintiffs' obligation to make the royalty payments terminates. Thus, the 1964 Agreement only required that the city

permits remain exclusive for five (5) years, after which the cities could issue additional, non-exclusive permits to third-parties without impacting Plaintiffs' obligation to make the 3% royalty payments under the Prewitt Agreements. Additionally, the 1971 Agreement contains no such language and does not require exclusive permits for any period of time.

Additionally, at least some of the city permits in the relevant central Texas cities became non-exclusive long before the passage of the *Texas Cable Act*. The permit issued to Plaintiffs' predecessor in interest in 1991 by the City of Waco stated, "***[a] franchise is nonexclusive***, and will not expressly or implicitly preclude the issuance of other franchises to operate cable systems within the City, or affect the City's right to authorize use of City Streets to other persons as it determines appropriate."[5] The permit issued to Plaintiffs' predecessor in interest in 1984 by the City of Temple stated:

> ***[T]his franchise*** and grant of right to use and occupy the City streets, sidewalks and other public easements for the purposes herein set forth and any renewal or extension of same ***is non-exclusive*** and does not establish priority for use over other franchise holders, permit holders and the City's own use of public property. The City hereby expressly reserves the right to grant a similar franchise, permit or license for use of said streets, sidewalks and other public easements or property to any person at any time during the period of this franchise.[6]

Similarly, the permit issued to Plaintiffs' predecessor in interest in 1985 by the City of Woodway stated:

> There is hereby granted by the City to Grantee ***the nonexclusive right and privilege*** to construct, erect, operate, and maintain, in, upon, along, across, above, over or under the public streets, alleys, easements, ways and places now laid out or dedicated and all extensions thereof and additions thereto in the City, all poles, wires, cables, underground conduits, manholes and other conductors and fixtures necessary for the maintenance and operation in the City of a cable television system for the transmission of television signals and other signals either separately or upon or in conjunction with any public utility maintaining the same in the City with all of the necessary and desirable appliances and appurtenances pertaining thereto…The rights granted herein for the purposes herein set for shall

---

[5] City of Waco Ordinance No. 1991-14, attached herein as Exhibit "A" (emphasis added)
[6] City of Temple Ordinance No. 1552, attached herein as Exhibit "B" (emphasis added)

not be exclusive.  The City reserves the right to make similar grants and the right to grant similar uses to any person at any time during the period of this franchise.[7]

These permits show that the city-issued permits became non-exclusive long before the passage of the *Texas Cable Act* and long before Plaintiffs acquired SICFAs covering any of the relevant central Texas cities.  These facts, combined with the language of the 1964 Agreement and the 1971 Agreement, show that continued exclusivity of the permits was not the consideration for Plaintiffs' promise to make the 3% royalty payments and that parties did not consider the permits to be valuable solely because they were exclusive.

## II.
## CONCLUSION

It should be very telling that Plaintiffs' rely on mischaracterizations and half-truths in making their arguments to the Court.  The reality is that Plaintiffs are willing to say *anything* in order to try to get out of their promise to make the 3% royalty payments to WAP, and this response is just more evidence of that.

---

[7] City of Woodway Ordinance No. 85-20, attached herein as Exhibit "C" (emphasis added)

Respectfully submitted,

| | |
|---|---|
| */s/ Roy L. Barrett* | */s/ Steve McConnico* |
| Roy L. Barrett | Steve McConnico |
| State Bar No. 01814000 | State Bar No. 13450300 |
| John Hawkins | Sam Johnson |
| State Bar No. 09249300 | State Bar No. 10790600 |
| John A. Powell | |
| State Bar No. 24029775 | of |
| Kristen A. Mynar | |
| State Bar No. 24074785 | SCOTT DOUGLASS McCONNICO |
| Robert Little | 303 Colorado Street, Suite 2400 |
| State Bar No. 24050940 | Austin, TX  78701 |
| | V: (512) 495-6300 |
| of | F: (512) 495-6399 |
| | |
| NAMAN, HOWELL, SMITH & LEE, PLLC | ATTORNEYS FOR WAP, LTD. AND |
| 400 Austin Avenue, Suite 800 | PREWITT MANAGEMENT, INC. |
| P.O. Box 1470 | |
| Waco, Texas 76703-1470 | |
| V: (254) 755-4129 | |
| F: (254) 754-6331 | |

## **CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing was delivered via electronic filing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record, on this 23rd day of May, 2018.

　　　　　　　　　　　　　　　　　　　　　　　/s/     Roy L. Barrett
　　　　　　　　　　　　　　　　　　　　　　　Roy L. Barrett