UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
Austin Division

| | |
|---|---|
| **CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE TEXAS LLC,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 1:16-cv-1268-LY** |
| ) | |
| **PREWITT MANAGEMENT, INC., as General Partner of WAP, Ltd., a Texas Limited Partnership, and** ) | |
| **WAP, LTD., a Texas Limited Partnership,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' SUMMARY OF THE CASE FOR TRIAL**

## TABLE OF CONTENTS

**Page**

I.      INTERPRETATION OF THE 1964 AND 1971 AGREEMENTS ....................................1

II.     INTERPRETATION AND EFFECT OF SECTION 66.004(f) OF THE TEXAS CABLE ACT ................................................................................................................3

III.    WHETHER SECTION 66.004(f) IS UNLAWFUL, PREEMPTED, AND/OR UNCONSTITUTIONAL ................................................................................................4

IV.     PLAINTIFFS ARE ENTITLED TO RECOVER SUMS WRONGFULLY COLLECTED AFTER THE CITY PERMITS EXPIRED...................................................7

V.      DEFENDANTS' AFFIRMATIVE DEFENSES ..................................................................8

VI.     WAP'S BREACH OF CONTRACT AND RESCISSION COUNTERCLAIMS.............10

## **TABLE OF AUTHORITIES**

**Page(s)**

Cases

*A.M. ex rel. McAllum v. Cash*
  585 F.3d 214 (5th Cir. 2009) ......................................................................7

*ACLU v. FCC*
  823 F.2d 1554 (D.C. Cir. 1987) ..................................................................4

*Allied Structural Steel Co. v. Spannaus*
  438 U.S. 234 (1978)......................................................................................6

*Ark. Writers' Project, Inc. v. Ragland*
  481 U.S. 221 (1987)......................................................................................6

*Ashcraft v. Lookadoo*
  952 S.W.2d 907 (Tex. Ct. App.—Dallas 1997).........................................2

*Bell v. Low Income Women of Tex.*
  95 S.W.3d 253 (Tex. 2002)..........................................................................7

*BMG Direct Mktg., Inc. v. Peake*
  178 S.W.3d 763 (Tex. 2005)........................................................................8

*Brown v. Oaklawn Bank*
  718 S.W.2d 678 (Tex. 1986)........................................................................8

*Cable TV Fund 14-A, Ltd. v. City of Naperville*
  No. 96 C 5962, 1997 WL 433628 (N.D. Ill. Jul. 29, 1997) ......................4

*Carey v. Brown*
  447 U.S. 455 (1980)......................................................................................7

*City of Rockwall v. Hughes*
  246 S.W.3d 621 (Tex. 2008)........................................................................4

*Clear Lake City Water Auth. v. Clear Lake Util. Co.*
  549 S.W.2d 385 (Tex. 1977)........................................................................4

*Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*
  525 S.W.3d 671 (Tex. 2017)........................................................................1

*Crisalli v. ARX Holding Corp.*
  177 F. App'x 417 (5th Cir. 2006) ...............................................................1

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*
    459 U.S. 400 (1983)........................................................................................5

*Exxon Corp. v. Oxxford Clothes, Inc.*
    109 F.3d 1070 (5th Cir. 1997) ......................................................................10

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*
    380 F.3d 849 (5th Cir. 2004) ........................................................................4

*Gen. Motors Corp. v. Romein*
    503 U.S. 181 (1992)......................................................................................5

*Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*
    24 F.3d 743 (5th Cir. 1994) ..........................................................................9

*Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*
    No. A-08-CA-767, 2010 WL 3522312 (W.D. Tex. Sept. 8, 2010) ...............3

*Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*
    575 F.2d 530 (5th Cir. 1978) ........................................................................9

*Lindquist v. City of Pasadena Texas*
    669 F.3d 225 (5th Cir. 2012) ........................................................................7

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*
    269 F.3d 494 (5th Cir. 2001) ........................................................................5

*Lopez v. Munoz, Hockema & Reed, L.L.P.*
    22 S.W.3d 857 (Tex. 2000)...........................................................................1

*Meza v. Gen. Battery Corp.*
    908 F.2d 1262 (5th Cir. 1990) ......................................................................9

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*
    460 U.S. 575 (1983)......................................................................................6

*Rogers v. Ricane Enterprises, Inc.*
    772 S.W.2d 76 (Tex. 1989)..........................................................................10

*In re SeaQuest Diving, LP*
    579 F.3d 411 (5th Cir. 2009) ......................................................................10

*SEC v. Helms*
    No. A-13-CV-1036 ML, 2015 WL 11255450 (W.D. Tex. July 2, 2015)................8

*Six Kingdoms Enters., LLC v. City of El Paso, Tex.*
    No. EP-10-CV-485-KC, 2011 WL 65864 (W.D. Tex. Jan. 10, 2011) ....................6

*Test Masters Educ. Servs. Inc. v. Singh*
    428 F.3d 559 (5th Cir. 2005) ........................................................................8

*Tex. Cable Ass'n et al. v. Hudson*
    No. 1:05cv00721 (W.D. Tex. May 31, 2012) ....................................................8, 9

*Time Warner Cable, Inc. v. Hudson*
    667 F.3d 630 (5th Cir. 2012) ............................................................6, 8, 9, 10

*Trient Partners I Ltd. v. Blockbuster Entm't Corp.*
    83 F.3d 704 (5th Cir. 1996) ...........................................................................4

*Turner Broad. Sys., Inc. v. F.C.C.*
    512 U.S. 622 (1994).......................................................................................6

*Ulico Cas. Co. v. Allied Pilots Ass'n*
    262 S.W.3d 773 (Tex. 2008)........................................................................10

*Wehling v. Columbia Broad. Sys.*
    721 F.2d 506 (5th Cir. 1983) ..........................................................................8

*Yturria v. Kerr-McGee Oil & Gas Onshore, LP*
    No. 7:05-CV-181, 2006 WL 3227326, at *16 (S.D. Tex. Nov. 6, 2006) ..................8

<u>Statutes</u>

42 U.S.C. § 1983 .........................................................................................................6

47 U.S.C. § 522(10) ....................................................................................................4

47 U.S.C. § 542(b) ......................................................................................................4

47 U.S.C. § 542(g)(1) ..................................................................................................4

47 U.S.C. § 556(c) .......................................................................................................4

Tex. Util. Code § 66.003..............................................................................................2

Tex. Util. Code § 66.004(a)-(b) ...............................................................................1, 9

Tex. Util. Code § 66.004(f).........................................................................3, 4, 5, 6, 7, 8, 9

Tex. Util. Code §§ 66.005-66.008 ...............................................................................2

Tex. Util. Code § 66.005(a) .........................................................................................4

<u>Other Authorities</u>

Tex. Const. Article I, § 18............................................................................................6

Tex. Const. Article I, § 26..................................................................................................4

Tex. Const. Article III, § 56(b)..........................................................................................6

U.S. Const. Article I, § 10.................................................................................................5

JX-1...............................................................................................1, 5, 6, 7, 8, 10, 11

JX-2..................................................................................................................2, 3, 5, 11

JX-3........................................................................................................................3, 11

JX-4.........................................................................................................................8, 9

JX-5..........................................................................................2, 3, 4, 5, 8, 9, 11

JX-6.........................................................................................................................8, 9

JX-9.............................................................................................................................1

JX-10...........................................................................................................................1

JX-11...........................................................................................................................1

JX-12...........................................................................................................................1

JX-13...........................................................................................................................1

JX-14.........................................................................................................................11

JX-19...........................................................................................................................6

JX-20...........................................................................................................................6

JX-21...........................................................................................................................5

JX-21...........................................................................................................................6

JX-38...........................................................................................................................5

JX-39...........................................................................................................................5

JX-52...........................................................................................................................1

As directed by the Court at the May 18, 2018 pre-trial conference, Plaintiffs Charter Communications, Inc. ("Charter") and Time Warner Cable Texas LLC ("TWC"), hereby submit a summary of their case for trial.[1]

## I.   INTERPRETATION OF THE 1964 AND 1971 AGREEMENTS

- The terms of the two agreements at issue in this case, from 1964 and 1971 ("the Prewitt Agreements"), have a definite legal meaning and are not susceptible to multiple reasonable interpretations. Thus, the Prewitt Agreements are unambiguous and should be interpreted only on their face.[2]

- In 1963 and 1964, W.A. Prewitt, Jr.—the predecessor in interest to WAP, Ltd. ("WAP")—obtained initial municipal permits from the cities of Temple, Waco, and McGregor, which gave him exclusive authority to construct and operate cable systems in those cities' rights-of-way.[3] In 1966, the cities of Bellmead, Beverly Hills, and Woodway issued local permits to an entity controlled by Plaintiffs' predecessor.[4] All of these City Permits had fixed terms, and each was subsequently renewed for a specified term of years. Each City Permit later expired by its own terms or was terminated by state-issued certificates of franchise authority ("SICFAs"), whichever was earlier.[5]

  - The City Permits expired by their terms on June 2, 2004 (Temple); June 5, 2006 (Waco); February 12, 2014 (McGregor), September 7, 2005 (Beverly Hills), April 25, 2015 (Woodway), respectively.[6]

  - TWC obtained SICFAs on the following dates covering the following service areas: Temple (02/16/2006); Bellmead (03/31/2006); Beverly Hills (05/15/2006); Waco (08/21/2006); McGregor (12/20/2011); and Woodway (12/20/2011).[7]

---

[1] Plaintiffs' claims and defenses are fully articulated in Plaintiffs' fully-briefed Renewed Mot. for Summ. J. (ECF 80 & 107), Plaintiffs' Proposed Findings of Fact and Conclusions of Law (ECF 100), and Plaintiffs' fully briefed Motion to Dismiss Counterclaims of Prewitt Management, Inc. (ECF 84 & 95). Plaintiffs' position on the interpretation of the agreements by reference to the documents themselves and not any extrinsic evidence is the subject of their pending Motion in Limine No. 1 to Exclude Extrinsic and Parol Evidence Regarding the Prewitt Agreements (ECF 102).

[2] *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017); *Crisalli v. ARX Holding Corp.*, 177 F. App'x 417, 419 (5th Cir. 2006); *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

[3] JX-1, ¶¶11-13; JX-9; JX-10; JX-11.

[4] JX-1, ¶¶ 20-21; JX-12; JX-13; JX-52.

[5] JX-1, ¶ 42-43; Tex. Util. Code § 66.004(b).

[6] JX-10 at DEF1333; JX-9 at DEF1091 & 1138; JX-11 at DEF817-28; JX-52 at DEF1709; JX-12 at DEF798.

[7] JX-1, ¶ 42.

- The parties to the Prewitt Agreements intended that the "permits" described in those Agreements were only city-issued permits.[8]

- Plaintiffs' three percent payment obligation under the Prewitt Agreements arose solely from the sale and assignment of the city-issued permits and was expressly limited in duration to the life of each assigned city-issued permit, extending only so far as those permits continued to exist based on the *cities*' authority to issue new, renewed, or extended permits.[9]  Indeed, the parties clearly intended that the obligation to pay the Prewitts was only to "run with the [city-issued] permits," and only those permits.[10]

  o The payment obligation under the Prewitt Agreements was not attached to the operation of the cable system.  Had the parties intended that the payment obligation would continue for that duration, regardless of the permit or franchise authority under which the cable systems were allowed to occupy the right-of-way, the parties could have said that.  But they did not.

    Had the parties chosen to tie the payment obligation only to the operation of the cable systems themselves, there would have been no reason to provide for payments only "during the life of each such assigned permit and amendments thereto," or to state that the payment obligation was to "run with the permits."  Nor would it have made any sense for the 1964 Agreement to provide that the payment obligation would "terminate" if Ameco exercised its option to acquire the permits and one of the cities issued an additional permit to a third party who started operations in the city.[11]

- The SICFAs obtained by TWC cannot be interpreted as renewals, amendments, extensions, or holdings over of the "permits" referred to or defined in the Prewitt Agreements, which contemplated only cities as granting authorities for the City Permits.  Under the Texas Cable Act, SICFAs are issued by the state rather than cities—an entirely different franchising authority—and they confer distinct rights and obligations compared to the prior, locality-based system, including uniform requirements for franchise fees, "in-kind" contributions of free services to cities, customer service requirements, and public, educational, and governmental access channels, as well as relaxed build-out requirements.[12]

---

[8] JX-2 at 4, § 1(d); *id*. at 10, § 6; *id*. at 7 § 2(d); *id*. at 10 § 8; *id*. at 1, § 1(c); JX-5 at 4 § V; *id*. at 5 § V(b); *id*. at 6 § V(b); *id*. at 8 § V(b).

[9] JX-2 at 4 § 2; *id*. at 4-5 § 2(b); JX-5 at 5-6 § V(b).

[10] JX-2 at 5 § 2(b); JX-5 at 6 § V(b).

[11] JX-2 at 7-8 § 2(e).

[12] *See, e.g.*, Tex. Util. Code §§ 66.003, 66.005-66.008; *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 911 (Tex. Ct. App.—Dallas 1997) ("[T]he parties here made their own contract, and we lack the power to vary those terms to protect one of them from the unforeseen consequences of their agreement.").

- Because the City Permits have expired, the Prewitt Agreements and any payment obligations thereunder are null and void and without further force or effect as of the date each City Permit was terminated by a SICFA.[13]

- There is no basis in the Prewitt Agreements, the 1965 Chattel Mortgages, in law, or in equity for converting a lien on the expired City Permits into a lien on state-issued SICFAs and an encumbrance on the cable systems owned in fee by Plaintiffs.[14]  If WAP were to obtain a lien on TWC's SICFAs, that lien would constitute an unconstitutional taking.

  - The 1965 Chattel Mortgages were liens on the city-issued permits only—not the cable systems—and each provided that "[i]n the event of default," the secured party will "take all steps necessary to cause *the permit in question* to be transferred back to the mortgagee."[15]

  - There is no evidence that Mr. Prewitt's successors ever sought to perfect any vendor's lien or chattel mortgage on any state-issued SICFA.  Nor is there any evidence that WAP ever actually *had* any charge or lien against any of TWC's SICFAs.

- Under the Prewitt Agreements, Mr. Prewitt's only remedy for any failure to make payment on a given permit was that the "instrument shall be of no further force or effect and *such permit* shall automatically revert" to Mr. Prewitt, his heirs, successors and assigns."[16]  The same was true under the Instruments of Assignment.[17]

## II.   INTERPRETATION AND EFFECT OF SECTION 66.004(f) OF THE TEXAS CABLE ACT

- The 1971 Agreement provides that the Prewitt Agreements "will remain in full force and effect *as written*."[18]

- Section 66.004(f) states that it was not "intended to abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations" incurred "before the date a franchise expired."  That necessarily includes the rights and remedies expressed in the Prewitt Agreements, including Plaintiffs' right to stop paying when the City Permits expired, and the right to halt payments at any time with the only consequence being a reversion of the City Permits.  Defendants themselves repeatedly have characterized Section 66.004(f) as a

---

[13] *Ins. Distribs. Int'l (Bermuda) LTD. v. Edgewater Consulting Grp. LTD.*, No. A-08-CA-767, 2010 WL 3522312, at *13 (W.D. Tex. Sept. 8, 2010) ("[W]hen a contract is limited by a recognized contingency or an event of limited duration, then it is reasonable for a court to look to that contingency or event to imply a term for the contract.").

[14] *See* JX-2 at 5-6 § 2(b); JX-5 at 8, § V(b).

[15] JX-3 at DEF45; DEF55; DEF65.

[16] JX-5 at 7, § V(b).

[17] JX-3 at DEF32; DEF38; DEF43; DEF51; DEF61; DEF71.

[18] JX-5 at 3, § IV (emphasis added).

"savings" clause, although they apparently maintain that it saves only their own rights to collect the 3% fee but not the right of Plaintiffs to halt payments when the City Permits terminated or to stop their payments and tender the City Permits back to Mr. Prewitt's successors.

- Reading Section 66.004(f) to extend the expired Prewitt Agreements beyond the expiration of the City Permits is unnecessary and "would lead to absurd results."[19]  It would ignore that the Prewitt Agreements were to be enforced "as written" and would entirely deny Plaintiffs' contractual right to cancel the payment obligation by choosing not to renew or extend their obligations under the expired City Permits.[20]

## III.   WHETHER SECTION 66.004(f) IS UNLAWFUL, PREEMPTED, AND/OR UNCONSTITUTIONAL

- ***Invalid Perpetual Contract.***  If Section 66.004(f) properly could be read as continuing Plaintiffs' payment obligations beyond the expiration of the City Permits, then the Prewitt Agreements as so interpreted would be perpetual and indefinite in duration, and as such, unlawful and/or terminable at will by either party.[21]

- ***Federal Cable Act Preemption.***  Interpreting Section 66.004(f) to require Plaintiffs to make payments to Defendants would violate and be preempted by the federal Cable Act, which limits franchise fees imposed by any governmental entities to no more than five percent of the cable operator's gross revenues from cable service.[22]  (The Texas Cable Act also caps franchise fees at five percent of a cable operator's gross revenues from cable service).[23]

    o   The franchise fee cap is mandatory and preempts any inconsistent state law.[24]

    o   A "franchise fee" is defined to "include[] any tax, fee, or assessment *of any kind imposed **by** a franchising authority or other governmental authority* on a cable operator . . . solely because of their status as such."[25]  There is no requirement that a franchise fee actually be paid *to* a governmental authority; only that a government authority impose the tax, fee, or assessment on the cable operator.

---

[19] *City of Rockwall v. Hughes*, 246 S.W.3d 621, 626 (Tex. 2008).

[20] *See* JX-5 at 3, § IV.

[21] *See Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 856 (5th Cir. 2004); *Trient Partners I Ltd. v. Blockbuster Entm't Corp.*, 83 F.3d 704, 708 (5th Cir. 1996); *Clear Lake City Water Auth. v. Clear Lake Util. Co.*, 549 S.W.2d 385, 391 (Tex. 1977); Tex. Const.  art. I, § 26 (prohibiting perpetuities).

[22] 47 U.S.C. §§ 522(10) & 542(b).

[23] Tex. Util. Code § 66.005(a).

[24] 47 U.S.C. § 556(c); *ACLU v. FCC*, 823 F.2d 1554, 1574 (D.C. Cir. 1987); *Cable TV Fund 14-A, Ltd. v. City of Naperville*, No. 96 C 5962, 1997 WL 433628, at *24-25 (N.D. Ill. Jul. 29, 1997).

[25]  47 U.S.C. § 542(g)(1) (emphasis added).

o Defendants do not dispute that TWC already pays the statutory maximum franchise fee of five percent to each of the Texas cities in which it operates.

- ***Federal Contracts Clause Violation.*** The Prewitt Agreements governed Plaintiffs' rights and obligations only during the life of the City Permits. Those Agreements were protected against government impairment by the Federal Contracts clause.[26]

    o Applying Section 66.004(f) to convert City Permits of limited duration with payment obligations that ran with the permits into perpetual payment obligations, despite the expiration of the City Permits and the Agreements expressly providing they were to be enforced "as written,"[27] would violate the Federal Contracts clause because it would result in a "substantial impairment of a contractual relationship" by the State.[28] It would reform and impair the terms of the Prewitt Agreements providing that the payment obligation was only for the "life of the permits" and was to "run with the permits."[29] And it would impair Plaintiffs right to stop the payments during the contract term and thereby render the Prewitt Agreements "of no further force or effect" so long as they tendered the City Permits to Mr. Prewitt's successors.[30]

    o The resulting impairments would be "substantial" because they would impose unnecessary and unreasonable costs on Plaintiffs and harm their competitive position in the market.

    o Neither Defendants nor the State has proffered any proof that Section 66.004(f) serves a "significant and legitimate public purpose" such as the "remedying of a broad and general social or economic problem," rather than "providing a benefit to special interests."[31]

    o The only evidence of Section 66.004(f)'s purpose is that it was drafted by the Prewitts' attorney "to protect existing parties [the Prewitts] who have contractual rights with respect to local franchises,"[32] then sent to Senator Fraser, who added it to SB 5 with minor revision.[33]

---

[26] U.S. Const. art. I, § 10.

[27] JX-5 at 3, § IV.

[28] *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992) (quotations omitted); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504 (5th Cir. 2001) ("[T]he court should consider the expectations of the parties with respect to changes in the law," including "whether the subject matter of the contracts had been subject to regulation at the time the contracts were made" and "what terms of the contract are affected and the duration of the effects.").

[29] JX-2 at 4 § 2; *id.* at 4-5 § 2(b); JX-5 at 5-6 § V(b).

[30] JX-5 at 7 § V(b).

[31] *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983).

[32] JX-21.

[33] JX-1, ¶¶ 32-38; JX-38; JX-39.

This is "uncomfortably close" to the exact issue the Supreme Court "has cautioned courts to investigate, that is, a legislative body acting to benefit one group of special interests at the expense of another."[34]

- ***Violation of Plaintiffs' Free Speech Rights.*** Interpreting Section 66.004(f) to extend Plaintiffs' payment obligations beyond the life of the City Permits would violate Plaintiffs' Free Speech rights under the U.S. and Texas constitutions.[35]

  o Cable operators such as Plaintiffs "engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment."[36]

  o Section 66.004(f) is not a law of general applicability and would be subject to strict scrutiny if it were interpreted to operate as Defendants suggest.[37]

  o Under Defendants' construction, Section 66.004(f) would mandate disparate treatment of, on the one hand, incumbent cable operators (such as Plaintiffs) burdened by "contractual rights, duties, and obligations" with private third parties stemming from prior municipal franchises, and on the other hand, new-entrant providers that never held municipal franchises before Texas moved to the state-issued franchising system, and therefore never had any private contractual agreements concerning cable permits for the construction and operation of cable systems.[38]

  o The communications between the Prewitts' attorney and Senator Fraser (the authors of Section 66.004(f)), suggests the section was drafted with the intent of burdening only the Plaintiffs for the benefit of the Prewitts.[39]

    ▪ This evidence indicates that Section 66.004(f) is an unconstitutional "special law" or special privilege, unreasonably designed to affect a particular class of persons distinguished by some characteristic other than geography.[40]

  o Applying strict scrutiny, Section 66.004(f) would violate the First Amendment if Defendants' interpretation were adopted, because the State has not shown that the

---

[34] *Six Kingdoms Enters., LLC v. City of El Paso, Tex.*, No. EP-10-CV-485-KC, 2011 WL 65864, at *6 (W.D. Tex. Jan. 10, 2011); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 248-49 (1978).

[35] U.S. Const. amend. I; Tex. Const. art. I, § 18; *see* 42 U.S.C. § 1983.

[36] *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 636 (1994); *see also Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 638 (5th Cir. 2012).

[37] *See Hudson*, 667 F.3d at 638; *see also Turner*, 512 U.S. at 640-41; *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228-29 (1987); *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585, 591-92 (1983).

[38] Tex. Util. Code § 66.004(f); *see Hudson*, 667 F.3d at 638-41.

[39] JX-1, ¶¶ 32-38; JX-19; JX-20; JX-21.

[40] Tex. Const. art. III, § 56(b)

section's discrimination against a small and identifiable number of cable operators is necessary to serve a compelling state interest (or any state interest at all) and is narrowly drawn to achieve that end.

o   Even applying intermediate scrutiny, the State has not put forth any substantial governmental interest for an interpretation of Section 66.004(f) that would burden the speech of only a handful of communications providers, let alone one that is no greater than necessary.

- **_Equal Protection Violation._**  For the same reasons that Section 66.004(f) would violate Plaintiffs' free speech rights under Defendants' construction, Section 66.004(f) also would violate Plaintiffs' equal protection rights under the U.S. and Texas Constitutions.

    o   "Under the equal protection clause, strict scrutiny applies to classifications that infringe on a fundamental right . . . such as the right to free speech."[41]  And "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."[42]  The same "federal analytical approach applies to equal protection challenges under the Texas Constitution."[43]

    o   Defendants' interpretation of Section 66.004(f) would distinguish among cable operators without a substantial state interest, and would not be finely tailored, rendering Section 66.004(f) unconstitutional.

### IV.   PLAINTIFFS ARE ENTITLED TO RECOVER SUMS WRONGFULLY COLLECTED AFTER THE CITY PERMITS EXPIRED

- Because the City Permits expired by their own terms or by TWC obtaining SICFAs covering each of the six cities between 2006 and 2011, Plaintiffs should be awarded judgment in the sum of all amounts collected by Defendants from Plaintiffs for each of those cities from the date each City Permit expired or was replaced, including Plaintiffs' October 21, 2016 payment to WAP for $500,355.38 made under protest:

    o   $7,115,866.51, if subject to a four-year statute of limitations.[44]

    o   $3,763,359.46, if subject to a two-year statute of limitations.[45]

---

[41] _A.M. ex rel. McAllum v. Cash_, 585 F.3d 214, 226 (5th Cir. 2009).

[42] _Carey v. Brown_, 447 U.S. 455, 461-62 (1980).

[43] _Lindquist v. City of Pasadena Texas_, 669 F.3d 225, 233 (5th Cir. 2012) (quoting _Bell v. Low Income Women of Tex._, 95 S.W.3d 253, 266 (Tex. 2002)).

[44] JX-1, ¶ 56 & Ex. A (payments 1/17/2013 through 10/21/2016).

[45] JX-1, ¶ 56 & Ex. A (payments 1/13/2015 through 10/21/2016).

## V.   DEFENDANTS' AFFIRMATIVE DEFENSES

- *Ratification.*   Defendants have not met their burden of proving "(1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act."[46]   That TWC stated Section 66.004(f) was "Not Applicable" on certain SICFA applications is non-dispositive and does not demonstrate approval or full knowledge of the facts.[47]   Defendants also have provided no evidence that Plaintiffs' conduct was intended to give validity to the earlier act.   Nor could a new contract be ratified due to a failure of consideration.   Even if the record could support a defense of ratification, ratification could not deprive Plaintiffs of their contractual right to halt payments.

- *Voluntary Payment/Estoppel, Equitable Estoppel and Quasi-Estoppel.*   Defendants' voluntary payments affirmative defense fails because Defendants have offered no evidence that the payments were made with full knowledge of all facts related to the payments or that Defendants detrimentally relied on payments by Plaintiffs' predecessors.[48]

- *Res Judicata and Collateral Estoppel.*   Defendants have not met their burden of establishing that the 1971 Bell County Lawsuit or the *Hudson* federal litigation erect any res judicata and collateral estoppel bars to Plaintiffs' claims.[49]

  o   For res judicata, Defendants must establish that (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a "final judgment on the merits"; and (4) the same claim or cause of action was involved in both actions."[50]

    For collateral estoppel, Defendants must establish (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue has been actually litigated in the prior litigation; and (3) the determination of the issue in the prior litigation has been a critical and necessary part of the judgment in that earlier action.[51]

---

[46] *SEC v. Helms*, No. A-13-CV-1036 ML, 2015 WL 11255450, at *6 (W.D. Tex. July 2, 2015); *see also Yturria v. Kerr-McGee Oil & Gas Onshore, LP*, No. 7:05-CV-181, 2006 WL 3227326, at *16 (S.D. Tex. Nov. 6, 2006) (denying ratification defense where defendants failed to "establish[] beyond peradventure 'all' of the essential elements of the defense of ratification."), *aff'd sub nom.*, 291 F. App'x 626 (5th Cir. 2008).

[47] *See* JX-1, ¶ 64.

[48] *See Brown v. Oaklawn Bank*, 718 S.W.2d 678, 681 (Tex. 1986); *see also BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 771 (Tex. 2005) (stating the voluntary payment rule's "scope has diminished" and is now has only "limited application in Texas jurisprudence").

[49] JX-4; JX-5; JX-6; *Hudson*, 667 F.3d at 630; Final Judgment After Remand, *Tex. Cable Ass'n et al. v. Hudson*, No. 1:05cv00721, at 3-5 (W.D. Tex. May 31, 2012).

[50] *Test Masters Educ. Servs. Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005).

[51] *Wehling v. Columbia Broad. Sys.*, 721 F.2d 506, 508 (5th Cir. 1983).

o   The 1971 lawsuit did not result in any final judgment on the merits. Rather, the parties settled their dispute, after which the court entered a stipulated order of dismissal "with prejudice as to the matters settled by [the 1971] agreement, but *otherwise without prejudice*" that lacked any discussion whatsoever of the merits.[52]

o   The *Hudson* litigation has no res judicata effect because neither Defendant here was a party to it, and Defendants do not satisfy any of the conditions necessary to show they have similarity in interest (privity) to the defendants there. Defendants interests were not adequately represented in the prior suit because Defendants cannot show that they "authorized a party in the prior suit to represent [their] interests, or [that they were] represented as a member of a class or association in the original litigation," which obviously was not the case in *Hudson*.[53] And, neither WAP nor Prewitt Management, Inc. ever sought to intervene in the *Hudson* litigation.

o   Neither of the prior litigations presented the same facts, claims, causes of action, or issues at stake here.

   o   Mr. Prewitt's claims in the 1971 lawsuit were entirely distinct from the claims in the instant case, and that action pre-dated Section 66.004(f) and Texas' transition to state-issued franchises by decades.[54]

   o   The plaintiffs in the *Hudson* litigation challenged only specific provisions of the Texas Cable Act—Sections 66.004(a) and (b)—on the grounds that they unconstitutionally excluded incumbent cable operators from statewide franchises.[55] And Defendants have repeatedly admitted that in *Hudson*, "the Fifth Circuit was analyzing a different provision within Section 66.004."[56]

   o   *Hudson* did not address the plaintiffs' Equal Protection claim.[57] And when *Hudson* was initiated in September 2005, TWC still held and operated under its city permits, meaning it would not have had an injury-in-fact sufficient to

---

[52] JX-6 (emphasis added); *see also Kaspar Wire Works, Inc. v. Leco Eng'g & Mach., Inc.*, 575 F.2d 530, 535 (5th Cir. 1978) ("[F]amiliar principles of res judicata cannot be applied automatically to judgments dismissing suits for declaratory relief without stated reasons.").

[53] *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990); *see also Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 747 (5th Cir. 1994) ("[I]t is not enough that the non-party may be interested in the same questions or proving the same facts.").

[54] JX-4; JX-5.

[55] *Hudson*, 667 F.3d at 642; Final Judgment After Remand, *Tex. Cable Ass'n et al. v. Hudson*, No. 1:05cv00721, at 3-5 (W.D. Tex. May 31, 2012).

[56] ECF 91, ¶ 97; ECF 114 ("In *Hudson*, the Fifth Circuit was dealing only with the old Sections 66.004(a) and 66.004(b) . . . not with Section 66.004(f)."); ECF 73-1 & 74, ¶ 48 (stating *Hudson* "held that a different provision of Section 66.004 was unconstitutional"); *id.* ¶ 49 ("In *Hudson*, the Fifth Circuit was analyzing a different provision within Section 66.004 of the *Texas Cable Act*."); *Id.* ¶ 51 (contrasting from Section 66.004(f) "the provision at issue in *Hudson*").

[57] *Hudson*, 667 F.3d at 642 n.19.

argue that its payment obligations under the Prewitt Agreements expired or were terminated by SICFAs it did not yet hold.[58]

- *Laches.* Defendants have not met their burden of proving "(1) unreasonable delay by one [Plaintiffs] having legal or equitable rights in asserting them; and (2) a good faith change of position by another [Defendants] to [their] detriment because of the delay."[59]

- *Waiver.* Defendants have not met their burden of proving "*the intentional* relinquishment of a right actually known, or intentional conduct inconsistent with claiming that right" by Plaintiffs.[60]

## VI.   WAP'S BREACH OF CONTRACT AND RESCISSION COUNTERCLAIMS

- *WAP's Breach of Contract Counterclaim Should Be Denied.*

  o WAP cannot deny Plaintiffs' right to terminate the Prewitt Agreements by arguing that Mr. Prewitt, but not Plaintiffs, has fully performed under the Agreements. WAP already stipulated that Plaintiffs or their predecessors made all required payments during the life of the City Permits, establishing that Plaintiffs also fully performed their obligations while the Prewitt Agreements were in effect.[61]

  o Under the Prewitt Agreements, Plaintiffs' predecessors received from Mr. Prewitt the assignments of exclusive city permits, which, as WAP admits, had value only during the life of those permits.[62] When TWC secured its non-exclusive SICFAs without the involvement or help of Defendants, the underlying predicate and any consideration received under the Prewitt Agreements vanished.

- *WAP's Rescission and Foreclosure on Chattel Mortgages Counterclaims Should Be Denied.*

  o "As a general rule, rescission puts an end to a contract," and the purpose "is to place the parties in the position that they would have occupied if no such contract had ever been made."[63] Here, placing the parties in a position as if no contracts had been made would mean not just returning the six city permits to WAP, but also requiring WAP to

---

[58] *See Hudson*, 667 F.3d at 634; 1:05-cv-00721-LY, ECF 1 (*Hudson* initiated on Sept. 8, 2005).

[59] *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1082 (5th Cir. 1997) (quoting *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76, 80 (Tex. 1989)).

[60] *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008) (emphasis added).

[61] *See* JX-1, ¶ 22.

[62] JX-1, ¶ 12-13; ECF 91, ¶ 8 ("Charter's predecessor in interest acquired [from Mr. Prewitt] exclusive franchise rights."), ¶ 10 (describing the "exclusive permits"); ¶ 11 (stating "the permits were valuable property"), ¶ 199 ("W.A. Prewitt, Jr. obtained permits giving him the exclusive right to develop and operate cable systems"); *see also* ECF 76, ¶ 4; ECF 77, ¶ 4.

[63] *In re SeaQuest Diving, LP*, 579 F.3d 411, 419 (5th Cir. 2009).

repay to Plaintiffs all past contractual payments made to the WAP and Mr. Prewitt dating back to 1964.  So, WAP really seeks a *forfeiture* of Plaintiffs' property.

o   Under the unambiguous terms of the 1964 Agreement, once Plaintiffs' predecessor, Ameco, exercised the option to purchase the city permits, the parties agreed all "*facilities (including but not limited to property and equipment) . . . shall be and remain the property of . . . Ameco and its assigns*."[64]  Defendants have stipulated that Ameco exercised this option.[65]

o   Mr. Prewitt confirmed to the Internal Revenue Service *under oath* that upon selling the city permits, he "*relinquished all incidents of ownership*" and that "payments based on future revenues derived from the systems utilizing the permits *[did] not constitute the retention of an economic interest in the property sold*."[66] JSUF ¶ 24.

o   The Prewitt Agreements, the 1965 Instruments of Assignment, and the Chattel Mortgages only contemplated a reversion of the *City Permits*—not the cable systems.

   ▪   Under the 1971 Agreement, Mr. Prewitt's only remedy for any failure to make a payment on a given city permit was that the "*instrument* shall be of no further force or effect and *such permit* [*i.e.,* the city permit] shall automatically revert" to Mr. Prewitt, his heirs, successors, and assigns.[67]

   ▪   The 1965 Chattel Mortgages each provided that "[i]n the event of default," the secured party will "take all steps necessary to cause *the permit in question* to be transferred back to the mortgagee."[68]  The same was true under each of the Instruments of Assignment.[69]

• If WAP were to obtain a lien on TWC's SICFAs, that lien would constitute an unconstitutional taking without compensation because the SICFAs cover more than just the six cities with respect to whose City Permits Mr. Prewitt once had an interest.  There also is no evidence that Mr. Prewitt or his successors properly perfected any vendor's lien or chattel mortgage on any city-issued permit.  Nor is there any evidence that WAP had any charge or lien against any of TWC's SICFAs.

---

[64] JX-2 at 4 § 1(d) (emphasis added).

[65] JX-1, ¶ 15.

[66] JX-14 at DEF355 (emphasis added); *see also* JX-1, ¶ 24.

[67] JX-5, at 7 § V(b).

[68] JX-3 at DEF45 (emphasis added); DEF55; DEF65.

[69] JX-3 at DEF32; DEF38; DEF43; DEF51; DEF61; DEF71.

Dated:  June 11, 2018                 Respectfully submitted,

                                  By   /s/ Steven P. Hollman
                                             _____

                                           R. James George, Jr.
                                           GEORGE BROTHERS KINCAID & HORTON LLP
                                           1100 Norwood Tower
                                           114 W 7th Street, Suite 1100
                                           Austin, Texas 78701
                                           512.495.1410 Telephone
                                           E-mail:  rjgeorge@gbkh.com

                                           Gardner F. Gillespie (admitted *pro hac vice*)
                                           Steven P. Hollman (admitted *pro hac vice*)
                                           J. Aaron George (admitted *pro hac vice*)
                                           Abraham J. Shanedling (admitted *pro hac vice*)
                                           James N. Bierman, Jr. (admitted *pro hac vice*)
                                           SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
                                           2099 Pennsylvania Avenue, N.W., Suite 100
                                           Washington, D.C.  20006-6801
                                           202.747.1941 Telephone
                                           Email: ggillespie@sheppardmullin.com
                                                shollman@sheppardmullin.com
                                                ageorge@sheppardmullin.com
                                                ashanedling@sheppardmullin.com
                                                jbierman@sheppardmullin.com

                                           *Counsel for Plaintiffs*
                                           *Charter Communications, Inc. and*
                                           *Time Warner Cable Texas LLC*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that a true and correct copy of the foregoing PLAINTIFFS' SUMMARY OF THE CASE FOR TRIAL was delivered via electronic filing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record on this 11th day of June 2018.


/s/ *Steven P. Hollman*
Steven P. Hollman