IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2023 APR 28 PM 3: 19

CLERK, US DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY_____
                    DEPUTY

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC., AND TIME WARNER CABLE TEXAS LLC, <br> PLAINTIFFS, <br><br> V. <br><br> PREWITT MANAGEMENT, INC., AS GENERAL PARTNER OF WAP, LTD., A TEXAS LIMITED PARTNERSHIP, DONNA L. NELSON, IN HER OFFICIAL CAPACITY AS CHAIRMAN OF THE PUBLIC UTILITY COMMISSION OF TEXAS, KENNETH W. ANDERSON., JR., IN HIS OFFICIAL CAPACITY AS COMMISSIONER OF THE PUBLIC UTILITY COMMISSIONER OF TEXAS, BRANDY MARTY MARQUEZ, IN HER OFFICIAL CAPACITY AS COMMISSIONER OF THE PUBLIC UTILITY COMMISSION OF TEXAS, AND WAP, LTD. <br> DEFENDANTS. | CAUSE NO. 1:16-CV-1268-LY |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is the above-referenced cause.  On August 21, 2018, the court called the case for bench trial, and all parties appeared through counsel.  The trial concluded the same day, and the parties submitted post-trial briefing.  Having carefully considered the briefing, exhibits, arguments of counsel, applicable law, and entire case file, the court makes the following findings of fact and conclusions of law.[1]

---

[1]    All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed.  Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

## I.   BACKGROUND

When cable-television providers entered the Texas market decades ago, they needed the permission of individual cities to construct, maintain, and operate cable systems in public spaces. Cities granted permission through permit agreements, which generally gave the permit holder the exclusive right to build a cable network in public rights-of-way for a term of years.

In the 1960s, W.A. Prewitt Jr., then operating movie theaters, realized that cable television was the wave of the future. In 1963 and 1964, Prewitt obtained cable permits from the cities of Waco, Temple, and McGregor, Texas. The permits authorized Prewitt to exclusively construct, maintain, and operate cable systems in those cities for a term of 20 years.

In 1964, Bruce Merrill of Ameco, Inc. ("Ameco")—a corporate predecessor of Plaintiff Charter Communications, Inc.—approached Prewitt about purchasing the Waco, Temple, and McGregor permits (the "City Permits"). The parties reached an agreement on March 12, 1964 (the "1964 Agreement"). Under the 1964 Agreement, Prewitt would form one or more Texas corporations (to be owned and run by Ameco) for the purposes of constructing, owning, and operating cable systems in Waco, Temple, and McGregor. Prewitt agreed to lease the City Permits to the soon-to-be-formed corporations until August 1964. In exchange for the lease, the corporations would pay Prewitt an initial sum of $10,553.58 and an additional sum of 3% of the gross revenue derived from the operation of the cable systems during the time of the lease. The agreement also provided the corporations with the option to purchase the City Permits for 3% of the gross revenue derived from the cable systems, to be paid quarterly to Prewitt and his heirs "during the life of each assigned permit and amendments thereto." If the corporations did not exercise the option and the lease expired, the City Permits would revert to and remain the property of Prewitt.

Pursuant to the 1964 Agreement, Prewitt[2] incorporated three Texas corporations (the "Ameco subsidiaries"). Ameco exercised the option to purchase the City Permits from Prewitt. As required by the 1964 Agreement, the parties entered into instruments of assignment and chattel mortgages for each City Permit. The instruments of assignment transferred and assigned the City Permits to the Ameco subsidiaries, reiterating the obligations assumed and providing that, should Ameco breach any obligation under the existing agreements, the City Permits "shall automatically revert to W.A. PREWITT, JR., his heirs, executors, administrators and assigns." The chattel mortgages secured Prewitt's interest in the City Permits and likewise provided that, should Ameco default or breach any agreement between the parties, the City Permits shall "be transferred back to mortgagee [Prewitt]." Ameco and its subsidiaries (hereinafter, "Charter"[3]) began making the quarterly 3% gross-revenue payments to Prewitt from the operation of the cable systems in Waco, Temple, and McGregor.

---

[2]   The permits at issue flowed through a number of different entities throughout their lifespans. Prewitt Management, Inc., a named defendant this suit, is a Texas corporation and the general partner of WAP, Ltd., also a defendant named in this suit. WAP, Ltd. is the successor to the interests of Prewitt. The parties stipulate that WAP, Ltd. is the successor-in-interest to whatever rights, entitlements, obligations, and duties that Prewitt may have had or may be determined by the court to continue to have under the 1964 Agreement, the instruments of assignment and the chattel mortgages, and later agreements. As the interests of Defendants Prewitt Management and WAP, Ltd., do not diverge, the court will refer to Defendants collectively as "Prewitt," unless otherwise noted or as needed for context.

[3]   Plaintiffs Time Warner Cable Texas LLC ("Time Warner") and Charter are successors-in-interest to the Ameco subsidiaries. Time Warner, a subsidiary of Charter, now holds a Texas state permit to provide cable services in Texas, including the cities of Waco, Temple, McGregor, Bellmead, Beverly Hills, and Woodway. The parties stipulate that Plaintiffs are the successors-in-interest to whatever rights, entitlements, obligations, and duties that Ameco, Inc. and the Ameco subsidiaries may have had, or may be determined by the court to continue to have, under the 1964 Agreement, the instruments of assignment and the chattel mortgages, and later agreements. As the interests of Time Warner and Charter do not diverge, the court will refer to Plaintiffs collectively as "Charter," unless otherwise noted or as needed for context.

In 1966, an Ameco subsidiary obtained 20-year cable-television permits for Bellmead, Beverly Hills, and Woodway, Texas—smaller "bedroom" communities bordering Waco.   In 1971, Prewitt sued Ameco and the Ameco subsidiaries, claiming in part that he had equitable title to and interest in those permits because of the 1964 Agreement, assignments, and chattel mortgages.   The parties entered into a settlement agreement (the "1971 Agreement") in which Ameco and its subsidiaries agreed to pay Prewitt and his heirs 3% of the gross revenue generated from the operation of cable systems in the three cities.

Over the next several decades, Charter amended and renewed the City Permits. Throughout the various amendments and renewals, Charter continued making the 3% gross-revenue payments to Prewitt on a quarterly basis.

In 2005, the Texas Legislature passed the Texas Cable Act (the "Act"), which vests the State of Texas (the "State") through the Public Utility Commission (the "Commission") with sole authority to regulate the construction and operation of cable networks in public rights-of-way.   S.B. 5, 79th Leg., 2nd C.S., ch. 2 § 27, 2005 Tex. Gen. Laws 4–34 (codified at Tex. Util. Code § 66.001 *et seq.*).   The Act phased out the previous municipal permitting system and instead grants the Commission authority to issue "state issued certificates of franchise authority" or "SICFAs."[4]  *Id.*

After September 1, 2005, only the Commission, and no longer individual cities, can grant new permissions to entities seeking to provide cable service in the State.   Tex. Util. Code Ann. § 66.003(a).   When a cable provider obtains a SICFA from the Commission, it can apply to amend the SICFA to cover additional service areas.   16 Tex. Admin. Code § 28.6(g).

---

[4]  The Texas Cable Act refers to the agreements as "franchises" and not permits.   The court refers to the state-issued franchise agreements as "franchises" and city-issued permits as "permits."

As initially passed, the Act granted smaller, non-incumbent cable providers (meaning, cable providers who were *not* the first to build cable networks in a city) the option to terminate any existing city-issued cable permit after September 1, 2005, and instead acquire a SICFA to cover those areas. *Id.* § 66.004(b). Incumbent cable providers could not seek a SICFA for a given municipal area until the most recent city-issued cable permit for the area expired. *Id.* § 66.003(a).

Charter, an incumbent cable provider in all cities at issue, could not exercise the option to immediately terminate any unexpired City Permit. The City Permits for Temple and Waco expired by their own terms on June 2, 2004, and June 5, 2006, respectively. Charter obtained a SICFA from the Commission in early 2006. Charter amended the SICFA on February 16, 2006, to cover the relevant service area in Temple. Charter again amended the SICFA on August 21, 2006, to cover the relevant service area in Waco.

In 2011, the Legislature amended the Act to allow incumbent cable providers to terminate an unexpired city permit and obtain a SICFA for a cable network in a city with a population of less than 215,000. *Id.* § 66.004(b-1). Acting under this amendment, Charter terminated the City Permit for McGregor, which has a population less than 215,000, on December 20, 2011. The same day, Charter amended the SICFA to cover McGregor. In 2012, the provisions of the Act differentiating between incumbent and non-incumbent providers in their abilities to terminate a municipal agreement and obtain a SICFA were held unconstitutional, thus allowing any cable provider to terminate an unexpired city-issued permit and instead obtain a SICFA. *See Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 642 (5th Cir. 2012).

5

Importantly, the Act also contains a provision dealing with existing contracts between a cable provider and a private party. The provision (hereinafter, the "Saving Clause"[5]) purports to prevent the Act from "abrogat[ing], nullify[ing], or adversely affectin[ing]" any existing contractual rights "incurred by a cable service provider . . . and owed or owing to any private person, firm, partnership, corporation, or other entity, *including without limitation those obligations measured by and related to the gross revenue.*" *See* Tex. Util. Code Ann. § 66.004(f) (emphasis added). The Saving Clause further provides that all royalty obligations incurred prior to the Act's passage "shall apply as though the revenue generated by the holder of a [SICFA] continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority." *Id.*

Charter continued making quarterly royalty payments to Prewitt for each city after the passage of the Act and after acquiring and amending the SICFA to cover the relevant service areas. Between 2005 and 2016, Charter paid Prewitt approximately $17 million in royalties. Charter merged with Time Warner in 2015. On October 21, 2016, Charter rendered a quarterly payment to Prewitt in the amount of $500,355.38 under protest. Charter has not made a royalty payment to Prewitt since.

Charter now sues Prewitt, seeking declaratory judgment that the 1964 Agreement and all later agreements (collectively, the "Agreements") are no longer enforceable because the royalty-payment obligations ended as the SICFA and its amendments replaced each City Permit. Alternatively, Charter seeks declaratory judgment that (1) the Agreements are unenforceable because they are indefinite in duration; (2) the Act's Saving Clause violates and is preempted by the Federal Cable Act; (3) the Saving Clause violates the First Amendment and the Equal

---

[5] The court refers to the applicable provision of Act as the "Saving Clause" because the parties used this terminology at trial. The Commission also referred to this provision as a "savings provision" in its motion to dismiss.

Protection Clause; and (4) the Saving Clause violates the Contracts Clause. Charter also seeks money damages for the payments it rendered to Prewitt between 2006 and 2016 after the SICFA and its amendments replaced the City Permits.

Prewitt brings counterclaims against Charter for breach of contract, unjust enrichment, declaratory judgment, injunctive relief, rescission, and foreclosure of the chattel mortgages. Prewitt argues that Charter ratified the royalty-payment obligations under the Agreements by continuing to pay Prewitt quarterly until 2016 even under the state-franchising system. Prewitt contends that because Charter ratified the Agreements, Charter's royalty-payment obligations must continue until Charter no longer operates cable systems in Waco, Temple, and McGregor.

For the reasons to follow, the court concludes that Charter's royalty-payment obligations ended as Charter acquired and amended the SICFA to cover each city, after which Charter could have repudiated the Agreements. However, Charter ratified the Agreements under the SICFA by continuing to make quarterly royalty payments until October 21, 2016. When Charter refused to make the next quarterly payment due in January 2017, it breached the ratified Agreements, causing the automatic reversion of whatever remained of the City Permits to Prewitt. The Agreements (and any ratification thereof) terminated in their entirety in January 2017. The court will render declaratory judgment accordingly by separate order.

## II.    ANALYSIS

The court will interpret the Agreements, discuss the effect of the Saving Clause, and address the issue of ratification. The court need not address Charter's arguments related to indefinite contracts, the Federal Cable Act, the First Amendment, the Equal Protection Clause, or the Contracts Clause.

## A. The language of the Agreements

Charter argues that the language of the Agreements shows that Charter's royalty-payment obligations ended as the SICFA and its amendments replaced the City Permits. Prewitt, on the other hand, argues that Charter's royalty-payment obligations hinge on Charter's continued *operation* of cable systems in Waco, Temple, and McGregor, not on the existence of the City Permits. According to Prewitt, the language of Agreements is broad enough support continued royalty-payment obligations even under the SICFA.

At trial, Prewitt abandoned any counterclaim for continued royalty-payments for Bellmead, Beverly Hills, and Woodway, because the royalty-payment obligations for these cities arose under the 1971 Agreement, not the 1964 Agreement. Prewitt seeks damages and continued royalty payments for only the cities of Waco, Temple, and McGregor.

### i.  *General principles of contract interpretation*

The parties agree that Texas law controls the interpretation of the contracts at issue. When parties dispute a contract's meaning, the court's primary objective is to "ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). "[A] contract's plain language controls" and the court must look towards "[o]bjective manifestations of intent." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 888 (Tex. 2019). If a court can give a clear and definite legal meaning to a contract, the contract is not ambiguous as a matter of law. *FPL Energy, LLC v. TXU Portfolio Mgmt. Co., L.P.*, 426 S.W.3d 59, 63 (Tex. 2014). Deciding whether a contract is ambiguous requires the court to examine the contract as a whole considering the circumstances present when the contract was entered. *Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C.*, 352 S.W.3d 445, 449–50 (Tex. 2011). If a contract is unambiguous, the court must enforce the

contract as written. *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). If a contract is ambiguous, the court may look to extraneous evidence to determine the true meaning of the instrument. *URI*, 543 S.W.3d at 764–65. Even when construing the terms of an unambiguous contract, the court may consult "surrounding facts and circumstances" to "provide context that elucidates the meaning employed." *Id.* at 765.

The court begins with the parties' first agreement—the 1964 Agreement—and will then address the corresponding instruments of assignment and chattel mortgages. The court will also address when, exactly, Charter's royalty-payment obligations ended.

ii. *The 1964 Agreement*

Both sides argue that the 1964 Agreement is unambiguous. The court agrees. The 1964 Agreement begins by recognizing that Prewitt "has obtained permits from Texas cities of Waco, Temple, and McGregor, which permits authorize Prewitt to construct, maintain and operate community antenna systems (CATV systems) in such cities." The agreement defines "the permits" in section 1(d): "The permits *from the cities* (sometimes referred to herein as "the permits" or "the city permits"), shall be and remain the property of Prewitt unless [Charter's purchase option] is exercised" (emphasis added). In describing the purchase option, the agreement provides that Charter must make the 3% royalty payments "*during the life of each such assigned permit* and amendments thereto, and any holding over thereunder, renewals or extensions thereof" (emphasis added). The agreement notes that the royalty-payment obligations "shall run with the permits."

Examining the language of the 1964 Agreement as a whole, the court finds that Charter's royalty-payment obligation for each city ended as the SICFA and its amendments replaced each City Permit—February 16, 2006, for Temple, August 21, 2006, for Waco, and December 20,

9

2011, for McGregor. The words of the agreement support this outcome because Charter's royalty-payment obligations "shall run with the permits"; the parties define "permits" as "permits from the cities"; and the parties explicitly recognize that Prewitt "has obtained permits from Texas cities of Waco, Temple, and McGregor." No language in the agreement indicates that the parties intended the royalty-payment obligations to extend beyond the lives of the City Permits. *See Pathfinder*, 574 S.W.3d at 888 ("[A] contract's plain language controls, not what one side or the other alleges they intended to say but did not.").

The court further finds that when the parties signed the 1964 Agreement, they did so under the reasonable expectation and assumption that the cities, not the State, would issue cable permits. The court consults the "surrounding facts and circumstances . . . to provide context" for the terms of the agreement, noting that when the parties signed the Agreements, only cities issued cable permits. *See URI*, 543 S.W.3d at 765; *Hudson*, 667 F.3d 630, 633 (5th Cir. 2012) ("Historically, cable providers in Texas obtained [] local government permission by negotiating long-term franchise agreements with each municipality."). The signatories to the agreement contemplated a city-by-city permitting system because that was the practice at the time. Indeed, this municipal-permitting system would continue for over 40 years after the parties signed the 1964 Agreement. The facts and circumstances surrounding the agreement further affirm its unambiguous language, which ties Charter's royalty-payment obligations to the lives of the City Permits. *URI*, 543 S.W.3d at 757 (courts may consult "objectively determinable facts and circumstances that contextualize the parties' transaction").

Prewitt, on the other hand, argues that Charter's royalty-permit obligations continue even under the SICFA. Prewitt largely relies on one clause from the 1964 Agreement: "in the event *any new permit* is granted to [Charter] after the expiration of the existing permits, *such new*

*permit* shall be conclusively treated and considered as a renewal of the existing permit, even if the terms thereof are new and different" (emphasis added).  Prewitt argues that the phrases "any new permit" and "such new permit" are broad enough to obligate Charter's continued royalty payments under the SICFA.  However, Prewitt's interpretation does not construe the terms "in the context in which they are used." *URI*, 543 S.W.3d at 764.  Prewitt's interpretation does not take into consideration the facts and circumstances surrounding the 1964 Agreement (a city-by-city permitting regime), nor does it address the language in the 1964 Agreement that consistently refers to city-issued permits. *See Pathfinder*, 574 S.W.3d at 889 (courts "must consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract").  Further, the instruments of assignment and chattel mortgages effectuating the 1964 Agreement clearly define "any new permit" as being granted "by the Cit[ies] of [Waco, Temple, and McGregor]."

### iii. *The instruments of assignment and chattel mortgages*

The instruments of assignment and chattel mortgages, which the parties executed after signing the 1964 Agreement, likewise confirm the unambiguous language of the 1964 Agreement.  "Generally, when parties enter into a second contract dealing with the same subject matter as a prior contract . . . the two contracts must be interpreted together and the later contract prevails to the extent they are inconsistent." *Subsea Co. v. Payan*, 448 S.W.3d 557, 560 (Tex. App.—Houston [14th Dist.] 2014, no pet.).  "Documents 'pertaining to the same transaction may be read together,' even if they are executed at different times and do not reference each other, and 'courts may construe all the documents as if they were part of a single, unified instrument.'" *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (quoting *Fort Worth ISD v. City of Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000)).

Two aspects of the instruments of assignment and chattel mortgages reaffirm the unambiguous language of the 1964 Agreement: (1) the city-specific "any new permit" language in the instruments of assignment and (2) the breach-and-remedy language in both the instruments of assignment and the chattel mortgages. The instruments of assignment and chattel mortgages incorporate the 1964 Agreement in full, stating that "the agreement dated March 12, 1964, between Prewitt and [Charter], referred to above, is hereby incorporated herein and made a part hereof by reference for all purposes."

First, the instruments of assignment, using much of the same language as the 1964 Agreement, transfer each City Permit from Prewitt to Charter for $10.00 and "the agreement of [Charter] to pay to [Prewitt] . . . three per cent (3%) of the gross revenues." Each instrument of assignment provides that Charter's royalty-payment obligations "shall run with the permit," along with any renewals, amendments, extensions, and holding-over periods. Importantly, the "any new permit" language in the instruments of assignment specifically references city-issued permits. The instrument of assignment for Temple, for example, reads: "in the event any new permit *is granted by the City of Temple* . . . such new permit shall be conclusively treated and considered as a renewal of the existing permit" (emphasis added). Each instrument of assignment contains city-specific "any new permit" language, providing further support to the fact that the Agreements tied Charter's royalty-payment obligations to the City Permits.

The breach-and-remedy language in the instruments of assignment and chattel mortgages further support this point. The instruments of assignment provide that "upon the breach of any such obligation by [Charter] hereunder . . . this instrument shall be of no further force or effect and such permit shall automatically revert to [Prewitt]." The chattel mortgages likewise provide that "in the event of default in the terms of this mortgage of any obligation secured thereby . . .

[Charter] will take all steps necessary to cause the permit in question to be transferred back to [Prewitt]." The court finds that Prewitt's bargained-for remedy in the event that Charter breached any obligation under the Agreements was the reversion of the City Permits. This remedy further supports the idea that the Agreements tied Charter's royalty-payment obligations to the life of the City Permits. Prewitt could not—and does not—claim any right to Charter's SICFA, which Charter acquired wholly without Prewitt.

The court finds that the parties entered into the Agreements under the basic assumption that the City Permits would continue to exist. When Charter obtained and amended the SICFA to cover the relevant service areas in Waco, Temple, and McGregor, the City Permits ceased to exist and Charter's duty to tender quarterly royalty payments to Prewitt ended.

### iv. Timing

The court turns to when, exactly, Charter's royalty-payment obligations ended under the plain terms of the 1964 Agreement. For two cities—Waco and Temple—Charter argues that the royalty-payment obligations ended when the City Permits expired on their own terms: June 2, 2004 (Temple) and June 5, 2006 (Waco). Charter had not yet amended the SICFA to include Temple and Waco when the permits expired. However, the 1964 Agreement obligates Charter's royalty payments "during the life of each assigned permit and amendments thereto, and *any holding over thereunder*." The court finds that the time periods between the expiration of the City Permits and the SICFA amendments (two months for Waco, 20 months for Temple) constitute "holding over" periods under the expired City Permits, and Charter's royalty-payment obligations to Prewitt continued during these periods. *See* HOLDING OVER, Black's Law Dictionary (11th ed. 2019) (in landlord-tenant law, "holding over" means "continuing to occupy the leased premises after the lease term has expired"). When Charter amended the SICFA to

cover Temple and Waco (February 16, 2006, and August 21, 2006, respectively), any holding-over period under the City Permits ended, since Charter's ability to construct and operate cable networks in the cities derived from a wholly separate State-issued franchise, not a City Permit.

Under the plain terms of the 1964 Agreement, Charter's royalty-payment obligation for Temple ended on February 16, 2006, when Charter amended the SICFA to cover Temple; Charter's royalty-payment obligation for Waco ended on August 21, 2006, when Charter amended the SICFA to cover Waco; and Charter's royalty-payment obligation for McGregor ended on December 20, 2011, when Charter terminated the City Permit for McGregor under the Act and amended the SICFA to cover McGregor.

In sum, when the parties entered into the Agreements, they did so under the basic expectation and assumption that the cities, not the State, would issue permits to cable providers. Reflecting this expectation, the plain language of the Agreements ties Charter's royalty-payment obligations to the continued existence of the City Permits.  Charter's royalty-payment obligation for each city ended when Charter amended the SICFA to cover each municipal area—February 16, 2006, for Temple, August 21, 2006, for Waco, and December 20, 2011, for McGregor.  At these three points in time, under the language of the Agreements, Charter was discharged of its royalty-payment obligation for each respective city.

Charter, of course, did not repudiate the Agreements at these three points in time, but instead continued paying royalties to Prewitt on a quarterly basis until 2016.  But before turning to the issue of ratification, the court will first address what effect—if any—the Act and the Saving Clause have on the Agreements.

**B. The Texas Cable Act and the Saving Clause**

In 2005, the Texas Legislature passed the Act, described as an "Act Relating to Furthering Competition in the Communications Industry." *See Hudson*, 667 F.3d at 633. The Act aimed to minimize regulatory costs and ease entry into the cable market by switching from a municipal-permitting system to a statewide-franchising system. *See id.* Importantly for this case, included in the Act is the Saving Clause, which reads in full:

> Except as provided in this chapter, nothing in this chapter is intended to abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations existing and incurred by a cable service provider or a video service provider before the date a franchise expires or the date a provider terminates a franchise under Subsection (b-1) or (b-2), as applicable, and owed or owing to any private person, firm, partnership, corporation, or other entity including without limitation those obligations measured by and related to the gross revenue hereafter received by the holder of a state-issued certificate of franchise authority for services provided in the geographic area to which such prior franchise or permit applies. All liens, security interests, royalties, and other contracts, rights, and interests in effect on September 1, 2005, or the date a franchise is terminated under Subsection (b-1) or (b-2) shall continue in full force and effect, without the necessity for renewal, extension, or continuance, and shall be paid and performed by the holder of a state-issued certificate of franchise authority, and shall apply as though the revenue generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority or municipality within the geographic area to which the prior permit or franchise applies. It shall be a condition to the issuance and continuance of a state-issued certificate of franchise authority that the private contractual rights and obligations herein described continue to be honored, paid, or performed to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such state-issued certificate of franchise authority and any renewals or extensions thereof, and that the applicant so agrees. Any person, firm, partnership, corporation, or other entity holding or claiming rights herein reserved may enforce same by an action brought in a court of competent jurisdiction.

Tex. Util. Code Ann. § 66.004(f). The Act, including the Saving Clause, took effect September 1, 2005. At that time, Charter operated under an existing, non-expired City Permit (McGregor) and under a holding-over period tied to expired City Permits (Waco and Temple)—all instances that required Charter's continued royalty payments under the plain language of the Agreements.

The first city at issue to receive coverage under Charter's SICFA was Temple on February 16, 2006. Under the terms of the Agreements, Charter's royalty-payment obligations for Temple ended on this day. The court now turns to what affect—if any—the Saving Clause had on Charter's royalty-payment obligations at this point in time. For the reasons to follow, the court finds that the Saving Clause, by its own language, does not affect Charter's royalty-payment obligations under the plain terms of the Agreements.

First, the Saving Clause provides that nothing in the Act is meant to "abrogate, nullify, or adversely affect in any way" any existing "contractual rights, duties, and obligations" between a cable-service provider and a private party. *Id.* The Agreements constitute existing agreements between a cable-service provider (Charter) and a private party (Prewitt). Under the terms of the Agreements, Charter's royalty-payment obligations ended when Charter's SICFA and its amendments replaced the City Permits. The Saving Clause does not "abrogate, nullify, or adversely affect in any way" Charter's ability to repudiate the Agreements when the royalty-payment obligations ended. *See id.* Nor does the Saving Clause affect the provided-for remedy in the Agreements: the automatic reversion of the whatever remained of the City Permits to Prewitt. Construing the Saving Clause in this way "give[s] effect to the Legislature's intent as expressed by the statute's language." *See Presidio ISD v. Scott*, 309 S.W.3d 927, 930 (Tex. 2010).

The Commission's interpretation of the Saving Clause also aligns with this outcome. *See Harris Cnty. Appraisal Dist. v. Texas Workforce Comm'n*, 519 S.W.3d 113, 118 (Tex. 2017) ("an agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration.'"). In briefing, the Commission described the Saving Clause as a "provision preserving cable providers' existing third-party contractual obligations at the time they obtained

a state-issued franchise." According to the Commission, the Saving Clause "does not purport to extinguish any existing obligation or create any new obligation, for that matter." When Charter amended the SICFA to cover Temple, its existing third-party contractual obligations with Prewitt tied Charter's royalty-payment obligations to the City Permits. Charter's amendment of the SICFA to cover Temple ended Charter's royalty-payment obligation for that city. Under the Commission's interpretation, the Saving Clause does not "create any new obligation" for Charter to continue paying Prewitt under the SICFA because under the plain terms of the Agreements, Charter's royalty-payment obligation had already ended.

Prewitt, on the other hand, argues that the Saving Clause requires the court (and the parties) to treat the SICFA and its subsequent amendments as if they were issued by the cities of Waco, Temple, and McGregor, thus obligating Charter to make royalty payments to Prewitt for so long as Charter continues to operate cable networks in these cities. Under Prewitt's interpretation, the Saving Clause serves to unilaterally reform the plain language of the Agreements to obligate Charter's continued payments under an entirely new franchising regime, where authorization comes from the State, not the original cities. Doing so rewrites the plain terms of the Agreements, replacing the terms that specifically tie Charter's royalty-payment obligations to the City Permits with a broader obligation to continue paying royalties under the SICFA. Moreover, Prewitt's construction strips the Agreements of their bargained-for remedy— the return of the City Permits to Prewitt upon Charter's breach—because Charter's obligations would continue even though the City Permits have now terminated. Such an interpretation raises a host of issues. *Quick v. City of Austin*, 7 S.W.3d 109, 115 (Tex. 1998) (courts "should, if possible, interpret the statute in a manner that avoids constitutional infirmity"); *Texas Mun. League Intergovernmental Risk Pool v. Texas Workers' Comp. Comm'n*, 74 S.W.3d 377, 381

(Tex. 2002) ("[Courts] presume that the Legislature intended for the law to comply with the United States and Texas Constitutions, to achieve a just and reasonable result, and to advance a public rather than a private interest.").

The court declines to adopt Prewitt's interpretation and instead concludes that the Saving Clause, by its own language, does not affect the existing Agreements between the parties.

### C. Ratification

Having found that Charter's royalty-payment obligations terminated as Charter's SICFA and its amendments replaced the City Permits, the court now turns to the issue of ratification. Prewitt argues that, even if the Agreements between the parties terminated when the SICFA and its amendments replaced the City Permits, Charter nonetheless ratified the royalty-payment obligations under the statewide-franchising system by continuing to make quarterly royalty payments to Prewitt until October 2016. Charter responds that it did not ratify the Agreements because it lacked full knowledge of the Agreements and did not intend to give validity to the Agreements under the SICFA. Alternatively, Charter argues that it ratified the Agreements only as to the periods that it paid Prewitt, but that any ratification of the Agreements ended when Charter stopped making payments after October 2016.

### i. Law

"Ratification is the adoption or confirmation by a person with knowledge of all material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021). Courts recognize two types of ratification—express ratification and implied ratification. *Id.* Express ratification occurs by express act or word. *Id.* Implied ratification "may be inferred from a party's course of conduct." *Id.* Courts recite three elements for ratification: "(1) approval by act, word, or

conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act." *Porter-Garcia v. Travis Law Firm, P.C.*, 564 S.W.3d 75, 92 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

A party seeking to establish ratification "must point to words or actions that 'clearly evidence[e] an intention to ratify.'" *BPX*, 629 S.W.3d at 197–98. In determining a party's intention (or lack thereof) to ratify, courts look to "the totality of the circumstances" and focus on "objective evidence of intent," such as the party's conduct. *Id.* at 197. "Acceptance of benefits is a quintessential indicator of ratification, and it will support a finding of ratification as a matter of law in many cases." *Id.* at 200. A party can also ratify a contract "by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it." *United States v. McBride*, 571 F. Supp. 596, 613 (S.D. Tex. 1983), aff'd, 915 F.2d 1569 (5th Cir. 1990). A party can ratify a contract even if it did not receive benefits under the ratified contract. *Malin Int'l Ship Repair & Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 250 (5th Cir. 2016). Ratification extends to the entire transaction, meaning that a party "cannot ratify those parts of the transaction which are beneficial and disavow those which are detrimental." *BPX*, 629 S.W.3d at 196.

   *ii. Analysis*

Prewitt argues that Charter impliedly ratified the Agreements under the statewide-franchising system when it continued to make quarterly payments to Prewitt between 2006 and 2016. Charter argues that it lacked the requisite knowledge to ratify the Agreements.

The parties do not meaningfully dispute the first element of ratification—that Charter demonstrated "approval by act, word, or conduct." *See Porter-Garcia*, 564 S.W.3d at 92. Charter continued paying Prewitt after obtaining and amending the SICFA. The parties concede

that Charter's continued royalty payments constitute an act or conduct evidencing approval of the Agreements under the SICFA.

For the second element of ratification, Charter argues that it did not possess "full knowledge of the facts of the earlier act"—namely, full knowledge of the Agreements and how the regulatory shift to the SICFA affected the Agreements. *See id.* The court disagrees. The record overflows with evidence demonstrating that Charter—a sophisticated organization with ample legal resources—had full knowledge of the Agreements. The parties stipulate that Time Warner possessed copies of portions of the 1964 Agreement and 1971 Agreement before the merger with Charter. Charter's files include a 2001 memo in which a Time Warner employee discussed the 1964 and 1971 Agreements. Charter's responses to interrogatories and requests for admission establish that Charter's president, John Bickham, knew of the Agreements at the earliest during 1995 and by the latest during 2000. The record clearly establishes that Charter had full knowledge of the Agreements.

For the third element of ratification, Charter argues that no evidence supports that it had "the intention of giving validity to the earlier act." *See id.* Again, the court disagrees. Looking to the totality of the circumstances, the court finds that Charter's continued payments between 2006 and 2016—a period spanning over a decade—provides "clear[] evidence" of an intention to ratify, at least for that period. *See BPX*, 629 S.W.3d at 197–98. Charter had copies of the 1964 and 1971 Agreements, Charter created at least one memo concerning the Agreements, and Charter sent various emails about the Agreements. And throughout this entire period, Charter continued to make quarterly royalty payments to Prewitt in large, noticeable sums. The court concludes that Prewitt has established by clear evidence that Charter ratified the royalty-payment

obligations from February 16, 2006 (when Charter acquired the first SICFA) until October 21, 2016 (when Charter tendered its final royalty payment).[6]

Prewitt takes this conclusion a step further, arguing that because Charter ratified the Agreements until 2016, Charter must now make royalty payments until it ceases to operate cable networks in the cities of Waco, Temple, and McGregor. However, Prewitt's position is inconsistent with the terms of the Agreements and Texas law, which provides that "[r]atification is not a game of 'gotcha.'" *See id.* at 202. In continuing to pay Prewitt until October 2016, Charter ratified the royalty-payment obligations under the Agreement, but, in doing so, it ratified the Agreements in full—including the terms for breach, remedy, and termination. *See id.* at 196 ("Ratification extends to the entire transaction."). Charter's decision to halt payment constitutes a breach of the ratified Agreements. Upon Charter's breach, the Agreements (through the instruments of assignment and chattel mortgages) provide that the City Permits "shall automatically revert to [Prewitt], his heirs, executors, administrators and assigns." The Agreements (through the instruments of assignment) further provide that, upon Charter's breach, the Agreements "shall be of no further force or effect." When Charter breached the ratified Agreements in January of 2017, whatever remained of the City Permits reverted to Prewitt, and the Agreements (and any ratification thereof) terminated.

The court concludes that Charter does not owe Prewitt damages or continued royalties for any period of operation after October 21, 2016, and Prewitt does not owe Charter damages for the payments Charter tendered between 2006 and 2016.

---

[6] The court also concludes that although Charter rendered its final royalty payment under protest, the act of tendering the payment—along with Charter's full knowledge of the Agreements and the totality of the circumstances—likewise constitutes ratification under the three-element test.

## III.    CONCLUSION

The court finds that under the Agreements, Charter's royalty-payment obligations ended as the SICFA and its amendments replaced each City Permit. Charter, however, ratified the Agreements—and therefore the royalty-payment obligations—under the SICFA when it made quarterly royalty payments to Prewitt between 2006 and 2016. Charter breached the ratified Agreements when it refused to make a quarterly royalty payment in January of 2017, causing the automatic reversion of whatever remained of the City Permits to Prewitt and the final termination of the Agreements. The court will render declaratory judgment accordingly by separate order. As the court conducted the bench trial in this case,

**IT IS ORDERED** that Charter's Renewed Motion for Summary Judgment filed April 6, 2018 (Doc. #80) is **DISMISSED** in light of these Findings of Fact and Conclusions of Law.

**IT IS FURTHER ORDERED** that Charter's Motion to Dismiss Counterclaims of Prewitt Management, Inc. filed April 11, 2018 (Doc. #84) is **DISMISSED** in light of these Findings of Fact and Conclusions of Law.

**IT IS FINALLY ORDERED** that Charter's Motion in Limine No.1 to Exclude Extrinsic and Parol Evidence Regarding the Prewitt Agreements filed May 4, 2018 (Doc. #102) is **DISMISSED**, as the court did not consider extrinsic or parol evidence in making these findings of fact or conclusions of law.

SIGNED this _____ day of April, 2023.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE