# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**Austin Division**

| | |
|---|---|
| CHARTER COMMUNICATIONS, INC., and TIME WARNER CABLE TEXAS LLC, <br><br> Plaintiffs/Counter-Defendants, <br><br> v. <br><br> PREWITT MANAGEMENT, INC., as General Partner of WAP, Ltd., a Texas Limited Partnership, <br><br> and <br><br> WAP, LTD., a Texas Limited Partnership, <br><br> Defendants/Counterclaimants. | Case No. 1:16-cv-1268-RP |

## THIRD AMENDED COMPLAINT

For their Third Amended Complaint against Defendants Prewitt Management, Inc. and WAP, Ltd., Plaintiffs/Counter-Defendants Charter Communications, Inc. and Time Warner Cable Texas LLC (collectively "Plaintiffs" or "Charter") state and allege the following:

## JURISDICTION AND VENUE

1.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Charter's claims arise under the laws of the United States, including 47 U.S.C. § 542, 28 U.S.C. § 1343(a)(3) and (4), 42 U.S.C. § 1983, the First Amendment to the U.S. Constitution , and the Equal Protection and Contract Clauses of the U.S. Constitution.  This Court has equitable jurisdiction to enjoin unconstitutional action.  *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).  The declaratory and injunctive relief sought herein are authorized by 28 U.S.C. §§ 2201 and 2202.  The Court has supplemental jurisdiction over claims

arising under state law, which are part of the same case or controversy as the federal claims.  28 U.S.C. § 1367(a).

2.      This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds the jurisdictional minimum.

a.      As of the date of Plaintiffs' Second Amended Complaint (Dkt. 72), March 29, 2018, Plaintiff Charter Communications, Inc. was a publicly-held corporation incorporated in Delaware with its principal place of business (*i.e.*, where its high level officers directed, controlled, and coordinated the corporation's activities) in Stamford, Connecticut.  Today, Charter Communications, Inc. is still a publicly-held corporation incorporated in Delaware with its principal place of business (*i.e.*, where its high level officers directed, controlled, and coordinated the corporation's activities) in Stamford, Connecticut.  Therefore, Charter Communications, Inc. is a citizen of Delaware and Connecticut for diversity jurisdiction purposes.

b.      Plaintiff Time Warner Cable Texas LLC ("TWC") (n/k/a Spectrum Gulf Coast, LLC), is a limited liability company directly managed by Charter Communications, Inc.[1] The citizenship of TWC's members, as of March 29, 2018 – the date of Plaintiff's Second Amended Complaint (Dkt. 72), is listed in Exhibit C, which shows that TWC's ultimate, incorporated entity members were incorporated in Delaware and New York, with their principal places of business in Connecticut and New York.  Therefore, TWC is a citizen of Delaware, New York, and Connecticut for diversity jurisdiction purposes.

---

[1]  Effective September 15, 2018, Time Warner Cable Texas LLC, changed its name to Spectrum Gulf Coast, LLC by filing a Certificate of Amendment with the Delaware Secretary of State.  A Certificate of Amended Registration related to the name change was filed with the Texas Secretary of State on September 19, 2018.  Dkt. 170-1 ¶¶ 7-8.

c.     Defendant Prewitt Management, Inc. ("PMI") is a corporation incorporated in Texas as of the date of Plaintiffs' Second Amended Complaint (Dkt. 72), and still is.  PMI therefore is a citizen of Texas for diversity jurisdiction purposes.

d.     Defendant WAP, Ltd. ("WAP") is a limited partnership formed in Texas. WAP's 1995 Limited Partnership Agreement, which WAP attached to its February 2018 motion to intervene (Dkt. 46-3), showed that WAP's partners were PMI (the general partner) along with thirteen limited partners, one of whom was an individual (Mellicient M. Prewitt) and the rest of whom were individuals (W. A. Prewitt, III, and Raymond A. Prewitt) named "as Trustee[s] of" various Prewitt family trusts domiciled in Texas and California.  Dkt. 46-3; *see also* Dkt. 136-14 at 165; Dkt. 167-68.  With this information, Charter filed its Second Amended Complaint (Dkt. 72), as ordered by the Court (Dkt. 69). In Defendants' August 12, 2024, filing regarding jurisdiction, however, Defendants stated that as of the date of the Second Amended Complaint, WAP's partners included individuals and trusts domiciled in Texas, California, Washington, Arizona, and Arkansas. Dkt. 169.  Nevertheless complete diversity exists here even if WAP is also a citizen of Washington, Arizona, and Arkansas, along with Texas and California.   WAP therefore is a citizen of Texas, California, Washington, Arizona, and Arkansas for diversity jurisdiction purposes.

e.     Based on information from Defendants, Defendants therefore are citizens of Texas, California, Washington, Arizona, and Arkansas, meaning complete diversity between the parties exists.

f.     The amount in controversy in the direct claims of Charter Communications, Inc., and Time Warner Cable Texas LLC, exceeds $75,000.  *See* Dkt. 96 at 3-4, 6, 8 (¶¶ 22, 41, 56); Dkt. 96-1.

3.      Venue lies in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this controversy occurred in this district.

## NATURE OF THE CASE

4.      More than 50 years ago, a powerful and politically influential individual, Mr. W.A. Prewitt, Jr., obtained local city franchise permits to operate cable television systems in Central Texas and sold those naked permits to a cable operator.  Without undertaking any action other than obtaining and transferring these public grants, Mr. Prewitt established a private income stream that now exceeds two million dollars annually and has run for more than a half century.  In the first decade of the new millennium, the city franchise permits, as renewed and extended, expired and the Texas Legislature removed any authority for the cities to issue or control franchise permits.  At that time, Mr. Prewitt's heirs sought and obtained an unusual and unique series of legislative provisions which became part of the Texas Utility Code.  The sole purpose of these provisions was to maintain the income stream for the expired permits by forcing Charter, and any successors, to continue to pay Mr. Prewitt's heirs for so long as Charter and its successors continue to operate in the cities under state franchise authorization.  Charter, which now operates the cable systems in question through its subsidiary, asks this Court to put an end to this unfair, unjustified, and unlawful gravy train.

5.      The city permits at issue authorized the construction and operation of cable systems in the cities of Waco, Temple, McGregor, Bellmead, Beverly Hills and Woodway, Texas. In exchange for Mr. Prewitt's agreement to assign the cable permits issued by these cities (collectively, the "City Permits"), Charter's predecessor agreed to pay Mr. Prewitt three percent of its gross receipts earned through the operation of the systems under the City Permits (the agreements, entered into in 1964 and 1971, are collectively referred to here as the "Prewitt Agreements").  The City Permits, and thus any obligation to make payments under the Prewitt

Agreements, terminated when a change in state law designated the state rather than individual municipalities as the franchise permit granting authority.  Charter seeks a declaration from this Court that the Prewitt Agreements, and its payment obligations thereunder, are terminated and a permanent injunction to enjoin Mr. Prewitt's successors in interest from seeking to collect monies from Charter under the expired Prewitt Agreements.

6.     The Texas Cable Act, enacted by the Texas legislature in 2005, moved the authority for issuance of cable television franchises from municipal to state control.  Anxious to preserve their income stream for the City Permits, Mr. Prewitt's heirs used their connections with the author of the Texas Cable Act, Senator Troy Fraser, to include in Section 66.004(f) of the Texas Cable Act a provision purporting to allow their heirs to continue to collect their percentage of gross revenues from the systems that previously had operated under the City Permits.  But because the City Permits have expired, the Prewitt Agreements terminated with them and are void and unenforceable by their own terms and as a matter of state law.  Further, the state statute purporting to condition the issuance of state permits on continuing payments under the terminated Prewitt Agreements runs afoul of the federal Cable Act's five percent cap on franchise fees.  Also, because the statute imposes discriminatory and unfair financial obligations on Charter that are not imposed on other state permit holders, it violates Charter's rights under the First Amendment and the Equal Protection Clause of the U.S. and Texas Constitutions, as well as under the federal Constitution's Contracts Clause.[2]  Charter therefore additionally seeks a declaration that its rights under these provisions preclude the Prewitt interests from continuing to collect payments under

---

[2]  Charter's initial Complaint in this matter named as defendants the Chairman and Commissioners of the Public Utility Commission of Texas ("PUC"), in their official capacities, in order to allow them notice and the opportunity to defend the constitutionality of section 66.004(f).  The PUC and the Texas Attorney General subsequently disclaimed any authority to enforce section 66.004(f), and any interest in defending its constitutionality and, thus, are not named as defendants to Charter's Second Amended Complaint.

the terminated Prewitt Agreements or section 66.004(f) of the Texas Cable Act.  Charter also seeks damages from the Prewitt interests equal to payments it has made since the City Permits expired.

## PARTIES

7.      Plaintiff Charter Communications, Inc. is a publicly-held Delaware corporation, founded in 1993 with its principal headquarters located in Stamford, Connecticut.  It is a cable and telecommunications provider and has significant coverage in Texas, where it competes with other national and local video service providers such as AT&T and Grande Communications.  In 2016, through a merger, Charter Communications, Inc. completed the acquisition of Time Warner Cable Inc., which directly or through subsidiaries owns cable systems providing cable services in various service areas within Texas.  Charter Communications, Inc. is the manager of TWC (n/k/a Spectrum Gulf Coast, LLC).

8.      Plaintiff TWC is a limited liability company.  It holds a state permit (in the form of a state issued certificate of franchise authority) to provide cable services in various service areas within Texas, including Waco, Temple, McGregor, Bellmead, Beverly Hills and Woodway. TWC is the successor in interest to the parties which contracted with Mr. Prewitt under the Prewitt Agreements.

9.      Defendant PMI is a Texas corporation that serves as a holding company for some of the business interests of the family of W.A. Prewitt, Jr.  PMI is the General Partner of WAP a successor to the interests of W.A. Prewitt, Jr. and his heirs under the Prewitt Agreements.  The company is run by W.A. "Buck" Prewitt, III, son of W.A. Prewitt, Jr.  According to WAP's partnership agreement (Dkt. 46-3), PMI has exclusive authority to act for WAP, no other entity (including WAP itself) can make decisions regarding the business of WAP, and third parties such as Plaintiffs can rely conclusively on the authority of PMI to act on behalf of WAP.

Consistent with the scope of that authority, at all times relevant to this proceeding, PMI has acted within the scope of its authority as WAP's exclusive, authorized agent, fully asserting counterclaims and defenses on behalf of WAP such that the litigation positions taken by PMI, and any outcome in this case, should bind WAP with equal force.

10.     Defendant WAP is the successor to the interests of W.A. Prewitt, Jr. and his heirs under the Prewitt Agreements.

### FACTS COMMON TO ALL COUNTS

**A.     The Prewitt Family**

11.     The Prewitts are a well-established, old-guard Central Texas family with deep pockets and equally deep political connections.  Over a  fifty year period, W.A. Prewitt, Jr. and his successors in interest (the "Prewitt interests") have secured valuable local government-issued permits and have monetized these raw governmental grants by assigning them in exchange for an income stream.  The City Permits—municipal cable franchises—at issue in this matter are an example.  They permitted the Prewitt interests to collect royalties each year since the 1960s—royalties that now exceed $2 million a year—without lifting a finger in the construction or operation of the cable systems.

**B.     The City Permits and The Prewitt Agreements**

**(1)     The 1964 Agreement**

12.     In 1963 and 1964, W.A. Prewitt, Jr. used his influence to obtain municipal permits from the Texas cities of Waco, Temple, and McGregor authorizing Mr. Prewitt to construct, maintain and operate community antenna systems (cable systems) in those cities.  Mr. Prewitt was not a cable operator, but he quickly arranged to monetize his influence in obtaining the City Permits by identifying an assignee willing to pay dearly for the bare permit rights he held.

13.    On March 12, 1964, Mr. Prewitt entered an agreement (the "1964 Agreement") with Ameco, Inc. ("Ameco"), TWC's predecessor, providing for Ameco to assume the obligation for the construction and operation of the cable systems in Waco, Temple, and McGregor.  A true and correct copy of the 1964 Agreement is attached hereto as Exhibit A and incorporated herein by reference.  Under the 1964 Agreement, Mr. Prewitt granted Ameco an option to acquire the municipal permits for those three cities in exchange for future payments of three percent of the gross revenues generated from the operation of the cable systems.  These payments were to continue "during the life of each [ ] assigned permit and amendments thereto," including "any holding over thereunder, renewals or extensions thereof."  Ex. A at 5.  The 1964 Agreement also stated that "[t]he obligations to make [the three percent] payments … shall run with the permits." *Id*.  The parties also recognized that the three percent payment was required, in part, for the exclusivity the permits gave Ameco to operate in the cities.  The 1964 Agreement provided that if Ameco exercised its option to acquire the permits, and one of the cities issued an additional permit to a third party who started operations in the city, then the obligation to pay Mr. Prewitt would "terminate."  *Id.* at 7-8.

14.    The "permits" at issue in the 1964 Agreement are referenced throughout as "city permits."  *See* Ex. A at 4 (describing "an option to purchase such city permits"); *id.* at 7 ("In the event of exercise of such options, Prewitt will take all steps necessary to cause the city permits to be assigned . . ."); *id.* at 10 ("Ameco is familiar with the terms and status of the city permits now held by Prewitt").  In addition, the "permits from the cities" explicitly are referred to and defined in the Agreement both as "the permits" and "the city permits."  *Id.* at 4.

15.    The 1964 Agreement also acknowledged the cities as the granting authorities of the permits.  *See id.* at 3 (requiring payment of sums "called for by the permits to be paid to such granting cities"); *see also id.* at 6 ("To the extent which may be permitted by law of said cities, the

obligation of the permit holder to make such payments to Prewitt . . . shall be written into, or reflected on the face of, such permit."). And, the parties agreed that, once Ameco exercised the option, all "facilities (including but not limited to property and equipment) . . . shall be and remain the property of . . . Ameco and its assigns." *Id*. at 4.

16.    Ameco did exercise its option to purchase the city permits from Mr. Prewitt shortly after the 1964 Agreement.

17.    Mr. Prewitt's only obligation under the 1964 Agreement was to "take all steps necessary to cause the city permits to be assigned" to Ameco or its successors. *Id*. at 7. Mr. Prewitt had no involvement in the construction or operation of the systems and no continuing obligation after transferring the City Permits to Ameco. The transfer of the subject permits was the sum total of Mr. Prewitt's contribution to the contractual relationship. And, for the raw transfer of bare governmental permits, the Prewitt interests were richly rewarded with royalty payments totaling many millions of dollars over the ensuing five decades.

### (2)    The 1971 Agreement

18.    In 1966, T.V. Cable, Inc. of Waco ("Waco TV") obtained cable permits to construct and operate cable systems from the cities of Bellmead, Beverly Hills, and Woodway.

19.    On August 16, 1971, Mr. Prewitt and Charter's predecessors entered into a settlement agreement (the "1971 Agreement") confirming that all rights, titles, and interests in and to the city-issued permits "to construct, maintain and operate . . . a CATV System in [Beverly Hills, Bellmead, and Woodway], cities of McLennan County, Texas, by ordinance finally passed by each City" would be held by Waco TV. A true and correct copy of the 1971 Agreement is attached hereto as Exhibit B and incorporated herein by reference. In exchange, TWC's predecessors again agreed to pay Prewitt and his heirs three percent of the gross revenues

generated from the operation of the systems in those cities "during the life of such permits and amendments thereto."  Ex. B at 5.

20.     The 1971 Agreement also provided that the payment obligation "shall run with the respective permits" and shall remain in full force and effect "as written."  Ex. B at 6, 3.  Further, any new permits granted by the cities "shall be conclusively treated and considered as a renewal of the existing permit."  *Id*. at 5-6.  The Agreement did *not* include language regarding new permits issued by any granting authority other than the cities.

21.     The 1971 Agreement explicitly provided that the permits at issue were "the permits of the Cities of Woodway, Bellmead and Beverly Hills [as] referred to herein."  *Id*. at 8.

22.     As with the 1964 Agreement, Mr. Prewitt's obligation under the 1971 Agreement extended only to the assignment to Charter's predecessors of the city permits.  Beyond the assignment of the permits, Mr. Prewitt had no ongoing obligation.

23.     The 1971 Agreement explicitly provided that Mr. Prewitt's remedy for any failure to make payment on a given permit was that "upon the breach of any such obligations by [Ameco], its successors or assigns, this instrument shall be of no further force or effect and *such permit* shall automatically revert" to Mr. Prewitt, his heirs, successors and assigns.  *Id*. at 7 (emphasis added).

24.     The rights and obligations under the Prewitt Agreements, including permits for cable systems in Waco, Temple, McGregor, Beverly Hills, Bellmead, and Woodway (the "Cities") and the obligation to pay a three percent royalty for the transfer of the City Permits passed over to various predecessors of Charter.  Pursuant to the Prewitt Agreements, Charter and its predecessors paid millions of dollars in royalty fees for five decades.  On information and belief, as of the turn of the century, Charter's predecessors did not have a complete copy of the Prewitt Agreements.  Charter Communications, Inc. first obtained a complete copy the Prewitt

Agreements from counsel for the Prewitt interests in October 2016.  Beginning in October 2016, Charter advised the Prewitt interests that it was paying under protest.

### C.     The Federal Cable Act

25.     In 1984, the United States Congress enacted the federal Cable Act to establish a national framework for regulating cable television.  With the federal Cable Act, Congress sought to "promote competition in cable communications and minimize unnecessary regulations that would impose an undue economic burden on cable systems."  47 U.S.C. § 521.

26.     The federal Cable Act authorizes a "franchising authority"—defined as "any governmental entity empowered by Federal, State, or local law to grant a franchise"—to impose on cable operators a franchise fee not to exceed five percent of the operator's gross revenues.  47 U.S.C. §§ 522(10); 542(b).  A "franchise fee" is defined to "include[] any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator or cable subscriber, or both, solely because of their status as such."  47 U.S.C. § 542(g).  The federal Cable Act preempts contrary state legislation.  *Id.* § 556(c).

### D.     The Texas Cable Act

27.     Starting in the 1980s, a number of states passed legislation removing cable franchising authority from municipalities and replacing it with state-issued franchises.  Consistent with this trend, the Texas legislature in 2005 moved the authority for the issuance of cable television franchises from municipal to state control.  Specifically, then Senator Fraser introduced, and the legislature adopted, Senate Bill 5, an "Act Relating to Furthering Competition in the Communications Industry," codified at Section 66 of the Public Utilities Code (the "Texas Cable Act"), which designated the Public Utility Commission of Texas ("PUC") as the franchising authority for state-issued franchises.  Tex. Util. Code. § 66.001.  The PUC must grant "state-issued certificates of franchise authority" ("SICFAs") for requested areas to applicants that

satisfy basic requirements.  Tex. Util. Code § 66.003.  Under the state licensing regime, cable agreements with municipalities are valid "until the franchise agreement is terminated . . . or until the franchise agreement expires." *Id*. § 66.003(a).  A municipal franchise terminates "on the date the commission issues the state-issued certificate of franchise authority." *Id.* § 66.004(b).  There is no requirement to obtain a local permit as a condition to receiving a state franchise permit.

28.     Under the Texas Cable Act, Texas cable operators' franchise fee obligations under previous municipal agreements ended, and each holder of a state-issued certificate of franchise authority was required pursuant to state law to pay each municipality in which it provides service a franchise fee of five percent of gross revenues—the maximum allowed under federal law.  Tex. Util. Code § 66.005(a).  The City Permits, transferred by Mr. Prewitt to Ameco and thereafter renewed and extended, expired either by their own terms or by operation of the Texas Cable Act, Tex. Util. Code § 66.004, and the obligation to pay royalty fees for the assignment of the City Permits ended.

## TWC's State Franchises

29.     Between 2006 and 2011,[3] pursuant to the Texas Cable Act, TWC received "state-issued certificates of franchise authority" that replaced the City Permits at issue in the Prewitt Agreements (the "State Franchises").

30.     TWC is not the only cable provider with state franchises to serve Waco and the surrounding cities.  For example, Grande Communications Networks LLC has state franchises to serve Waco, Temple, Beverly Hills, and Woodway.

## The Prewitt's Political Activity and Section 66.004(f)

---

[3] The State Franchises were issued on the following dates: Temple (02/16/2006); Bellmead (03/31/2006); Beverly Hills (05/15/2006); Waco (08/21/2006); McGregor (12/20/2011); Woodway (12/20/2011).

31.    Faced with the potential loss of its lucrative revenue stream, the Prewitt interests resolved to act and to intervene in the state's new cable licensing system.  Upon information and belief, one of W.A. Prewitt, Jr.'s sons, W.A. "Buck" Prewitt, III, has stated that the family was able to ensure that the Texas Cable Act included language specifically intended to extend the Prewitt Agreements' royalties to the new State Franchises, in perpetuity.  Indeed, prior to the Texas Cable Act's enactment, the Prewitts retained John Cunningham, then a lawyer at Naman, Howell, Smith & Lee, LLP, to lobby Senator Fraser regarding the wording of his soon-to-be-introduced bill.  Less than a month before Senator Fraser introduced the bill, Cunningham faxed Buck and Janice Steffes (Senator Fraser's Chief of Staff) a memorandum and "proposed addition" to Section 66.004, intended to protect the Prewitts' purported "contractual rights with respect to local franchises" and their "private property rights."  Senator Fraser adopted nearly verbatim the language proposed by Cunningham when he introduced Section 66.004(f).

32.    As codified, Section 66.004(f) provides that the Texas Cable Act is not intended to "adversely affect in any way the contractual rights, duties, and obligations incurred by a [cable operator] . . . before the date a franchise expires," including "those obligations measured by and related to the gross revenue hereafter received by the holder of a state-issued certificate of franchise authority."  Under subsection (f), any contractual rights or obligations in effect on September 1, 2005, "shall continue in full force and effect, without the necessity for renewal, extension, or continuance . . . as though the revenue generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority."  Thus, the statutory language purports to extend the payment obligation beyond the life of the City Permits.

33.    With respect to the franchising authority's obligations, Section 66.004(f) makes it a precondition to the issuance or renewal of a SICFA "that the private contractual rights and

-13-

obligations herein described continue to be honored . .  to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such state-issued certificate of franchise authority and any renewals or extensions thereof."

34.     None of Charter's direct competitors in the Cities make regular payments to private entities in Texas, pursuant to Section 66.004(f), based on contractual agreements related to municipal permits or franchises issued prior to the enactment of the Texas Cable Act.  And upon information and belief, no cable operator at all, besides Charter, currently makes regular payments to private entities in Texas pursuant to Section 66.004(f).

## CLAIMS FOR RELIEF

### First Claim for Relief
### (Declaratory Judgment)
### The Prewitt Agreements Are Unenforceable Because The City Permits Expired

35.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

36.     The Prewitt Agreements transferred the City Permits to Charter's predecessors in exchange for three percent royalty payments "during the life of the permits."  Ex. A at 5; Ex. B at 5.  The obligation to pay the royalty specifically was to "run with the permits."  Ex. B at 6.  The "permits" at issue were limited to the city authorizations to construct, operate, and maintain cable systems.  *See* Ex. A at 4; Ex. B at 8.  The royalty payments were made in exchange for the assignment of such permits, with "permit" as used throughout referring to the "city permits" issued by the municipalities.  *Id.*

37.     These City Permits no longer exist.  Even if the City Permits had not otherwise expired, they ceased to exist when Charter's predecessor obtained the State Franchises between 2006 and 2011.

38.     Any payment obligations under the Prewitt Agreements ended with the expiration of the City Permits and the issuance to Charter's predecessor of the State Franchises.  The State Franchises are not "permits" as referred to or defined in the Prewitt Agreements because they are issued by the state, a separate issuing authority, rather than by the city, and the State Franchises therefore cannot be regarded as "new permit[s]" that would be treated as "renewal[s] of the existing permits."  *See* Ex. A at 5; Ex. B at 6.

39.     By the terms of the Prewitt Agreements and according to municipal and State law, TWC's obligation to pay Prewitt the three percent royalty fees expired with the City Permits.

40.     There is an actual controversy of a justiciable nature concerning the rights and obligations of Charter and Defendants under the Prewitt Agreements and federal and state law, and Charter is entitled to a judgment declaring the City Permits have expired and the Prewitt Agreements and any payment obligations thereunder are null and void and without further force or effect.

### Second Claim for Relief
### (Declaratory Judgment)
### The Agreements Are Unenforceable Because They Are Indefinite In Duration

41.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

42.     As a matter of Texas law, when a contract is indefinite in duration, it may be terminated at the will of either party.  Moreover, the Fifth Circuit Court of Appeals does not favor perpetual contracts and presumes that any such contract is terminable at will.  *See Fluorine On Call Ltd v. Fluorogas Limited, et al.*, 380 F.3d 849, 855 (5th Cir. 2004) (collecting cases).

43.     If the Prewitt Agreements could be interpreted as continuing beyond the expiration of the City Permits, then the Agreements reasonably must be interpreted as being indefinite in

duration.  If, in other words, Charter's obligation to pay the three percent royalty fees did not "run with the permits" themselves, but rather properly could be interpreted to continue interminably, then the Prewitt Agreements are unlawful perpetual contracts.

44.    Charter is entitled to a judgment declaring that the Prewitt Agreements were terminable at will and have been terminated.  Even if the Prewitt Agreements were not terminable at will, they would be terminable at a reasonable time, which would be no later than the replacement of the City Permits with the State Franchises.

### Third Claim for Relief
### (Declaratory Judgment)
### Section 66.004(f) Violates The Federal Cable Act And Is Preempted

45.    Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

46.    The federal Cable Act caps at five percent any franchise fees imposed on cable operators.  47 U.S.C. §§ 542(b) & 522(10).  Specifically, no "governmental entity empowered by Federal, State, or local law to grant a franchise" can impose on a cable operator "any tax, fee, or assessment of any kind" in excess of five percent of gross revenues.  *Id*. §§ 542(b), (g)(1).  Any contrary state legislation is preempted and superseded by the Cable Act, *id.* § 556(c), and the Supremacy Clause, U.S. Const. art. VI, cl. 2.

47.    Pursuant to the Texas Cable Act, Charter pays a five percent franchise fee to each of the cities in which it operates.  Tex. Util. Code § 66.005(a).  Under federal law, these fees are the maximum fees that legally can be imposed on Charter as a cable operator.

48.    The Prewitt interests acted to ensure that as "a condition to the issuance and continuance of a state-issued certificate of franchise authority" Charter would have to continue beyond the expiration of the City Permits to pay the Prewitt interests an additional three percent

fee in perpetuity in order to provide cable service in the Cities.  Tex. Util. Code § 66.004(f).

These statutorily mandated payments are an "assessment" " impose[d] by . . . a governmental

entity on a cable operator . . . solely because of [its] status as such," 47 U.S.C. § 542(g)(1), and

thus constitute a franchise fee that is subject to  the federal franchise fee cap.

49.     Because section 66.004(f) requires payment of a fee above and beyond the five

percent franchise fee that is paid to the local governments under the Texas Cable Act, the section

violates the federal franchise fee cap and is preempted and superseded by 47 U.S.C. § 556(c) and

the Supremacy Clause.

50.     Charter therefore is entitled to a judgment declaring section 66.004(f) unlawful

and preempted by federal law.

**Fourth Claim for Relief**
**(Declaratory Judgment)**
**Section 66.004(f) Violates The First Amendment And The Equal Protection Clause**

51.     Charter realleges and incorporates herein by reference the allegations of numbered

paragraphs 1 through 40 inclusive, as though fully set forth herein.

52.     On information and belief, Charter is the only cable provider with obligations

imposed by Section 66.004(f), but it is not the only cable provider with state franchises to serve

the Cities.  Applying Section 66.004(f) to require Charter to continue to pay a three percent fee for

the expired City Permits as a condition to the issuance of its State Franchises in the Cities

therefore would violate the free speech and equal protection clauses of the Constitutions of the

United States and Texas and 42 U.S.C. § 1983.

53.     As a cable operator, Charter is entitled to the protection of the First Amendment.

Because Section 66.004(f) draws distinctions between cable operators, it is not a law of general

applicability and is subject to strict scrutiny.  In fact, the apparent purpose of Section 66.004(f)

was to require Charter to continue to pay the Prewitt interests a royalty fee above and beyond the franchise fees imposed on Charter and other cable operators.

54.     Section 66.004(f) therefore discriminates against a small and identifiable number of cable providers—in fact, apparently only a single operator—without being narrowly tailored to serve a compelling state interest.  Even under intermediate scrutiny, section 66.004(f) does not further an important or substantial governmental interest, nor is the incidental restriction on Charter's First Amendment freedoms less than what is necessary to the furtherance of any legitimate state interest.

55.     Under the Equal Protection Clauses of the U.S. and Texas Constitutions, targeting one speaker for restrictive burdens without applying the same burdens on others is unlawful.  Section 66.004(f) draws distinctions between cable operators with the apparent purpose of allowing the Prewitt interests to continue to collect a substantial fee from Charter.  Applying strict scrutiny, Section 66.004(f) is neither finely tailored nor does it serve a substantial state interest.  Indeed, it serves no public interest at all but rather purports to mandate a private inurement.  The statute therefore is unconstitutional under Equal Protection analysis.

56.     Charter therefore is entitled to a judgment declaring section 66.004(f) unconstitutional and unlawful.

**Fifth Claim for Relief**
**(Declaratory Judgment)**
**Section 66.004(f) Violates The Federal Contracts Clause**

57.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

-18-

58.     The Prewitt Agreements governed Charter's rights and obligations during the life of the City Permits.  Those Agreements were protected against impairment by the government through the Contracts Clause of the U.S. Constitution.

59.     By enacting the requirements of Section 66.004(f) despite the expiration of the City Permits, the legislature substantially impaired the contractual relationship between Prewitt and Charter.  The payment obligations under the Prewitt Agreements terminated with the expiration of the City Permits, and any purported ongoing obligation for Charter to continue making payments to the Prewitt interests is the result of an unlawful contractual revision adopted by the State.

60.     Because any action to enforce Section 66.004(f) would substantially impair the Parties' contractual relationship, the regulation can only survive if it serves a significant and legitimate public purpose, such as remedying a broad and general problem.  While the Texas Cable Act as a whole may serve such a purpose, there is no justification offered in the legislative history for the carve-out in Section 66.004(f), and, on information and belief, the section was added solely at the behest of the Prewitt interests for their own benefit.  Indeed, the challenged provision seems to serve no public interest at all but rather appears to mandate a private inurement.

61.     Charter therefore is entitled to a judgment declaring Section 66.004(f) unconstitutional and unlawful.


**<u>Sixth Claim for Relief</u>**
**(Money Damages)**
**Charter Is Entitled to Recover Sums Improperly Collected by the Prewitt Interests After the Prewitt Agreements Terminated**

62.     Charter realleges and incorporates herein by reference the allegations of numbered paragraphs 1 through 40 inclusive, as though fully set forth herein.

-19-

63.     By virtue of the facts set forth above, Charter has been forced to pay the Prewitt interests a sum exceeding $12 million since the City Permits expired, all moneys that the Prewitt interests were not entitled to receive.  Therefore, Charter is entitled to judgment in the sum of the amounts wrongfully collected by the Prewitt interests.

## Prayer for Relief

WHEREFORE, Plaintiffs Charter Communications, Inc., and Time Warner Cable Texas LLC (n/k/a Spectrum Gulf Coast, LLC), request the following relief:

(1) a declaration that:

    a.  the City Permits expired by their own terms and were terminated and replaced by State Franchises in the period 2006-2011; and

    b.  the Prewitt Agreements terminated as of the dates the City Permits expired and were terminated and are null and void and have no further force or effect; and

    c.  to the extent the Prewitt Agreements properly could be interpreted to impose upon Charter payment obligations continuing after the expiration and termination of the City Permits, they are indefinite in duration and therefore are terminable at will and have been terminated; and

    d.  Section 66.004(f) of the Texas Cable Act is unlawful and inconsistent with state and federal law insofar as:

        i.  it violates the federal Cable Act's five percent cap on franchise fees;

        ii.  it violates the free speech and equal protection clauses of the U.S. and Texas Constitutions; and

iii.  it conflicts with the Contracts Clause of the U.S. Constitution; and

(2) to the extent the Prewitt Agreements properly could be interpreted to impose upon Charter payment obligations continuing after the expiration and termination of the City Permits, and are not terminable at will, a declaration that they are indefinite in duration and are terminable by the Court on a reasonable date, such as the date when the State Franchises replaced the City Permits; and

(3) a judgment for all sums improperly paid to the Prewitt interests on a quarterly basis from the date on which the Prewitt Agreements terminated by virtue of the expiration of the City Permits and their replacement with State Franchises under the Texas Cable Act; and

(4) an award of costs and reasonable attorney's fees  and such other and further relief as this Court may deem just and proper.

Dated:  August 20, 2024              Respectfully submitted,

By     /s/ *Paul A. Werner*
       _____

           Paul A. Werner
           Abraham J. Shanedling
           Steven P. Hollman (admitted *pro hac vice*)
           SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
           2099 Pennsylvania Avenue, N.W., Suite 100
           Washington, D.C.  20006-6801
           202.747.1941 Telephone
           pwerner@sheppardmullin.com
           shollman@sheppardmullin.com
           ashanedling@sheppardmullin.com

           D. Douglas Brothers (State Bar No. 03084500)
           GEORGE, BROTHERS, KINCAID & HORTON LLP
           114 W 7th Street, Suite 625
           Austin, Texas 78701
           512.495.1446 Telephone
           dbrothers@gbkh.com

           *Counsel for Plaintiffs/Counter-Defendants*
           *Charter Communications, Inc. and*
           *Time Warner Cable Texas LLC (n/k/a Spectrum Gulf*
           *Coast, LLC)*

# EXHIBIT A

EXHIBIT J

A G R E E M E N T

THIS AGREEMENT made and entered into this _12ᵗʰ_
day of _March_ , 1964, by and between W. A. PREWITT,
JR., hereinafter called "Prewitt", and AMECO, INC., an
Arizona corporation, hereinafter called "Ameco".

W I T N E S S E T H:

WHEREAS, Prewitt has obtained permits from Texas
cities of Waco, Temple and McGregor, which permits author-
ize Prewitt to construct, maintain and operate community
antenna systems (CATV systems) in such cities; and

WHEREAS, Prewitt is desirous of leasing such per-
mits to one or more Texas corporations, and granting them
an option to purchase the same, under the terms and condi-
tions set forth herein; and

WHEREAS, the parties are also desirous that Prewitt
receive a management contract, also as set forth herein;
and

WHEREAS, Ameco is engaged in the business of de-
signing, engineering and installing all equipment necessary
for CATV systems and is also engaged in the business of
manufacturing certain electronic equipment used in CATV
systems; and

WHEREAS, one or more Texas corporations are to be
formed, which corporation may be granted the leases and
options and enter into certain agreements as is more fully
set forth herein.

Defendant000001

NOW, THEREFORE, in consideration of the mutual coven-
ants hereinafter made and entered into, the parties hereto
agree as follows:

1.   LEASE.   Prewitt will cause to be formed at
Ameco's expense and for Ameco's convenience one or more
Texas Corporations.   While Prewitt will, for Ameco's conven-
ience, cause the Texas corporations to be formed, Prewitt
shall not have the responsibility of causing the Texas cor-
porations to carry out any of their obligations set forth
herein.   Each Texas corporation will lease from Prewitt one
or more of the above named permits for a period from April 1,
1964 to August 31, 1964, both dates inclusive, and Prewitt
will assign such permits to such corporation until August 31,
1964, only, for the following rental:

    (a)   The sum of $10,553.58 plus the sum neces-
sarily incurred by Prewitt after February 17, 1964,
in furtherance of the purposes of this agreement
(to be prorated among such corporations in such man-
ner as such corporations and Ameco shall mutually
agree upon), and payable in advance on April 1,
1964; and

    (b)   In addition thereto, the additional sum
of three per cent (3%) of the gross revenues re-
ceived by each such corporation from the operation
of the Community Antenna Television System, said
sum to be paid at the expiration of such lease.   By
the term "gross revenues" as used herein, is meant
revenues derived from the operation of such sys-
tem from any source.   (The fees called for by the

2.

Defendant000002

permitsto be paid to the granting cities shall
not be deducted therefrom, but any other sales or
use tax or like tax which may be imposed upon the
receipt of revenue from the operation of such
system shall be deducted, in computing "gross
revenues"); and

(c)  In addition thereto, such corporations
shall pay all sums called for by the permits to be
paid to such granting cities, and shall take all
other steps necessary under the law and such per-
mits to keep all of same in full force and effect
and to comply with all terms and provisions thereof.

(d)  In addition thereto, Ameco will con-
struct or cause to be constructed at the Texas
corporation's cost and expense the CATV systems
in Waco, Temple and McGregor, and the necessary
microwave systems thereto.  Ameco shall use due
diligence in proceeding with the construction of
such facilities, and in any event shall cause the
facilities to be constructed within any time limits
set forth in the respective permits from such
cities, and the Texas corporations shall at their
own cost and expense obtain any necessary consents,
permits, permission and agreements from the respec-
tive cities, and any other parties, for any permits,
leases, assignments or actions of any nature called
for, required or contemplated by this contract be-
tween Ameco and Prewitt; provided, however, that
Prewitt will join in the request for assignment of
the permits from him to the corporation.

3.

Defendant000003

Upon expiration of this lease, and in the event the option referred to in numbered paragraph (2) is not exercised, all such facilities (including but not limited to property and equipment) and any microwave permits obtained by Ameco or its assigns shall revert to, and become the property of Prewitt, and such city permits shall revert to and remain the property of Prewitt, but in the event such option is exercised, all of such facilities and said microwave permits shall be and remain the property of the Texas corporations or Ameco and its assigns.  The permits from the cities (sometimes referred to herein as "the permits" or "the city permits"), shall be and remain the property of Prewitt unless the option in numbered paragraph (2) below is exercised.

2.  OPTION.  In consideration of the sum of $10.00 to Prewitt, cash in hand paid by Ameco, the receipt and sufficiency of which is hereby acknowledged and confessed, Prewitt hereby grants Ameco, its successors and assigns, an option to purchase such city permits on September 1, 1964, notice of the exercise of which may be given at any time not earlier than August 15, 1964, for the following price and terms:

(a)  Ameco may assign such option, or such permits if purchased, to one or more of the Texas corporations referred to above, but the option may not be exercised as to less than all such permits.

(b)  In consideration of and payment for the purchase by it of such permits, and as the purchase price there Ameco or its said /'m assigns shall pay to Prewitt, his heirs, successors,

4.

Defendant000004___

personal representatives and assigns, during the
life of each such assigned permit and amendments
thereto, and any holding over thereunder, renewals
or extensions thereof, a sum equal to three per
cent (3%) of the gross revenues received by Ameco
or its said assigns from the operation of such
CATV system, as such term "gross revenues" has here-
tofore been defined, said sum to be paid quarterly.
For the purposes of this agreement, in the event any
new permit is granted to Ameco or any assignee of
any such permits, or any company directly or indirectly
controlled by any of same before, at, or after the
expiration of the existing permits, such new permit
shall be conclusively treated and considered as a
renewal of the existing permit, even if the terms
thereof are new and different, and such three per
cent (3%) of the gross revenues thereof shall be so
paid to Prewitt, his heirs, successors, personal
representatives and assigns, as aforesaid.

The obligation to pay such three per cent
(3%) shall not be affected or decreased by any
termination of the employment contract referred to
herein.

The obligations to make such payments, and
the other obligations of Ameco and such corporations
hereunder, shall run with the permits and shall be
and constitute a charge and lien against the same at
all times, and no assignment, transfer or encumbrance
of such permits shall ever be made or be valid without

5.

the express assumption by the assignee or transferee
of the provisions of this contract, and any such
assignment, transfer or encumbrance shall be
subject to the terms of this contract.

No such assignment, transfer or encumbrance
shall ever be made without the express written con-
sent of W. A Prewitt, Jr., provided, however, that
such consent shall be given (and is hereby given)
to any such assignment, transfer or encumbrance
which is expressly and in writing made subject to
the terms of this contract and by the terms of which
the assignee or transferee assumes the provisions of
this contract.  To the extent which may be permitted
by law of said cities, the obligation of the permit
holder to make such payments to Prewitt, and the
charge and lien in favor of Prewitt securing the same,
shall be written into, or reflected on the face of,
such permit.

Without in any way waiving or altering the
foregoing, in the event a mortgage or lien, voluntary
or involuntary, is created by or against the holder of
such permit, or in the event there is any voluntary or
involuntary, or court sale, any purchaser at a fore-
closure or other sale, whether under judicial or
bankruptcy sale, or by foreclosure or other appropriate
proceedings, or otherwise, whether voluntary or in-
voluntary, or as the result of any legal process or
legal or other proceedings whatsoever, shall thereby
become liable under and be bound by all the terms,
conditions and agreements herein as the assignee or
assignees hereof.

6.

Defendant000006

(c)  In the event of exercise of such option, the option holder shall give written notice of the exercise thereof to Prewitt at his last known address in Temple, Texas, by certified or registered mail, to be mailed not earlier than August 15, 1964, and not later than August 31, 1964.  In the event of the exercise thereof, the effective date of such purchase shall be September 1, 1964.

(d)  In the event of exercise of such options, Prewitt will take all steps necessary to cause the city permits to be assigned to the Texas corporation or corporations designated by Ameco.  Simultaneously with the assignment of such permits, the required Employment Agreements will be executed and there will be delivered to Prewitt a document, satisfactory in form to Prewitt, evidencing the corporation's obligation to pay and perform to Prewitt each and every obligation incumbent upon it or Ameco hereunder, and security instruments making same a charge and lien against such permits.

(e)  In the event of the exercise of this option, and in the event an additional permit is issued by either Waco, Temple or McGregor, to a third party or parties not directly or indirectly connected with Ameco or any of such corporations, prior to January 31, 1969, and in the further event that thereafter such additional permit holder commences actual, bona fide operation and Cable TV service to customers in such city, the Texas corporation's obligation to

Defendant000007

pay Prewitt a sum equal to three per cent (3%)
of its gross revenues from such city's operations
shall also terminate as to that city only, with-
out, however, being altered, affected, diminished
or terminated as to the other cities covered here-
by.  The date of such termination shall be the date
when such additional permit holder commences actual,
bona fide operation and Cable TV service to custo-
mers.  However, the provisions of this subdivision
(e) of this numbered paragraph 2 hereof shall take
effect only in the event Ameco and such Texas cor-
porations use their best good faith efforts to
oppose and prevent the issuance of such other per-
mits.

(f)  In addition thereto, in the event of
the exercise of this option, such corporations
shall pay all sums called for by the permits to be
paid to such granting cities, and shall take all
other steps necessary under the law and such per-
mits to keep all of same in full force and effect
and to comply with all terms and provisions thereof,
and shall use due diligence in the operation thereof.

3.  INDEMNIFICATION:  During the term of such lease,
Ameco agrees, and each such corporation will agree, to in-
demnify Prewitt and hold him harmless from any and all
claims, demands, causes of action or liabilities of any
nature accruing under or by reason of such permits or the
operation thereof or of such systems, during the term of
such lease or leases.  In the event such option to purchase

8.

Defendant000008

is exercised, Ameco further agrees, and each such corporation
will agree, to indemnify Prewitt and hold him harmless from
any and all claims, demands, causes of action or liabilities
assumed by Ameco or such corporations hereunder (as well as
any and all other claims, demands, causes of action or lia-
bilities of any nature accruing or to accrue under or by
reason of such permits or the operation thereof from and
after the time of such transfers if it is determined that
Prewitt was not the cause or a contributing cause to the
action which causes any loss, damage or injury).

4.   EMPLOYMENT CONTRACT.   Each Texas corporation re-
ferred to above will enter into an Employment Agreement with
Prewitt in substantial compliance with the Employment Agree-
ment form attached hereto and made a part hereof, and called
"Employment Agreement".

It is understood and agreed that the gross sum
to be received by Prewitt from the Employment Agreements
shall be Five Thousand Dollars ($5,000.00) for a period
from and including April 1, 1964 through August 31, 1964;
and that in the event of the exercise of such option shall
be on the basis of One Thousand Dollars ($1,000.00) per
month thereafter for an additional period of thirty-one (31)
months.   In the event Ameco chooses to assign its rights
under this contract to more than one corporation, and there-
fore more than one Employment Agreement is used, the com-
pensation set forth in the total number of agreements shall
equal the sum of One Thousand Dollars ($1,000.00) per month.

5.   If Ameco has not notified Prewitt in writing of
its   intent to proceed, and in connection therewith tendered

9.

Defendant000009

to Prewitt the sum set forth in 1 (a) hereof on or before
April 1, 1964, Prewitt and Ameco shall be released from all
liability to perform hereunder.  If such notice is sent and
such sum paid, Prewitt will transfer forthwith to Ameco or
its assignees all stock books, minute books, seals, and
other corporate records of the Texas corporations formed
according to 1 hereof.  No stock of such corporation shall
have been issued.

6.  Ameco is familiar with the terms and status of
the city permits now held by Prewitt, and referred to herein.

7.  This agreement shall be binding upon the parties
hereto, their heirs, legal representatives, successors and
assigns.  Each and every right, payment and agreement in
favor of Prewitt hereunder is assignable by him.

8.  Anything in this agreement to the contrary not-
withstanding, it is agreed and understood that Prewitt will
cause the various city permits to be assigned to the Texas
corporations designated by Ameco in such form so that if
the Texas corporations elect to exercise the option to pur-
chase the permits, no further action on the part of the
city which granted the permits will be necessary in order to
make the Texas corporations the absolute owner of such per-
mits.  Ameco and the Texas corporations will agree that if
they do not exercise their option to purchase the permits,
they will assign back to Prewitt the aforementioned permits,
and will obtain any permission therefor, if necessary, from
the cities involved.

In this connection, it is expressly stipulated
that the assignment of such permits during the leasehold

10.

Defendant000010

term shall not constitute a transfer of title as between
the parties, but that Ameco or such corporation to whom same
are transferred will hold such permits in trust and as trus-
tee for Prewitt during such time, and will, at the time of
the assignment of such permits to it or them in the first
instance, execute and deliver to Prewitt an application for
re-assignment of the same, for use in the event it or they
fail to exercise the option herein granted. Assignments of
such permits prior to exercise of such option shall not
constitute a parting with or conveyance by Prewitt of the
title to such permits, but such assignments are made be-
cause the nature of Prewitt's said permits, as property, is
such that they can only effectively be leased and used by
lessee by an assignment thereof.

9.  If Ameco shall give notice of its intention to
proceed, then upon the happening of the following events,
Ameco shall be fully discharged and relieved of any and all
undertakings or liabilities imposed hereunder:

(a)  The contemplated Texas corporations
being organized and assuming Ameco's obligations
hereunder; and

(b)  Construction of the various CATV sys-
tems being substantially completed.

Executed on the day and year above written, with
each signed copy constituting an original.

W. A. PREWITT, JR.

AMECO, INC.

By

ATTEST:

11.

Defendant000011

## EMPLOYMENT AGREEMENT

THIS AGREEMENT made and entered into as of the

_____ day of _____, 1964, by and between _____

_____, a Texas corporation,

hereinafter called "Employer", and W. A. PREWITT, JR.,

hereinafter called "Employee";

## W I T N E S S E T H:

WHEREAS, Employer hereby owns and operates a com-

munity antenna system (CATV system) in and about the City

of _____, and

WHEREAS, Employee is knowledgable in the operation

of CATV systems, and

WHEREAS, Employer wishes to avail itself of Em-

ployee's services for a period of five (5) months, to-wit:

from April 1, 1964 through August 31, 1964, both dates

inclusive.

NOW, THEREFORE, in consideration of the mutual coven-

ants and agreements hereinafter made and entered into, the

parties hereto agree as follows:

1.  Employer agrees to employ Employee for a

period of five (5) months, commencing the 1st day of April,

1964. In consideration of such services as are hereinafter

described, Employer agrees to pay to Employee the sum of

_____Dollars ($         ) per

month.

Defendant000012

2. Employee shall, on the average, devote not less
than eighty per cent (80%) of his time to furthering the
interests of Employer. Employee shall take his directions
from the properly constituted officers and directors of
Employer and from Ameco, Inc., if Employer so designates.

3. Employee shall have the responsbility of being
the General Manager of Employer in connection with the
Employer's CATV system and Employee shall concern himself
with taking such actions as may be necessary to see that
the CATV system obtains good public relations, obtains a
maximum number of customers and operates efficiently. Em-
ployee shall hire and fire the necessary personnel subject
to the general policies made by Employer. All expenses in-
curred by Employee on behalf of Employer shall fall within
the general guide lines and budgetary controls set by Em-
ployer.

4. This Agreement is terminable only for cause.
Employee shall do nothing that will limit his capacity to
further the interests of Employer.

5. In the event the Employer exercises its option
to purchase the Cable TV permits for Waco, McGregor and
Temple now owned by Employee, in accordance with terms of
contract between Employee and Ameco, Inc., dated February
_____, 1964, then and in such further event only, this
Employment Contract is automatically extended for an addi-
tional period of thirty-one (31) months from and beginning
September 1, 1964, at the same monthly salary set forth in
numbered paragraph (1) hereof, and on the same terms and
conditions set forth in the preceding portions hereof.

2.

Defendant000013

In the event of such extension, the parties further agree that if an additional permit is issued by any of such cities during the term hereof to a third party or parties not connected with Employer or Ameco, Inc., or any other Texas corporations formed or caused to be formed by it, authorizing another CATV system to be constructed and operated in the City of _____, Employer shall have the option to terminate forthwith this Employment Agreement, effective as of the date such additional permit holder commences actual bona fide operation and Cable TV service to customers in such city.

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the day and year first above written, with each signed copy constituting an original.

By_____

_____
W. A. PREWITT, JR.

3.

Defendant000014

## AMENDMENT TO AGREEMENT

AMENDMENT TO AGREEMENT made and entered into this
_16_ day of March, 1965, by and between W. A. PREWITT,
JR., (hereinafter called "Prewitt"), and AMECO, INC., an
Arizona corporation, (hereinafter called "Ameco").

W I T N E S S E T H:

WHEREAS, under the terms of that certain Agreement
dated March 12, 1964, between Prewitt and Ameco, Prewitt
agreed to execute an EMPLOYMENT AGREEMENT with certain Texas
corporations as described therein, all as is set forth in
paragraph 4 of said Agreement, and

WHEREAS, Prewitt and Ameco desire to amend said March
12, 1964 Agreement by deleting the obligations set forth in
paragraph 4.

NOW, THEREFORE, in consideration of the mutual coven-
ants and agreements hereinafter made and entered into, the
parties hereto agree as follows:

1.   That the March 12, 1964 Agreement between
Prewitt and Ameco be and hereby is amended by delet-
ing therefrom the provisions of paragraph 4.  This
agreement shall not affect any payments made to Prewitt
from March 12, 1964 to the date hereof.

2.   This agreement shall be binding upon the par-
ties hereto, their heirs, legal representatives, succes-
sors and assigns.

IN WITNESS WHEREOF, the parties hereto have executed
this Amendment to Agreement as of the day and year first above
written.

AMECO, INC.

By _____

_____
W. A. PREWITT, JR.

Defendant000015

## C O N S E N T

The undersigned corporations hereby consent to the foregoing Agreement.

TV CABLE, INC. OF WACO

By _Bruce Merrill_

TV CABLE, INC. OF TEMPLE

By _Bruce Merrill_

TV CABLE, INC. OF McGREGOR

By _Bruce Merrill_

2.

Defendant000016

# EXHIBIT B

## A G R E E M E N T

AMECO, INC. ("AMECO"), T.V. CABLE, INC. OF WACO ("WACO TV"), T.V. CABLE, INC. OF TEMPLE ("TEMPLE TV"), and T.V. CABLE, INC. OF McGREGOR ("McGREGOR TV"), all corporations, and W. A. PREWITT, JR. ("PREWITT"), for and in consideration of the mutual promises contained herein, agree as follows:

### I.

Heretofore, the following instruments were executed and are in effect, and are not cancelled, abrogated or set aside by this Agreement:

(a)   Agreement between AMECO and PREWITT dated March 12, 1964, as amended by Amendment to Agreement dated March 16, 1965;

(b)   Instrument of Assignment, Etc. from PREWITT to WACO TV dated March 16, 1965;

(c)   Chattel Mortgage from WACO TV to PREWITT dated March 16, 1965;

(d)   Instrument of Assignment, Etc. from PREWITT to TEMPLE TV dated March 16, 1965;

(e)   Chattel Mortgage from WACO TV to PREWITT dated March 16, 1965;

(f)   Instrument of Assignment, Etc. from PREWITT to McGREGOR TV dated March 16, 1965;

(g)   Chattel Mortgage from McGREGOR TV to PREWITT dated March 16, 1965;

(h)   Indemnification Agreement from AMECO to PREWITT, dated March 16, 1965;

(i)   Any other instruments executed and delivered by and between PREWITT and any of the others of such parties in connection with such transactions.

Defendant000017

II.

Heretofore, PREWITT, as Plaintiff, sued the other parties hereto, as Defendants, in Cause No. 53,919-C in the District Court of Bell County, Texas, 169th Judicial District, styled: W. A. Prewitt, Jr. vs. TV Cable, Inc. of Temple, et al. Such cause of action will be dismissed at Defendants' cost, with prejudice as to the matters settled by this Agreement, but otherwise without prejudice.

The Defendants in such law suit jointly and severally agree that they have no cause of action against PREWITT arising from the filing of such suit or his activities thereunder, and such Defendants hereby release and discharge PREWITT, his heirs and assigns, from any claim, demand, cause of action or liability, if any, which they or any of them might otherwise assert therefor.

The parties agree that the following, and the following only, were the matters involved in such law suit.

III.

The first point involved in such law suit was the claim by PREWITT that the Defendants, and each of them, jointly and severally, had breached their agreements with him by:

(i)  failing to develop the TV cable systems with due diligence, thereby damaging him;

(ii)  failing to construct the systems in a workmanlike manner, thereby damaging him;

(iii)  failing to maintain and operate the systems in a competent and workmanlike manner, thereby damaging them.

For and in consideration of the sum of FIVE THOUSAND AND NO/100ths ($5,000.00) DOLLARS to PREWITT cash in hand paid by AMECO, WACO TV, TEMPLE TV, and McGREGOR TV, the receipt and sufficiency of which is hereby acknowledged and confessed, PREWITT has released and discharged and by these presents does for himself, his executors, administrators and assigns, release, acquit and forever

- 2 -

Defendant000018

discharge AMECO, WACO TV, TEMPLE TV and McGREGOR TV, and
each and all their successors and assigns, and any and
all other persons, firms and corporations who are or might
be liable, of and from any and all actions, causes of
action, claims, demands, damages, costs, loss of services,
expenses, compensation, and all consequential damage on
account of or in any way growing out of any and all
claims, demands, liabilities, causes of action and damages
resulting from any failure of any of such parties released
from developing and/or constructing such TV cable systems
with due diligence or in a workmanlike manner, or from
any past failure to maintain and operate same in a com-
petent and workmanlike manner, without, however, affecting,
altering or diminishing any claim, demand or cause of
action, if any, which he may have by reason of future
acts or omissions of any of the other parties hereto,
their successors or assigns.

## IV.

The second point involved in such law suit is the
claim and prayer of PREWITT for anticipatory breach of
the various agreements contained in the contracts, and
for future damages and acceleration of maturity of the
obligations contained therein by reason of such alleged
breach, and for a finding that the permits referred to in
the aforementioned documents have revested in him or for
foreclosure of this chattel mortgage.  In this connection,
the parties agree that the agreements referred to in
numbered paragraph I hereof are, and will remain in full
force and effect as written; that the payments are not

- 3 -

Defendant000019

accelerated and no payment is made for anticipatory breach,
and PREWITT abandons any claim for acceleration of payment,
damages for anticipatory breach, reversion of permits or
foreclosure of chattel mortgages, for any past acts or
omissions of any of the other parties, without, however,
affecting, altering or diminishing any claims, demands or
causes of action, if any, which he may have by reason of
future acts or omissions of any of the other parties hereto,
their successors or assigns.

.V

The third and final point involved in such law suit
is the claim of PREWITT that he had equitable title to,
and interest in, permits now outstanding in the name of
WACO TV to construct, maintain and operate a Community
Antenna System or CATV System (as same are defined in the
other instruments referred to above), in the following cities
of McLennan County, Texas, by ordinance finally passed by
each City, respectively, on the dates indicated below:

| NAME OF CITY | ORDINANCE NO. | DATE FINALLY PASSED AND ADOPTED |
|---|---|---|
| Woodway | | January 24, 1966 |
| Bellmead | | February 8, 1966 |
| Beverly Hills | | February 5, 1966 |

Such cities are sometimes referred to herein as the
"Suburban Cities of Waco". PREWITT asserts such claim even
though such permits are issued in the name of WACO TV. The
other parties hereto warrant and agree to and with PREWITT that
those are the ordinances, and the only ordinances, presently
in effect in such cities relating to the Community Antenna
System or CATV System now operated in such cities, and if
there are any amendments thereto now in effect, they are also
included by reference herein.

- 4 -

Defendant000020

The parties have settled and compromised PREWITT'S said claim by agreeing as follows:

(a)  PREWITT will receive no compensation for his interest in such permits through June 30, 1971.

(b)  Effective with the beginning of business on July 1, 1971, for and in consideration of the sum of TEN AND NO/100ths ($10.00) DOLLARS to PREWITT cash in hand paid by WACO TV, the receipt of which is hereby acknowledged and confessed, and for the additional consideration of the agreement by WACO TV to pay to PREWITT, his heirs, personal representatives, successors and assigns, during the life of such permits and amendments thereto, any holding over thereunder, renewals or extensions thereof, a sum in the amount of three (3%) percent of the gross revenues received by WACO TV from the operation of such CATV SYSTEMS in the Cities of Woodway, Bellmead and Beverly Hills (for the payment and performance of all of which and of all agreements contained in this Paragraph V, express and superior vendor's liens and chattel mortgage liens are hereby retained upon such permit and rights), PREWITT hereby BARGAINS, SELLS, ASSIGNS, TRANSFERS AND DELIVERS to WACO TV the said permits in said three cities and all his rights, titles and interests therein and thereto, subject to the terms and provisions thereof and hereof; this assignment and conveyance being without warranty by PREWITT, express or implied.

For the purpose of this Assignment, in the event any new permit is granted by either Woodway, Bellmead or Beverly Hills to WACO TV (or any party to whom WACO TV assigns this or any new permit) or to any person, firm, corporation or company, directly or indirectly controlled

- 5 -

Defendant000021

by any of same, either before, at or after the expira-
tion of the existing permits, such new permit shall be
conclusively treated and considered as a renewal of the
existing permit, even if the terms thereof are new and
different, and such three (3%) percent of the gross re-
venues thereof shall be so paid to W. A. PREWITT, JR.,
his heirs, personal representatives, successors and
assigns, as aforesaid, and all references to the "permits"
contained herein shall be deemed to apply to any such
renewed, extended or new permit, as the case may be.

The obligations to make such payments and perform
such duties and obligations shall run with the respective
permits and shall be and constitute a first charge and
lien against each of the same at all times, and no assign-
ment, transfer or encumbrance of any of such permits shall
ever be made or be valid without the express assumption
by the assignee or transferee of the provisions of this
Assignment, and any such assignment, transfer or encum-
brance shall be subject to the terms of this Assignment.

No further assignment, transfer or encumbrance of any
of such permits shall ever be made without the express
written consent of PREWITT and the three respective
cities named above, provided, however, such consent
shall be given (and is hereby given) by PREWITT to any
such assignment, transfer or encumbrance which is
expressly and in writing made subject to the terms of
this assignment and by the terms of which the assignee
or transferee assumes the provisions of this assignment.

Without in any way waiving or altering the foregoing,
in the event a mortgage or lien, voluntary or involuntary,
is created by or against the holder of any of such permits,

- 6 -

Defendant000022

or in the event there is any voluntary or involuntary,
or court, sale, judicial or bankruptcy sale, or by
foreclosure or other appropriate proceedings, or other-
wise, whether voluntary or involuntary, or as to the
result of any legal process or other legal proceedings
whatsoever, any purchaser, assignee or transferee there-
under shall thereby become liable under and be bound by
all the terms, conditions and agreements herein as the
assignee or assignees hereof.

By the term "gross revenues" as used herein is meant
revenues from the operation of each such system from any
source.  (The fees called for by each such permit to be
paid to the respective cities named above shall not be
deducted therefrom, but any other sales or use tax or
like tax which may be imposed upon the receipt of revenue
from the operation of such system shall be deducted, in
computing "gross revenues.")

The percentage of the gross revenues payable to
PREWITT shall be paid to him or his order at Temple, Bell
County, Texas, quarterly as they accrue, upon the 15th
day of January, April, July and October of each year.

BUT IT IS EXPRESSLY AGREED AND STIPULATED that a
vendor's lien is retained against each such permit in
its entirety to secure the obligations of assignee here-
under, and that upon the breach of any such obligations
by WACO TV or its successors or assigns hereunder, and
that upon the breach of any such obligations by WACO TV,
its successors or assigns, this instrument shall be of
no further force or effect and such permit shall auto-
matically revert to W. A. PREWITT, JR., his heirs, per-
sonal representatives, successors and assigns.

- 7 -

Defendant000023

Without otherwise altering its terms, the Chattel Mort-
gage from WACO TV as mortgagor to PREWITT as Mortgagee dated
March 16, 1965, referred to above, is hereby amended so that
that Chattel Mortgage referred to therein shall not only
include the permit of the City of Waco, but also includes
(in addition to and not in lieu of the Waco permit) the permits
of the Cities of Woodway, Bellmead and Beverly Hills referred
to herein, and this Paragraph V of this Agreement is made a
part of such Chattel Mortgage, and incorporated therein by
reference for all purposes, and the mortgaged property
referred to therein shall hereafter include not only the
City of Waco permit referred to therein, but also the permits
of the Cities of Woodway, Bellmead and Beverly Hills referred
to herein.  Such Chattel Mortgage, as hereby amended, shall
also be treated as a security agreement.

Without in any way limiting, waiving, questioning or
diminishing any rights, liens or securities granted PREWITT
hereunder, the other parties hereto agreement with PREWITT
that even if such security should ever be questioned, set
aside or held for naught, PREWITT will still receive the payments
set forth herein and his right thereto shall not be invali-
dated by any defect, if any, in this transfer or his security
hereunder (it being expressly stipulated and agreed, however,
that no defect therein is admitted or implied hereby).

## VI.

At the time that such suit was filed, WACO TV, TEMPLE
TV and McGREGOR TV were each delinquent on their quarterly
payments to PREWITT under the agreements referred to above.
Since such time they have made payments which they represent
and warrant to PREWITT, bring their obligations under such
agreements to current condition, and while PREWITT has not
audited same and reserves all his rights under the agreements
to do so, the parties agree that such point is not involved

- 8 -

Defendant000024

in such law suit and that PREWITT has received payment of sums which the other parties represent and warrant to be payment in full to date.

## VII

This Agreement is binding upon the parties hereto, their respective heirs, personal representatives, successors and assigns.

Signed the _16_ day of _August_ A. D. 1971.

AMECO, INC.

_Bruce Merrell_
President

ATTEST:

_Don Corbitt_
Secretary

- 9 -

Defendant000025

T.V. CABLE, INC. OF WACO

ATTEST:

*Don Corbitt*

Secretary

*Bruce T Merrill*

*President*

T.V. CABLE, INC. OF TEMPLE

ATTEST:

*Don Corbitt*

Secretary

*Bruce Merrill*

*President*

T.V. CABLE, INC. OF McGREGOR

ATTEST:

*Don Corbitt*

Secretary

*Bruce Merrill*

*President*

*W. A. Prewitt, Jr.*

W. A. PREWITT, JR.

STATE OF ARIZONA

COUNTY OF MARICOPA

    BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared *Bruce Merrill* , *President* of AMECO, INC., known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said AMECO, INC., a corporation, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 16th day of *August* A. D. 1971.

    (L.S.)

*Catherine A. Fulton*

NOTARY PUBLIC in and for
Maricopa County, Arizona

STATE OF *Arizona*

COUNTY OF *Maricopa*

    BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared *Bruce Merrill* , *President* of T.V. CABLE, INC. OF WACO, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said T.V. CABLE, INC. OF WACO, a corporation, and that he executed the same as the act of such corporation, for the purposes and consideration therein expressed, and in the capacity therein stated.

- 10 -

Defendant000026

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 16th
day of *August* A. D. 1971.

(L.S.)

_Catherine A. Fulton_
NOTARY PUBLIC in and for
_Maricopa_ COUNTY, _Az_

My Commission Expires Apr. 16, 1974

STATE OF _Arizona_ }

COUNTY OF _Maricopa_ }

    BEFORE ME, the undersigned, a Notary Public in and
for said County and State, on this day personally appeared
_Bruce Merrill_, _President_
of T.V. CABLE, INC. OF TEMPLE, known to me to be the
person and officer whose name is subscribed to the fore-
going instrument and acknowledged to me that the same was
the act of the said T. V. CABLE, INC. OF TEMPLE, a
corporation, and that he executed the same as the act
of such corporation for the purposes and consideration
therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 16th
day of *August* A. D. 1971.

(L.S.)

_Catherine A. Fulton_
NOTARY PUBLIC in and for
_Maricopa_ County, _Az_

My Commission Expires Apr. 16, 1974

STATE OF _Arizona_ }

COUNTY OF _Maricopa_ }

    BEFORE ME, the undersigned, a Notary Public in and
for said County and State, on this day personally appeared
_Bruce Merrill_, _President_
of T.V. CABLE, INC. OF McGREGOR, known to me to be the
person and officer whose name is subscribed to the fore-
going instrument and acknowledged to me that the same was
the act of the said T.V. CABLE, INC. OF McGREGOR, a
corporation, and that he executed the same as the act
of such corporation for the purposes and consideration
therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 16th
day of *August* A. D. 1971.

(L.S.)

_Catherine A. Fulton_
NOTARY PUBLIC in and for
_Maricopa_ County, _Az_

My Commission Expires Apr. 16, 1974

- 11 -

Defendant000027

THE STATE OF TEXAS    }

COUNTY OF BELL        }


BEFORE ME, the undersigned, a Notary Public in and for said County and State, on this day personally appeared W. A. PREWITT, JR., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this the 23rd day of August A. D. 1971.

(L.S.)

NOTARY PUBLIC in and for
Bell County, Texas

- 12 -

Defendant000028

# EXHIBIT C

**LIST OF RELEVANT PARTNERS AND MEMBERS OF**
**TIME WARNER CABLE TEXAS LLC AS OF MARCH 29, 2018**

As set forth fully below, the following is a listing of the relevant partners and members of Time Warner Cable Texas LLC, and of their partners and members, and so on, all the way down, as they existed as of **March 29, 2018**. The members of Time Warner Cable Texas LLC were ultimately traceable to three incorporated entities (bolded below) that were citizens of the States of Connecticut, New York, and Delaware, and described as follows:

1. Time Warner Cable Texas LLC was a limited liability company with one member, Time Warner Cable Enterprises LLC.

2. Time Warner Cable Enterprises LLC was a limited liability company with one member, Time Warner Cable, LLC.

3. Time Warner Cable, LLC was a limited liability company with one member, Charter Communications Operating, LLC.

4. Charter Communications Operating, LLC was a limited liability company with one member, CCO Holdings, LLC.

5. CCO Holdings, LLC was a limited liability company with one member, CCH I Holdings, LLC.

6. CCH I Holdings, LLC was a limited liability company with one member, CCHC, LLC.

7. CCHC, LLC was a limited liability company with one member, Charter Communications Holding Company, LLC.

8. Charter Communications Holding Company, LLC was a limited liability company with one member, Spectrum Management Holding Company, LLC.

9. Spectrum Management Holding Company, LLC was a limited liability company with one member, Charter Communications Holdings, LLC.

10. Charter Communications Holdings, LLC was a limited liability company with three members: (1) Advance/Newhouse Partnership (see below at No. 11); (2) CCH Holding Company, LLC (see below at 12); and (3) CCH II, LLC (see below at No. 13).

11. Advance/Newhouse Partnership was a general partnership with two partners: (1) A/NPC Holdings Sub LLC; and (2) A/NPC Holdings LLC.

-1-

o A/NP Holdings Sub LLC was a limited liability company with one member, A/NPC Holdings LLC.

o A/NPC Holdings LLC was a limited liability company with two members: (1) Newhouse Cable Holdings LLC; and (2) Advance Communications Company LLC.

- Newhouse Cable Holdings LLC was a limited liability company with one member, Newhouse Broadcasting Corporation.

  - **Newhouse Broadcasting Corporation was a corporation formed under the laws of New York with its principal place of business in New York.**

- Advance Communications Company LLC was a limited liability company with one member, Advance Local Holdings Corp.

  - **Advance Local Holdings Corp. was a corporation formed under the laws of Delaware with its principal place of business in New York.**

12. CCH Holding Company, LLC was a limited liability company with one member, Charter Communications, Inc. (described below at No. 18).

13. CCH II, LLC was a limited liability company with five members: (1) Charter Communications, Inc. (described below at No. 18); (2) NaviSite Newco LLC; (3) Insight Communications Company LLC; (4) TWC Sports Newco LLC; and (5) Coaxial Communications of Central Ohio LLC.

14. NaviSite NewCo LLC was a limited liability company with one member, Charter Communications, Inc. (described below at No. 18).

15. Insight Communications Company LLC was a limited liability company with one member, Charter Communications, Inc. (described below at No. 18).

16. TWC Sports Newco LLC was a limited liability company with one member, Charter Communications, Inc. (described below at No. 18).

17. Coaxial Communications of Central Ohio LLC was a limited liability company with one member, Insight Communications Company LLC (described above at No. 15).

18. **Charter Communications, Inc. was a publicly-held corporation formed under the laws of Delaware with its principal place of business in Connecticut.**

###