IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHARTER COMMUNICATIONS, INC., et al. | § | |
|    Plaintiffs, | § | |
| | § | |
| v. | § | NO. 1:16-CV-1268-RP |
| | § | |
| PREWITT MANAGEMENT, INC., et al. | § | |
|    Defendants, | § | |

## DEFENDANTS' RESPONSE BRIEF REGARDING REMAINING CLAIMS

4905-2347-3826

TABLE OF CONTENTS

INDEX OF AUTHORITIES ..................................................................................................iii

OVERVIEW OF THE REMAINING CLAIMS .................................................................. 1

ARGUMENT ........................................................................................................................ 4

       A.     Two important preliminary truths ................................................................ 4

           1.     Charter's claims are facial challenges to the Savings Clause, which entail a significantly heightened burden ................................. 4

           2.     Numerous other states include provisions like the Savings Clause in their cable enactments. ..................................................... 6

       B.     The Savings Clause does not violate the Federal Cable Act and is not preempted (Claim 3) ................................................................................. 8

       C.     The Savings Clause does not violate the First Amendment or the Equal Protection Clause (Claim 4). ............................................................ 10

           1.     Operation of the Savings Clause is not state action. ........................ 12

           2.     The Savings Clause passes both rational basis and intermediate scrutiny. ................................................................................................ 14

       D.     The Savings Clause does not violate the Federal Contracts Clause (Claim 5) ......................................................................................................... 17

       E.     The 1964 Agreement is not an indefinite contract subject to termination under Texas law (Claim 2) ....................................................... 21

           1.     The 1964 Agreement is not of unlimited duration. ......................... 21

           2.     A reasonable term should be applied. ............................................... 22

           3.     Prewitt has fully performed. ............................................................... 25

       F.     Next steps ..................................................................................................... 28

CERTIFICATE OF SERVICE ............................................................................................ 29

4905-2347-3826

INDEX OF AUTHORITIES

**Cases**

*Allied Structural Steel Co. v. Spannaus*,
  438 U.S. 234 (1978) ................................................................................... 18

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ..................................................................................... 12

*Americans for Prosperity Foundation v. Bonta*,
  594 U.S. 595 (2021) ..................................................................................... 5

*Anderson v. Edwards*,
  514 U.S. 143 (1995) ................................................................................... 5, 8

*Apao v. Bank of N.Y.*,
  324 F.3d 1091 (9th Cir. 2003) ................................................................... 13

*Ayton v. Holder*,
  686 F.3d 331 (5th Cir. 2012) ..................................................................... 17

*Big Spring v. Bd. of Control*,
  404 S.W.2d 810 (Tex. 1966) ...................................................................... 25

*Blum v. Yaretsky*,
  457 U.S. 991 (1982) ................................................................................... 12

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*,
  531 U.S. 288 (2001) ................................................................................... 13

*Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*,
  180 F.3d 686 (5th Cir. 1999) ..................................................................... 10

*Cmty Health Sys. Prof'l Servs. Corp. v. Hansen*,
  525 S.W.3d 671 (Tex. 2017) ...................................................................... 22

*DeJoria v. Maghreb Petroleum Expl., S.A.*,
  No. A-13-CV-654-RP-AWA, 2018 WL 1057029 (W.D. Tex.
  Feb. 26, 2018), report and recommendation adopted, No. 1:13-CV-654-RP,
  2018 WL 1830789 (W.D. Tex. Mar. 28, 2018), aff'd, 935 F.3d 381
  (5th Cir. 2019), as revised (Aug. 16, 2019) .............................................. 11

*Edmonson v. Leesville Concrete Co., Inc.*,
  500 U.S. 614 (1991) ................................................................................... 11

4905-2347-3826

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983) ........................................................................................ 18

*Enron Corp. v. Spring Indep. Sch. Dist.*,
  922 S.W.2d 931 (Tex. 1996) ........................................................................... 11

*Fischer v. CTMI, L.L.C.*,
  479 S.W.3d 231 (Tex. 2016) ........................................................................... 25

*Flowers v. Connect America.com, LLC*,
  No. CIV.A. 12-4787, 2014 WL 4762643 (E.D. Pa. Sept. 24, 2014) ...................... 26

*Grapentine v. Pawtucket Credit Union*,
  755 F.3d 29 (1st Cir. 2014) ............................................................................ 13

*Gulf Oil Corp. v. Reid*,
  161 Tex. 51, 337 S.W.2d 267 (1960) ............................................................... 22

*Hall v. Hall*,
  308 S.W.2d 12 (Tex. 1957) ............................................................................. 22

*Hogan v. S. Methodist Univ.*,
  688 S.W.3d 852 (Tex. 2024) ............................................................................. 7

*Ins. Distributors Intern. (Bermuda) LTD. v. Edgewater Consulting Group LTD.*,
  No. A-08-CA-767 AWA, 2010 WL 3522312 (W.D. Tex. Sept. 8, 2010) ....... 23, 24

*JPMorgan Chase Bank, N.A. v. SFR Investments Pool 1, LLC*,
  200 F. Supp. 3d 1141 (D. Nev. 2016) .............................................................. 12

*Kennedy v. McMullen*, |
  39 S.W.2d 168 (Tex. Civ. App.—Beaumont 1931, writ ref'd) ...................... 25, 26

*LeClerc v. Webb*,
  419 F.3d 405 (5th Cir. 2005) .......................................................................... 17

*Linn v. Employers Reins. Corp.*,
  153 A.2d 483 (Pa. 1959) ................................................................................. 26

*Lipscomb v. Columbus Mun. Separate Sch. Dist.*,
  269 F.3d 494 (5th Cir. 2001) ..................................................................... 18, 20

*Lugar v. Edmondson Oil Co., Inc.*,
  457 U.S. 922 (1982) ....................................................................................... 11

iv

*Marshall v. Marshall*,
735 S.W.2d 587 (Tex. App.—Dallas 1987, writ ref'd n.r.e.) ................................ 22

*Metromarketing Services, Inc. v. HTT Headwear, Ltd.*,
15 S.W.3d 190 (Tex. App.— Houston [14th Dist.] 2000, no pet.) ........................ 22

*Mobil Exploration & Producing United States v. Dover Energy Exploration*,
56 S.W.3d 772 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ................... 25, 27

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ...................................................................................... 5, 11

*NetChoice, L.L.C. v. Paxton*,
121 F.4th 494 (5th Cir. 2024) ............................................................................. 5

*Smith v. Davis*,
426 S.W.2d 827 (Tex. 1968) .............................................................................. 11

*Time Warner Cable, Inc. v. Hudson*,
667 F.3d 630 (5th Cir. 2012) ............................................................ 13, 14, 15, 16

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994) .......................................................................................... 16

*United States v. Salerno*,
481 U.S. 739 (1987) ......................................................................................... 5, 8

*Vacco v. Quill*,
521 U.S. 793 (1997) .......................................................................................... 17

*Veix v. Sixth Ward Bldg. & Loan Ass'n*,
310 U.S. 32 (1940) ........................................................................................... 18

*Yale Sec., Inc. v. Freedman Sales, Ltd.*, 165 F.3d 34, 1998 WL 690944
(7th Cir. 1998) ................................................................................................. 27

**Statutes**

47 U.S.C. §522(10) ............................................................................................... 9

47 U.S.C. §542(b) ................................................................................................. 9

47 U.S.C. §542(g)(1) ............................................................................................. 9

Tex. Util. Code §66.001 ......................................................................................... 2

Tex. Util. Code §66.003(a) ................................................................................................. 2

Tex. Util. Code §66.003(c) ................................................................................................. 2

Tex. Util. Code §66.003(e) ............................................................................................... 21

Tex. Util. Code §66.004(b) ................................................................................................. 2

Tex. Util. Code §66.004(f) ......................................................................................... 2, 4, 5

**Other Authorities**

Indiana Video Service Franchises Act, IC 8-1-34-22 (a), (b) ............................................. 6

Kansas Video Competition Act, K.S.A. 12-2023(j)(l) ...................................................... 6

Louisiana Consumer Choice for Television Act, LSA-R.S. 45: §1365 (B)(3) ................... 6

North Carolina State Franchise for Cable Service Act, N.C.G.S.A. § 66-355(b) ............... 6

**Constitutional Provisions**

Tex. Const. art. I, §16 ........................................................................................... 7, 16, 20

Defendants Prewitt Management, Inc., as General Partner of WAP, Ltd., a Texas Limited Partnership; and WAP, Ltd., a Texas Limited Partnership (together, "Prewitt") file this response brief regarding the remaining claims of Plaintiffs Charter Communications, Inc. and Time Warner Cable Texas LLC (together, "Charter"). For the reasons discussed below, the Court should reject Charter's remaining claims and render judgment for Prewitt (1) confirming Charter's continued contractual obligation to pay to Prewitt royalty of 3% of the gross income Charter receives from its operations in the three Texas cities; (2) awarding Prewitt a judgment for the amount of unpaid past royalties, plus interest; and (3) awarding Prewitt its reasonable and necessary attorney's fees.

<u>OVERVIEW OF THE REMAINING CLAIMS</u>

The core of this suit is the 1964 Agreement, through which Prewitt's predecessor W.A. Prewitt, Jr. assigned to Charter's predecessor the city permits necessary to build cable infrastructure and provide cable television services within three Texas cities.[1] That private contract entailed bilateral obligations: Mr. Prewitt assigned the valuable city permits, and in return Charter's predecessor agreed to pay 3% of its gross revenue derived from its operations in the three cities for so long as it continued those operations. Charter's predecessor built out its cable systems in the three cities and began paying the 3% royalty to Mr. Prewitt. Those 3% royalty payments continued until 2016, when Charter stopped making the payments and filed this suit.

---

[1] The parties' *Joint Stipulation of Undisputed Facts* provides a comprehensive recital of the factual background. It appears as a stand-alone filing at Dkt.96 and was also admitted as Joint Exhibit J-1 during the bench trial before Judge Yeakel. Dkt.136-6.

4905-2347-3826

In 2005, the regulatory landscape changed with the adoption of the Texas Cable Act. Tex. Util. Code §66.001 *et seq*. Through the Texas Cable Act, individual city permits were abolished in favor of state-issued certificates of franchise authority ("SICFAs"). A SICFA grants the same rights to use the public ways of cities and to operate cable television systems as were previously granted by the city permits. *Id*. §66.003(c). As a result of the Texas Cable Act, franchises granted and permitted by cities and municipalities would terminate "on the date the commission issues the" SICFA, or whenever the municipal franchise permit expired. *Id*. §§66.003(a), 66.004(b).

The Texas Cable Act included a Savings Clause mandating that existing contractual arrangements "shall continue in full force and effect," including expressly "obligations measured by and related to the gross revenue hereafter received by the holder of a state-issued certificate of franchise authority for services provided in the geographic area to which such prior franchise or permit applies." Tex. Util. Code §66.004(f) (the "Savings Clause"). The Savings Clause provides further that continuing to honor existing private royalty agreements is a "condition to the issuance and continuance of a" SICFA. *Id*.

In 2016 Charter stopped making the 3% royalty payments and filed this suit seeking declaratory judgment that the 1964 Agreement and its royalty payment obligation under that agreement were unenforceable because the underlying city-issued permits had expired and been replaced by the SICFAs and a declaration that the Savings Clause was facially invalid and unenforceable. Charter also sought to recover all of the royalty payments it had made to Prewitt since it acquired SICFAs covering the three cities.

After a bench trial in 2018, the district court in 2023 rendered judgment that:

2

(1) the Savings Clause did not preserve Charter's obligation to make royalty payments after Charter acquired SICFAs covering the three cities;

(2) under the plain terms of the 1964 Agreement, the royalty obligation ended when the city-issued permits were terminated and replaced by SICFAs; and

(3) Charter is not entitled to recover any portion of the quarterly royalty payments it voluntarily made prior to October 2016.

Because the district court rendered judgment that the royalty obligation had terminated, it did not reach Charter's remaining facial challenges to the validity of the Savings Clause.

On appeal, the Fifth Circuit reversed the judgment. The unanimous panel agreed that the Savings Clause preserved Charter's existing royalty obligation notwithstanding the regulatory change from city permits to SICFAs:

> Here, Prewitt assigned the city-issued permits for the Cities to Charter in exchange for a royalty of 3% of gross revenues earned on the permits. When Charter later obtained the SICFAs, under the Savings Clause, it agreed to honor all pre-existing royalties "*as though* the revenue generated" in the Cities "continued to be generated" under the prior city-issued permits, and "*as though* the cable service provider continued to operate under" the city-issued permits." Because Charter's royalty-payment obligation is "measured by and related to the gross revenue hereafter received by the holder of a [SICFA] for services provided in the geographic area to which such prior franchise or permit applie[d]," Prewitt is entitled to the same 3% of gross revenues that Charter previously earned on the city-issued permits.

Dkt.186, Opinion p.18 (court's emphasis) (quoting Tex. Util. Code §66.004(f)).

One member of the panel agreed with the majority that the Savings Clause preserved the royalty obligation. But she would hold that, in addition, the plain language of the 1964 Agreement "provides that Charter's obligation to pay quarterly royalties to Prewitt

3

remained after Charter acquired state-issued SICFAs and the city-issued permits covering Waco, Temple, and McGregor were supplanted." Opinion p.20 (Richman, J., concurring).

The Fifth Circuit remanded the case to this Court to resolve, in the first instance, Charter's claims that the Court's interpretation of the Savings Clause "'would run afoul of federal (and state) laws' as well as the Texas and United States Constitutions." Opinion p.18. Hence there are four remaining claims before this Court on remand. Charter has filed its opening brief on those claims. Dkt.194. For the reasons discussed below, the Court should reject Charter's claims, affirm the validity of the Savings Clause, and render judgment enforcing the 3% contractual royalty obligation.

## ARGUMENT

A.    Two important preliminary truths

When analyzing Charter's remaining claims, it is important to clarify two important issues, one of which Charter ignores, and the other of which it affirmatively represents.

1.    Charter's claims are facial challenges to the Savings Clause, which entail a significantly heightened burden.

Three of Charter's four remaining claims are facial challenges to the validity of the Savings Clause. Charter does not plead that the Savings Clause *as applied to its royalty obligations* violates constitutional protections; it advances facial challenges only.

Charter's live pleading, the Third Amended Complaint, pleads Claims 3, 4 and 5 as facial challenges and seeks broad relief invalidating the Savings Clause entirely. Dkt.180 ¶50 ("Charter therefore is entitled to a judgment declaring section 66.004(f) unlawful and preempted by federal law."); ¶¶56, 61 ("Charter therefore is entitled to a judgment

4

declaring Section 66.004(f) unconstitutional and unlawful"). Its opening brief to this Court likewise presents its claims as facial constitutional challenges and seeks relief invalidating the Savings Clause for all purposes. Dkt.194 p.24 ("Because Section 66.004(f) of the Texas Cable Act is unconstitutional in multiple respects, the Court should declare the law invalid.").

Charter chose to litigate its claims as facial challenges, "and that decision comes at a cost." *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024). Because "facial challenges threaten to short circuit the democratic process by preventing duly enacted laws from being implemented in constitutional ways," the Supreme Court "has therefore made facial challenges hard to win." *Id*. (cleaned up); *see also NetChoice, L.L.C. v. Paxton*, 121 F.4th 494, 497 (5th Cir. 2024) ("Because of the significant risks associated with facial challenges—even those under the First Amendment— challengers bear a heavy burden.").

For facial challenges under the First Amendment, the "question is whether a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723; *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595, 615 (2021). For facial challenges other than those under the First Amendment, "a plaintiff cannot succeed on a facial challenge unless it "establish[es] that no set of circumstances exists under which the [law] would be valid," or it shows that the law lacks a "plainly legitimate sweep." *Moody*, 603 U.S. at 723 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Anderson v. Edwards*, 514 U.S. 143, 155, n. 6 (1995) (applying *Salerno* standard in a preemption case).

4905-2347-3826

Charter's opening brief wholly ignores those applicable standards. It pleads facial challenges, and seeks the broad relief available under facial challenges, but it makes no effort to satisfy or even address the stringent standards applicable to such challenges. This is not a "gotcha" or a procedural default. It is, rather, a situation where Charter failed to satisfy the burden applicable to the claims it actually filed.

2.      Numerous other states include provisions like the Savings Clause in their cable enactments.

Throughout its opening brief, Charter insists that the Savings Clause was included in the Texas Cable Act solely for the benefit of Prewitt, and Charter is the sole cable provider burdened by a legacy contractual obligation by virtue of the Savings Clause. *See, e.g.*, Dkt.194 p.9, 15, 18, 19, 23. This allegation—that the legislature adopted the Savings Clause under nefarious circumstances, and it exists only to persecute Charter—pervades Charter's opening brief. But it is simply not true.

While the legislative history of the Texas Cable Act reflects that Prewitt lobbied for inclusion of a Savings Clause, numerous other states included similar savings clauses when adopting cable regulatory acts.[2] Texas and other states have seen fit to include savings

---

[2] *See, e.g.,* Kansas Video Competition Act, K.S.A. 12-2023(j)(l) ("Nothing in this act is intended to abrogate, nullify or adversely affect in any way any franchise or other contractual rights, duties and obligations existing and incurred by a cable operator or competitive video service provider before the enactment of the act."); Indiana Video Service Franchises Act, IC 8-1-34-22 (a), (b) ("(a) A provider that elects to terminate a local franchise under section 21 of this chapter remains subject to the contractual rights, duties, and obligations incurred by the provider that are owed to any private person; (b) All liens, security interests, royalties, and other contracts, rights, and interests owed to a private person, shall: (1) Continue in full force and effect without the need for renewal, extension, or continuance; and (2) be paid or performed by the provider after becoming a holder of a certificate under this chapter."); Louisiana Consumer Choice for Television Act, LSA-R.S. 45: §1365 (B)(3) ("An incumbent service provider that elects to terminate its existing franchise for a local governmental subdivision shall remain subject to the contractual rights, duties

4905-2347-3826

clauses in their cable enactments to ensure that regulatory changes do not violate constitutional prohibitions against impairing settled expectations under existing contracts. *See* Tex. Const. art. I, §16 ("No…law impairing the obligation of contracts, shall be made."); *Hogan v. S. Methodist Univ.*, 688 S.W.3d 852, 860 (Tex. 2024) (confirming that "protecting settled expectations" is a "fundamental objective" of the constitution's retroactivity bar). Savings clauses are thus common and routine in cable regulatory enactments, and for good reason. Charter's repeated insistence that the Savings Clause in the Texas Cable Act is somehow unique is simply wrong.

Charter is also wrong that it is the sole cable provider whose existing contractual obligations were preserved by the Savings Clause. The Savings Clause requires that, as a condition to the issuance and continuance of a SICFA, the applicant must affirm that it will honor any existing contractual obligations. As a result, when it first began issuing SICFAs, the PUC required that applicants state whether the obligation imposed by the Savings Clause applied to the applicant. If the applicant had any existing contractual obligations subject to the Savings Clause, it was required to affirmatively state its agreement to comply with such obligations. In fact, numerous cable service providers disclosed in their applications for SICFAs that they had existing contractual obligations subject to the

---

and obligations incurred by the incumbent service provider under the terms and conditions of the terminated local franchise that are owed to any private person, including a subscriber."); North Carolina State Franchise for Cable Service Act, N.C.G.S.A. § 66-355(b) ("A termination of an existing agreement ends the obligations under the agreement and under any local cable regulatory ordinance that specifically authorizes the agreement as of the effective date of the termination but does not affect the rights or liabilities of the county or city, a taxpayer, or other person arising under the existing agreement or local ordinance before the effective date of the termination.").

7

4905-2347-3826

Savings Clause and affirmed their willingness to continue to comply with those obligations. *See* Joint Exhibit 35. Charter cites no evidence—no evidence at all—supporting its repeated assertion that it is the only cable provider burdened by a preexisting contractual obligation preserved by the Savings Clause. Its insistence that it is the only such party is contrary to the actual record, and it rests on nothing more than Charter's own *ipse dixit*.

B.      The Savings Clause does not violate the Federal Cable Act and is not preempted (Claim 3).

Charter argues that the Savings Clause is preempted by the Federal Cable Act because, by preserving Prewitt's contractual right to a 3% royalty, the Savings Clause conflicts with the Federal Cable Act's 5% cap on government-imposed franchise fees. Dkt.194 pp.11-15.

As discussed in section A.1 of the Argument, Charter plead its preemption claim as a facial challenge to the Savings Clause. Dkt.180 Claim 3 ¶¶45-50. Charter therefore has the burden to show that no set of circumstances exists under which the Savings Clause would be valid. *Salerno*, 481 U.S. at 745; *Anderson v. Edwards*, 514 U.S. at 155, n.6. It wholly failed to meet that burden, and the Court should overrule Claim 3.

If Charter had advanced this claim as an as-applied challenge, the Court should still overrule Claim 3. The Savings Clause does not violate the Federal Cable Act because it does not authorize *any governmental entity* to impose a franchise fee above the 5% federal statutory cap. The plain terms of the Federal Cable Act make clear that Charter's contractual 3% royalty obligation is therefore not a "franchise fee" subject to the statutory 5% cap.

8

4905-2347-3826

The plain terms of the Federal Cable Act make clear that the cap applies to government-imposed fees only. It defines "franchising authority" as "*any governmental entity* empowered by Federal, State, or local law to grant a franchise." 47 U.S.C. §522(10) (emphasis added). It provides that "franchise fee" includes "any tax, fee, or assessment of any kind *imposed by a franchising authority or other governmental entity* on a cable operator or cable subscriber, or both, solely because of their status as such." *Id*. §542(g)(1) (emphasis added). And it provides that "the *franchise fees* paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services." *Id*. §542(b) (emphasis added).

Charter is correct that courts have determined that what constitutes a "tax, fee, or assessment" should be interpreted broadly. Dkt.194 p.14. But no matter how broadly those terms are construed, under the plain terms of the Federal Cable Act, only taxes, fees, and assessments *imposed by governmental entities* can be "franchise fees" subject to the 5% cap. As a definitional matter, Charter's 3% royalty obligation is not a "franchise fee," and it thus does not violate the Federal Cable Act's 5% cap, because it is not imposed by "a franchising authority or any other governmental entity." 47 U.S.C. §542(g)(1) The 3% royalty is, instead, imposed by the 1964 Agreement, a private contract between private parties. The Savings Clause did not impose that obligation; it simply preserved the existing contractual obligation and saved it from being washed out due to regulatory changes made by the Texas Cable Act.

9

4905-2347-3826

Indeed, the commissioners of the PUC moved to dismiss Charter's claims against them in this suit because the 3% royalty obligation is strictly a private contractual matter that the PUC has no part of: the Savings Clause "is a savings provision for cable providers' contracts with third parties….This provision preserves cable and video providers' existing contractual obligations to third parties after they obtain a new, state-issued franchise to replace their existing municipal franchise….It does not create new rights, but provides that these rights survive the substitution of a new state-issued franchise for the providers' prior municipal or local franchise." Dkt.12 pp.10-11.

Charter's preemption claim rests on the false premise that the Savings Clause imposed the 3% royalty obligation. In fact, that royalty payment obligation is a private contractual matter arising from the 1964 Agreement, not a "franchise fee" imposed by a governmental entity. The Court should overrule Charter's Claim 3.[3]

C.    The Savings Clause does not violate the First Amendment or the Equal Protection Clause (Claim 4).

Charter argues that the Savings Clause violates its First Amendment and Equal Protection rights by putting it "at a competitive disadvantage vis-à-vis competitors." Dkt.194 p.15.

---

[3] As is discussed below in section C.1 regarding Claim 4, operation of the Savings Clause is not state action, and is not subject to constitutional scrutiny, because it simply preserves existing private contractual rights and does not impose or coerce any obligation. The same issue applies to foreclose Charter's claim that operation of the Savings Clause is preempted by the Federal Cable Act. *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tex.*, 180 F.3d 686, 690 (5th Cir. 1999) (explaining that "federal law preempts state law" when "state action directly conflicts with the force or purpose of federal law"). The absence of state action is thus an additional reason to overrule Claim 3.

4905-2347-3826

As discussed in section A.1 of the Argument, Charter pleads this claim as a facial challenge to the Savings Clause. Dkt.180 Claim 4 ¶¶51-56. Charter therefore has the burden to show that "a substantial number of [the Savings Clause's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723. It wholly failed to meet that burden, and the Court should overrule Claim 4.

If Charter had advanced this claim as an as-applied challenge, the Court should still overrule Claim 3. As a starting point, in analyzing the constitutionality of a state statute, the Court must begin with a presumption that the statute is constitutionally valid. *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex. 1968); *DeJoria v. Maghreb Petroleum Expl., S.A.*, No. A-13-CV-654-RP-AWA, 2018 WL 1057029, at *4 (W.D. Tex. Feb. 26, 2018), report and recommendation adopted, No. 1:13-CV-654-RP, 2018 WL 1830789 (W.D. Tex. Mar. 28, 2018), aff'd, 935 F.3d 381 (5th Cir. 2019), as revised (Aug. 16, 2019). "Courts presume that the Legislature understands and correctly appreciates the needs of its own people, that its laws are directed to problems made manifest by experience, and that its discriminations are based upon adequate grounds." *Enron Corp. v. Spring Indep. Sch. Dist.*, 922 S.W.2d 931, 934 (Tex. 1996).

The Court should overrule Claim 4 for several reasons, starting with the fact that there is no state action subject to constitutional protection. The Savings Clause does nothing more than preserve existing private contractual obligations under the 1964 Agreement, and its operation does not constitute state action subject to constitutional provisions.

11

1.      Operation of the Savings Clause is not state action.

"The Constitution's protections of individual liberty and equal protection apply in general only to action by the government." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619 (1991); *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982) ("As a matter of substantive constitutional law the state-action requirement reflects judicial recognition of the fact that most rights secured by the Constitution are protected only against infringement by governments."). To invoke constitutional protections against a private actor—as Charter seeks to do here—a party must show that the private conduct is fairly attributable to the government such that it constitutes state action.

State action has two requirements: (1) there must be "an alleged constitutional deprivation caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible," and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The fact that a business is subject to state regulation "does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Id*. at 52. Moreover, "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Id*. Private entities are not subject to constitutional requirements "unless there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id*. A "sufficiently close nexus" exists where the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to

12

be that of the State." *Id*. (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). This nexus does not exist—and thus there is no state action—where the action was taken "with the mere approval or acquiescence of the State." *Am. Mfrs.*, 526 U.S. at 52; *JPMorgan Chase Bank, N.A. v. SFR Investments Pool 1, LLC*, 200 F. Supp. 3d 1141, 1158 (D. Nev. 2016).

Though the Savings Clause was enacted by the Texas legislature as part of the Texas Cable Act, the private contractual obligations it preserved are not state action subject to constitutional scrutiny. This is due to the nature of savings clauses, which do not impose new obligations or coerce private conduct but simply preserve private consensual contract rights that already exist. Because the State does not exercise coercive power through the Savings Clause or jointly participate in the consensual contractual obligations it preserves, operation of the Savings Clause is not state action subject to constitutional protections. *See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001) (stating that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents"); *Grapentine v. Pawtucket Credit Union*, 755 F.3d 29, 33 (1st Cir. 2014) (noting the principle "that mere legislative sanction of a private remedy does not constitute state action"); *Apao v. Bank of N.Y.*, 324 F.3d 1091, 1094 (9th Cir. 2003) (stating that "the state's statutory authorization of self-help provisions" is insufficient "to convert private conduct into state action" where statute "neither encourages nor compels the procedure, but merely recognizes its legal effect").

13

The fact that there is no state action here is dispositive of Claim 4 (and Claims 3 and 5 as well), but Charter's opening brief wholly ignores this critical threshold issue. Its argument rests almost entirely on a Fifth Circuit case holding that a separate provision of the Texas Cable Act violated the First Amendment rights of two incumbent cable operators. *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630 (5th Cir. 2012). The provision at issue in that case is a perfect example of what actually is state action. *Hudson* involved a provision in the Texas Cable Act that allowed incumbent cable providers to terminate their city permits in favor of statewide SICFAs, but only in cities with a population less than 215,000 people. 667 F.3d at 635. That provision applied to just two cable providers. *Id*. The State created the new regulatory scheme changing cable operations in Texas from city-permit-based to state-issued SICFAs, but affirmatively carved out that change and denied it to just two incumbent cable providers in larger Texas cities. That is state action.

Charter treats operation of the Savings Clause as though it were the same as the substantive regulatory provision at issue in *Hudson*, but the Savings Clause is a horse of a different color. Because the Savings Clause merely preserves existing private contractual rights and imposes no new or different obligations or regulations, operation of the Savings Clause is not state action, and it is not subject to constitutional scrutiny. The Court should overrule Charter's Claim 4 for this reason.

2.    The Savings Clause passes both rational basis and intermediate scrutiny.

Even if operation of the Savings Clause were state action (and it is not), Charter's First Amendment and Equal Protection claims fail on the merits because the Savings Clause passes both rational basis and intermediate scrutiny inquiries.

14

Charter's argument that the Savings Clause is subject to strict scrutiny rests on its repeated claim that it is the only incumbent cable provider whose existing contractual obligations were preserved by the Savings Clause. Dkt.194 p.18. Charter cites no evidence to support that claim, and in fact the record demonstrates that numerous cable providers attested in their applications for SICFAs that they agreed to honor existing contractual obligations pursuant to the Savings Clause. Joint Exhibit 35. The Court in *Hudson* applied strict scrutiny to the provision at issue because it applied only to "a small and identifiable number of cable providers." 667 F.3d at 639. There is no such evidence here, and by its plain terms the Savings Clause preserves existing contractual obligations of all cable providers.

Further, unlike the provision at issue in *Hudson*, the Savings Clause does not impose different obligations upon incumbent cable providers as opposed to new entrants.  Instead, it preserves the existing private agreements of all cable providers, whether incumbent or new entrant. Charter's 3% royalty obligation flows from the 1964 Agreement—its own private contractual agreement—and not from any requirement of the statute. Operation of the Savings Clause thus does not raise the same concerns raised by the provision at issue in *Hudson*, where the statute restricted the right of two specific incumbent providers to obtain SICFAs while allowing new entrants to obtain one in the same market or geographical area.

Moreover, the Savings Clause does not reference or draw distinctions based on the content of any contracts it preserves. Instead, it provides simply that any existing contracts between cable providers and private parties are not abrogated by the passage of the Texas

15

Cable Act. Existing contracts, no matter their contents, would not be washed out by the action of the Texas Cable Act. The Savings Clause is thus not a content-based regulation, and it is not subject to strict scrutiny.

The Savings Clause should likewise not be subject to intermediate scrutiny because it is content-neutral and does not "impose special obligations upon cable operators and special burdens upon cable programmers." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994). But even if intermediate scrutiny were the appropriate inquiry, the Savings Clause readily satisfies that test. Under intermediate scrutiny, the Court must sustain provisions if they "further an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Hudson*, 667 F.3d at 641. To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. *Turner*, 512 U.S. at 662. So long as the restriction promotes a substantial governmental interest that would be achieved less effectively without the restriction, it is sufficiently narrowly tailored. *Id*. The Savings Clause furthers a substantial governmental interest in that it preserves existing private contracts and avoids impairing such contracts in violation of the Texas Constitution. *See* Tex. Const. art. I, §16 ("No…law impairing the obligation of contracts, shall be made."). The preservation of existing contracts is unrelated to the suppression of free expression; indeed, it is agnostic as to the terms of any private contract it preserves. And any incidental restriction on alleged First Amendment freedoms of incumbent cable operators is no greater than necessary to further the interest in

16

4905-2347-3826

preserving existing private contractual rights. The Savings Clause thus passes intermediate scrutiny, if that is the appropriate inquiry.

In fact, the appropriate inquiry is the rational basis test, and the Savings Clause readily satisfies that inquiry. Under a rational basis review, the challenged statute will be upheld "so long as it bears a rational relation to some legitimate end." *LeClerc v. Webb*, 419 F.3d 405, 421 (5th Cir. 2005) (quoting *Vacco v. Quill*, 521 U.S. 793, 799 (1997)); *Ayton v. Holder*, 686 F.3d 331, 338 (5th Cir. 2012). The Savings Clause bears a rational relation to the legitimate end of ensuring that the Texas Cable Act does not impair existing private contracts in violation of the Texas Constitution.

The Savings Clause thus satisfies both rational basis and intermediate scrutiny. The Court should overrule Charter's Claim 4.

D.      The Savings Clause does not violate the Federal Contracts Clause (Claim 5).

Charter's Contract Clause claim is deeply ironic. Charter contends that, by saving the 3% royalty obligation from being washed out as part of the Texas Cable Act's change in cable regulation, the Savings Clause "substantially impaired the contractual relationship between Prewitt and Charter." Dkt.180 ¶59. But if the Savings Clause *had not* saved the 3% royalty obligation from being washed out, that would have substantially impaired the contractual relationship between Prewitt and Charter.

As discussed in section A.1 of the Argument, Charter plead its Contracts Clause claim as a facial challenge to the Savings Clause. Dkt.180 Claim 5 ¶¶57-61. Charter therefore has the burden to show that no set of circumstances exists under which the

17

Savings Clause would be valid. *Salerno*, 481 U.S. at 745. It wholly failed to meet that burden, and the Court should overrule Claim 5.

If Charter had advanced this issue as an as-applied challenge, the Court should still overrule Claim 5, for two reasons. First, as discussed above in section C.1 regarding Claim 4, operation of the Savings Clause is not state action that is subject to constitutional scrutiny. Second, on the merits, operation of the Savings Clause to preserve Charter's contractual 3% royalty obligation does not violate the Contracts Clause.

Claims under the Contracts Clause entail a three-step analysis. The threshold inquiry is "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411 (1983). "In considering whether an impairment to contract is substantial, the court should consider the expectations of the parties with respect to changes in the law." *Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 504 (5th Cir. 2001). In determining the extent of the impairment, the court should also consider whether the industry has been regulated in the past. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242 n.13 (1978) (citing *Veix v. Sixth Ward Bldg. & Loan Ass'n*, 310 U.S. 32, 38 (1940) ("When he purchased into an enterprise already regulated in the particular to which he now objects, he purchased subject to further legislation upon the same topic.").

Next, if the state regulation constitutes a substantial impairment, "the State, in justification, must have a significant and legitimate public purpose behind the regulation." *Energy Reserves*, 459 U.S. at 411.

18

4905-2347-3826

Finally, if a legitimate public purpose has been identified, the court determines whether the impairment is reasonable and necessary. *Lipscomb*, 269 F.3d at 505. This final step is inapplicable here, however, because the contract that was allegedly impaired—the 1964 Agreement—is between private parties. "In cases involving impairment of contracts between private parties, the court does not independently review the reasonableness of the legislation; it should defer to the judgment of the legislature." *Id.*

Charter's Contracts Clause claim fails at every step of the test. First, the Savings Clause did not substantially impair the 1964 Agreement, considering the expectations of the parties. Under the 1964 Agreement, Charter contracted to pay a 3% royalty to Prewitt so long as Charter conducted cable operations in the three cities pursuant to city permits Prewitt assigned to Charter. While the royalty obligation was tied to the city permits, the parties broadened the scope to include not only the existing permits themselves, but also "amendments thereto, and any holding over thereunder, renewals or extensions thereof." 1964 Agreement ¶2(b). The parties also anticipated the possibility that new permits might replace the existing permits in the future and provided that the 3% royalty obligation would attach to any *new* permit to provide cable services in the subject cities:

> For the purposes of this agreement, in the event any new permit is granted to Ameco or any assignee of any such permits, or any company directly or indirectly controlled by any of same before, at, or after the expiration of the existing permits, such new permit shall be conclusively treated and considered as a renewal of the existing permit, even if the terms thereof are new and different, and such three percent (3%) of the gross revenues thereof shall be so paid to [Mr. Prewitt], his heirs, successors, personal representatives and assigns, as aforesaid.

*Id.*

19

4905-2347-3826

Given that cable service in Texas at the time was dependent on city permits, the terms of the 1964 Agreement thus reflect an expectation that the 3% royalty obligation would continue so long as Charter continued to provide cable service in the three cities. And in fact, even under Charter's construct, the 3% royalty obligation was binding from 1964 until at least 2005, when the Texas Cable Act was adopted. Charter argues that the Savings Clause impairs the 1964 Agreement because it "rewrites the only remedy the parties bargained for in the event of a breach—reversion of the city permits to the Prewitts." Dkt.194 p.22. At the time of the 1964 Agreement, however, reversion of the city permits to Prewitt meant that Charter could no longer provide cable services in the three cities. Charter still has that identical right—if it stops providing cable services in the three cities, it no longer has to pay the 3% royalty. Charter's Contracts Claim thus fails the threshold inquiry because the Savings Clause does not substantially impair the 1964 Agreement. Instead, it acts to preserve the 1964 Agreement by continuing the royalty obligation so long as Charter continues to provide cable service in the three cities—which was exactly the parties' expectation decades ago.

The Contracts Clause claim fails the second step as well, because the State had a significant and legitimate public purpose behind including the Savings Clause in the Texas Cable Act. If there were no Savings Clause, and the Texas Cable Act washed out all existing private contracts relating to city-permitted cable services when it changed the regulatory landscape, that would have violated the Texas Constitution's prohibition against impairment of contracts. *See* Tex. Const. art. I, §16 ("No…law impairing the obligation of contracts, shall be made.").

20

Because Prewitt has identified a legitimate public purpose for the Savings Clause, and the contract that was allegedly impaired—the 1964 Agreement—is between private parties, the Court need not consider whether any impairment by operation of the Savings Clause is reasonable and necessary. *Lipscomb*, 269 F.3d at 505.

The Savings Clause does not substantially impair the 1964 Agreement, and in any event, there was a legitimate public purpose for preserving existing private contracts as part of the regulatory reform. There is thus no Contracts Clause violation, and the Court should overrule Charter's Claim 5.

E.     The 1964 Agreement is not an indefinite contract subject to termination under Texas law (Claim 2).

Charter argues that, by preserving its 3% royalty obligation under the 1964 Agreement, the Savings Clause converts the 1964 Agreement into a contract with an indefinite term of duration, which makes it terminable at will under Texas law. Dkt.194 p.24. The Court should overrule Claim 2.

1.     The 1964 Agreement is not of unlimited duration.

Charter's 3% royalty obligation under the 1964 Agreement is tied to its continued operation of cable systems in the three cities. The plain terms of the 1964 Agreement discussing the effect of renewals, extensions, holding over, and new permits makes plain that the 3% royalty obligation is not narrowly tethered to a particular city permit. Instead, the 3% royalty obligation under the 1964 Agreement was always tied to one thing: Charter's continued operation of cable systems in the cities. That remains true today. Charter can terminate its SICFAs and cease providing cable service within the three cities

4905-2347-3826

by simply giving the PUC notice; that will terminate the 3% royalty obligation. Tex. Util. Code §66.003(e). Both before adoption of the Texas Cable Act and after, Charter could end its 3% royalty obligation at any time by ceasing to provide cable service in the three cities. The 3% royalty obligation is thus not indefinite in nature because it is tied to continued cable service in the three cities, and Charter can terminate it at any time.

In this regard, Charter's surrender of its SICFAs and termination of cable operations in the cities would operate as a condition subsequent to the 1964 Agreement. A condition subsequent "excuses an already binding agreement." *Cmty Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 683 (Tex. 2017). It is "a condition referring to a future event, upon the happening of which the obligation becomes no longer binding upon the other party, if he chooses to avail himself of the condition." *Id*. at 682. Thus, the 1964 Agreement, even after the operation of the Savings Clause, does not have an indefinite duration because Charter can terminate the 3% royalty obligation by surrendering its SICFAs and ceasing operations in the three cities.

2.     <u>A reasonable term should be applied.</u>

If the 1964 Agreement does not already contain a definite term of duration (and it does), the Court should imply one based on the continued operation of the relevant cable systems. The Texas Supreme Court long ago held that a term of reasonable duration may be implied in contracts where no such term is stated. *Hall v. Hall*, 308 S.W.2d 12, 16 (Tex. 1957). Since that time, Texas courts routinely imply reasonable terms into agreements that have no stated duration. *See Marshall v. Marshall*, 735 S.W.2d 587, 592 (Tex. App.— Dallas 1987, writ ref'd n.r.e.) (when a contract is limited by the happening of an event or

22

contingency, the event or contingency determines the duration); *Metromarketing Services, Inc. v. HTT Headwear, Ltd.*, 15 S.W.3d 190, 195-96 (Tex. App.— Houston [14th Dist.] 2000, no pet.) (stating that when the parties do not fix the time of performance, courts imply a reasonable time for performance); *Gulf Oil Corp. v. Reid*, 161 Tex. 51, 337 S.W.2d 267, 275 (1960) ("Where no time is fixed for performance of any phase of a contract, the law necessarily will imply that it is to be performed within a reasonable time. That which is implied in a written contract is as much a part of it as though it were expressed therein.").

When a contract is limited by a recognized contingency or event, it is reasonable for a court to imply a term for the contract based on that contingency or event. A case from this division explained the rule. *Ins. Distributors Intern. (Bermuda) LTD. v. Edgewater Consulting Group LTD.*, No. A-08-CA-767 AWA, 2010 WL 3522312, at *3 (W.D. Tex. Sept. 8, 2010). In that case, an attorney entered into a written contract with an insurance brokerage whereby the insurance brokerage would pay the attorney 50% of commissions it received on policies written for clients that were referred by the attorney. In exchange, the attorney agreed to provide consulting services to the brokerage. *Id.* At some point the two sides got crossways, and one party attempted to invalidate the contract by arguing that the contract was indefinite in duration and therefore terminable at will. The contract contained the following language regarding termination: "6.1 Termination of Agreement. This Agreement may be terminated only upon the prior written consent of both parties." *Id.* at *12.

The *Edgewater* Court held that, "the statement that the contract can only be terminated when all parties agree means that the contract can last indefinitely, at the

23

election of either party." *Id*. The Court discussed the development of Texas case law regarding contracts of indefinite duration, explaining that a court should "imply a term for a contract that does not contain one," and "when a contract is limited by a recognized contingency or an event of limited duration, then it is reasonable for a court to look to that contingency or event to imply a term for the contract." *Id*. at *13. The commissions on the policies continued for the life of the policies, and the obligation to pay 50% of the income was based on the payment of those commissions, so "the parties clearly anticipated that this contract would last as long as the policies around which it revolved lasted, and thus the Court should imply a term into the contract, as this is an ascertainable contingency that would allow the court to make such an implication." *Id*. at *14. The Court therefore implied a term into the contract that, "[s]o long as there are policies paying commissions…the parties expected the [contract] to remain in force." *Id*. The Court rejected the contention that "the contract is terminable at will or has been terminated." *Id*.

Here, Charter's 3% royalty obligation is likewise limited by a recognized contingency: Charter's operation of cable systems in the three cities. The royalty obligation is based on Charter's revenue from those operations, and the 1964 Agreement reflects that the parties anticipated this contractual obligation would last as long as Charter continued to receive revenue from operating those cable systems. This Court should therefore look to that contingency to imply a term for the 1964 Agreement. Even if the Court determines that the 3% royalty obligation is indefinite in term, it should imply a reasonable term for so long as Charter continues to operate cable systems in the three cities.

24

4905-2347-3826

3.    Prewitt has fully performed.

Charter cannot repudiate its contractual obligations under the 1964 Agreement because Prewitt fully performed under that agreement. Where one party to a contract has fully performed its obligations in exchange for an agreement to make a continued payment, the contract is not indefinite or terminable at will. *Mobil Expl. & Producing U.S., Inc. v. Dover Energy Expl., L.L.C.*, 56 S.W.3d 772, 778 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ("[B]ecause the defendant had received full performance from the plaintiffs and had accepted the benefits of its agreement, it could not turn around and repudiate its obligation."). A "contract in which one party has performed all its obligations need not have a termination date." *Id.* (citing *Kennedy v. McMullen*, 39 S.W.2d 168 (Tex. Civ. App.—Beaumont 1931, writ ref'd)). Where one party has performed its obligations under a contract, the other party's "acceptance of the benefits under the contract" renders indefinite-term contract principles irrelevant. *Big Spring v. Bd. of Control*, 404 S.W.2d 810, 816-17 (Tex. 1966); *see also Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 240 (Tex. 2016) ("The law favors finding agreements sufficiently definite for enforcement, 'particularly…where one of the parties has performed his part of the contract.'"). This equitable rule ensures that "a party who terminates or repudiates a contract cannot continue to reap the benefits of the subject matter of the contract, to the prejudice of the other party." *Mobil*, 56 S.W.3d at 778.

*Kennedy* perfectly illustrates this principle under facts remarkably similar to this case. In *Kennedy*, McMullen obtained a certificate from the Texas Railroad Commission to operate a bus line between two Texas cities. 39 S.W.2d at 169. Kennedy entered into an

25

agreement with McMullen to acquire McMullen's route; McMullen gave up the route and transferred the certificate to Kennedy. *Id*. at 169-71. In exchange, Kennedy agreed to pay McMullen a percentage of gross revenues obtained from operations on that route. *Id*. at 169-70. Kennedy subsequently sought to avoid the agreement, arguing that it was terminable at will because it gave McMullen "a perpetual royalty with no restriction as to time." *Id*. at 171. The court of appeals acknowledged the general rule that a contract that is indefinite as to the time of performance may be terminated by either party, but went on to find that general rule was not controlling because McMullen had fully performed under the contract by assigning his route to Kennedy in exchange for a royalty payment on ongoing operations. *Id*. at 174. If Kennedy no longer wished to pay McMullen the agreed percentage of revenues from continuing operations, he could discontinue operating the bus route. *Id*. Thus, where one party has fully performed its obligations under a contract by transferring a government-issued certificate/permit/franchise authorizing operations to another party in exchange for a royalty payment based on gross revenues from those operations, the contract does not fail or become terminable based on an alleged indefinite duration because the purchaser can terminate the royalty obligation by discontinuing operations at any time.

Courts in other jurisdictions similarly apply this equitable and common-sense exception to the general rule that contracts of indefinite duration are terminable at will. If one party has fully performed, the other may not wash out its own corresponding obligation based on the absence of a stated duration. *See, e.g.*, *Linn v. Employers Reins. Corp.*, 153 A.2d 483, 485-86 (Pa. 1959) ("Defendant has thus received full performance from plaintiffs and cannot now be permitted to accept the benefits of its agreement while at the

26

same time repudiate the obligations it assumed and has recognized for twenty-seven years. So long as the fruits of this agreement are enjoyed, the consideration agreed upon must be paid in accordance with the contract under which it was given."); *Flowers v. Connect America.com, LLC*, No. CIV.A. 12-4787, 2014 WL 4762643, at *9 (E.D. Pa. Sept. 24, 2014) (holding that "a party's right to an earned commission is not forfeited upon the termination of the contract that entitled the party to the commission, unless the contract provides otherwise or further work is required by the party to secure the commission"); *Yale Sec., Inc. v. Freedman Sales, Ltd*., 165 F.3d 34 (table), 1998 WL 690944, at *4 (7th Cir. 1998) (declining to declare contract terminable at will where one party had fully performed: "That would mean that Yale could have piggybacked on Freedman's efforts in lining up the Grainger contract and, once that deal was inked, it could have escaped its obligation to pay by immediately invoking at-will termination.").

Here, Mr. Prewitt fully performed under the 1964 Agreement by assigning to Charter's predecessor the valuable city permits along with the right to build, maintain, and operate cable systems in the three cities. Because Charter thereby "received full performance from" Mr. Prewitt and "accepted the benefits of its agreement" by operating cable systems in the three cities, it cannot now "turn around and repudiate its obligation" to pay the 3% royalty. *See Mobil*, 56 S.W.3d at 778. Thus, even if there is no definite term of duration stated in the 1964 Agreement, Mr. Prewitt's full performance ensures that Charter's corresponding 3% royalty obligation is not terminable at will.

The Court should overrule Charter's Claim 2.

4905-2347-3826

F.    <u>Next steps</u>

For these reasons, the Court should overrule Charter's remaining claims. Upon that resolution, the Court should render judgment in Prewitt's favor enforcing the 3% royalty "on all of Charter's revenues, including from cable and non-cable service." ECF-194 p.13. The judgment should include a declaration enforcing Charter's obligation to pay the 3% royalty on a going-forward basis, and also an award of past unpaid royalties that have accrued since October 2016, when Charter made its last quarterly royalty payment. Prewitt anticipates that the parties will stipulate to the amount of such past royalties and accrued interest. Prewitt is also entitled to an award of its reasonable and necessary attorney's fees incurred in enforcing the contractual 3% royalty obligation against Charter. Dkt.83 p.29. Rendition of a final judgment will thus entail further submissions by the parties.

WHEREFORE, Prewitt respectfully prays that the Court overrule Charter's remaining issues and allow this case to proceed to a final judgment enforcing the 1964 Agreement's 3% royalty obligation.

28

4905-2347-3826

Respectfully submitted,

SCOTT DOUGLASS & McCONNICO LLP
303 Colorado Street, Suite 2400
Austin, Texas 78701
(512) 495-6300 Telephone
(512) 495-6399 Fax


By: _____
Jane Webre
Texas State Bar No. 21050060
jwebre@scottdoug.com
Lauren Ditty
Texas State Bar No. 24116290
lditty@scottdoug.com

Roy L. Barrett
State Bar No. 01814000
NAMAN HOWELL SMITH & LEE, PLLC
400 Austin Avenue, Suite 800
P.O. Box 1470
Waco, Texas 76703-1470
(254) 755-4129
(254) 754-6331 (Fax)

ATTORNEYS FOR DEFENDANTS


CERTIFICATE OF SERVICE

I certify that on May 4, 2026, I electronically filed the foregoing document with the clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

_____
Jane Webre

29

4905-2347-3826